1  QUALLS & WORKMAN, L.L.P.
   Daniel H. Qualls (Bar # 109036)
2  Robin G. Workman (Bar # 145810)
   244 California Street, Suite 410
3  San Francisco, CA 94111
   Telephone: (415) 782-3660
4
   Attorney for Plaintiff Johnny McFarland,
5  and all others similarly situated.

6

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHNNY MCFARLAND, on behalf of himself )   CASE NO.  CV 07-03953 PJH
    and all others similarly situated,         )
12                                             )   APPENDIX OF DECISIONS IN SUPPORT OF
                                               )   PLAINTIFF'S MOTION FOR PARTIAL
13               Plaintiff,                     )   SUMMARY JUDGMENT
                                               )
14      vs.                                     )
                                               )   Date:  2/13/08
15  GUARDSMARK, LLC, and Does 1 through 50, )   Time:  9:00 a.m.
    inclusive,                                 )   Ctrm:  3, 17th Floor
16                                             )   Judge: Hon. Phyllis J. Hamilton
                 Defendants.                    )
17  _____

18      Plaintiff submits the following authorities and decisions in support of his Motion for

19  Summary Judgment for the Court's reference:

20      A.   Brookler v. RadioShack Corp., No. BC313383 (Los Angeles County
             Superior Court, filed Feb. 8, 2006)
21
        B.   Gonzalez v. Nestle Waters North America Holdings, No. BC321485 (Los
22           Angeles County Superior Court, filed Feb. 8, 2006)

23      C.   Miguel, et al. v. Inland Paperboard And Packaging, Inc., 2007 U.S. App.
             LEXIS 1515 (9th Cir. Oct. 20, 2006)
24
        D.   Perez v. Safety-Kleen Systems, Inc.., 2007 U.S. Dist. LEXIS 48308 (N.D.
25           Cal. Jun. 27, 2007)

26      E.   Savaglio v. Wal-Mart Stores, Inc., no. C-835687 (Alameda County
             Superior Court, filed Nov. 6, 2003)
27

28

1    F.    <u>Smith v. Hearst Communications, Inc.</u>, 2006 U.S. Dist. LEXIS 22546 (N.D.
2        Cal. April 13, 2006)

    G.    <u>Stevens v. GCS Service, Inc.</u>, No. 04-1337CJC (C.D. Cal., filed Apr. 6,
3        2006)

4    H.    <u>Tormey v. The Vons Cos., et al</u>, 2007 U.S. Dist. LEXIS 66010 (S.D. Cal.
       Sept. 5, 2007)
5

6    I.    <u>Torres v. ABC Security Service, Inc.</u>, No. RG04-158744 (Alameda County
       Superior Court, filed Dec. 12, 2006)

7

8 Date: January 9, 2008             QUALLS & WORKMAN, L.L.P.

9

10             By:      <u>/S/ Robin G. Workman</u>
11                      Attorneys for Plaintiff Johnny McFarland,
                     and all others similarly situated.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

I, the undersigned, hereby declare:

I am a member of the bar of this court. I am over the age of eighteen years and not a party to the within action. My business address is Qualls & Workman, L.L.P., 244 California Street, Suite 410, San Francisco, California.

October 25, 2007, I served a true and correct copy of the **APPENDIX OF DECISIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** electronically. I caused said documents to be transmitted using ECF as specified by General Order No. 45 to the following parties:

Martin D. Bern
Munger Tolles & Olson LLP
560 Mission Street
Twentyseventh Floor
San Francisco, CA 94105-2907
bernmd@mto.com

Malcolm A. Heinicke
Munger Tolles & Olson LLP
560 Mission Street
27th Floor
San Francisco, CA 94105-2907
heinickema@mto.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on January 9, 2008, at San Francisco, California.

/S/ Robin G. Workman

# EXHIBIT A

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS    JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM<br>10 | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A.    Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC313383 | Plaintiff<br>Counsel | |
|---|---|---|---|
| | MORRY BROOKLER<br>VS<br>RADIOSHACK CORPORATION | Defendant<br>Counsel | |

**NATURE OF PROCEEDINGS:**

MOTION BY PLAINTIFF FOR CLASS CERTIFICATION (TAKEN
UNDER SUBMISSION ON 1-31-2006);

After further consideration of the pleadings, the
evidence, the relevant authority and the oral
argument of counsel, the court rules as follows on
Plaintiff's Motion for Class Certification:

---

■ THE FACTS

This is a purported class action filed  Morry
Brookler ("Plaintiff")  filed an action against his
former employer, RadioShack Corporation
("Defendant") alleging that Defendant denied him and
others similarly situated employees their requisite
meal and break rests in violation of the
California Labor Code.

The two proposed Classes that Plaintiff is seeking
certification of are defined as follows:

Class I: All non-exempt employees in Radio Shack
stores in California from April 7, 2000, through the
present who were not allowed to take a 10 minute
rest period during every 4 continuous hours of
employment.

Class II: All non-exempt employees at Radio Shack
stores in California from April 7, 2000, through the

Page    1 of    9    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| ATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS         JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE                    JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| 10 A         A. AYALA, C.A.    Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC313383 | Plaintiff |
|---|---|---|
| | | Counsel |
| | MORRY BROOKLER | |
| | VS | Defendant |
| | RADIOSHACK CORPORATION | Counsel |

**NATURE OF PROCEEDINGS:**

present who were not provided uninterrupted 30
minute meal break following every 5 continuous
hours of work.

---

■ ANALYSIS

Class certification is appropriate when "the
question is one of a common or general interest, of
many persons, or when parties are numerous and it
is impracticable to bring them all before the
court." Code of Civil Procedure § 382. " To obtain
certification, a party must establish the existence
of both an ascertainable class and a well-defined
community of interest among class members.
[Citation] The community of interest requirement
involves three factors: '[1] predominant questions
of law or fact; [2] class representatives with
claims or defenses typical of the class; and [3]
class representatives who can adequately represent
the class. The party seeking certification has the
burden of establishing the prerequisites for a
class action." Sav-On Drug Stores, Inc. v.
Superior Court (2004) 34 Cal.4th 319, 326, citing
Lockheed Martin Corporation v. Superior Court
(2003) 29 Cal.4th 1096, 1104.

For the reasons that follow, after considering all
of the relevant factors, the court finds that the
Plaintiffs have not met that burden with regard to
Class I, but Plaintiffs have met this burden for

Page    2 of    9    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 10B | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A. | Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC313383 | Plaintiff Counsel |
|---|---|---|
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Defendant Counsel |

**NATURE OF PROCEEDINGS:**

Class II.
----------------------------------------------------------
Ascertainability:

Ascertainability is required in order to give
notice to putative class members who may be
affected by the judgment. It is defined in terms
of "objective characteristics and common
transactional facts making the ultimate
identification of class members possible. <u>Hicks v.
Kaufman & Broad Home Corp.</u> (2001) 89 Cal. App. 4th
908, 915. Whether a class is ascertainable is
determined by examining (1) the class definition,
(2) the size of the class, and (3) the means
available for identifying class members. <u>Reyes v.
Board of Supervisors of San Diego County</u> (1987) 196
Cal.App.3d 1263, 1271.

Plaintiff defined two classes of employees that he
believed qualified for damages under the instant
facts. The definitions, in summary, stated that
class members were non-exempt employees of radio
shack during a specific time period that were
denied either a meal period or a rest break. It can
be inferred that Defendant is opposing this element
because the definitions include ultimate facts,
namely, people who were denied  According to the
California Appellate Court, "A class is still
ascertainable even if the definition pleads
ultimate facts or conclusions of law, <u>i.e.</u>,
homeowners whose homes contain Fibermesh

Page    3 of    9    DEPT. 69

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 10C JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A. Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC313383 | | |
|---|---|---|---|
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Plaintiff Counsel | |
| | | Defendant Counsel | |

**NATURE OF PROCEEDINGS:**

Foundations "with manifested damage or defect due to the Fibermesh substitution " <u>Hicks v. Kaufman and Broad Home Corp.</u> (2001) 89 Cal.App.4th 908, 915.

As such, the definition is valid and the putative class may be ascertained from Defendant's personnel records.
-------------------------------------------------------
Common questions of law or fact:

In order to determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged. <u>Hicks v. Kaufman & Broad Home Corp.</u> (2001) 89 Cal.App.4th 908, 916.The Court must consider whether the theory of recovery advanced by the proponents of certification, is, as an analytical matter, likely to prove amenable to class treatment. <u>Sav-On Drug Stores, Inc. v. Superior Court</u> (2004) 34 Cal.4th 319, 327.

Pursuant to the California Appellate Court's holding in <u>Albert H. Cicairos et al. v. Summit Logistics, Inc.</u> (2005) 133 Cal.App.4th 949, 963, "Under the facts presented in support of summary judgment, the defendant's obligation to provide the plaintiffs with an adequate meal period is not satisfied by assuming that the meal periods were taken, because employers have an affirmative obligation to ensure that workers are actually

| MINUTES ENTERED |
|---|
| 02/08/06 |
| COUNTY CLERK |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| ATE: 02/08/06 | | DEPT. 69 |
| HONORABLE EDWARD A. FERNS    JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM<br>10 D | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A.    Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| 8:30 am | BC313383 | Plaintiff<br>Counsel |
| | MORRY BROOKLER<br>VS<br>RADIOSHACK CORPORATION | Defendant<br>Counsel |

**NATURE OF PROCEEDINGS:**

relieved of all duty." Thus, pursuant to current law, the lack of evidence that meal breaks were given to the putative class members corroborates Plaintiff's theory that common proof, namely Defendant's records, can be used to prove liability. This conclusion was not refuted by Defendant's contention that meal breaks were offered per employee manuals since offering meal breaks in an employee manuals doe s not satisfy the burden of ensuring that employees receive a meal break. On the other hand, it is difficult to track any wrongdoing on the part of the Defendant with regard to rest breaks since the written employee manual requires rest breaks and employers are not mandated to keep written records of an employee's rest break.

-----------------------------------------------

Class representatives with claims or defenses Typical of the Class:

The class representative's claim are typical of class claims if the individual facts applicable to the class representative are very similar, but not necessarily identical, to the facts which are common to the class. <u>Classen v. Weller</u> (1983) 145 Cal.App.3d 27, 46.

Plaintiff's evidence establishes similar claims between both Plaintiff and the putative class.

-----------------------------------------------

Class representatives are Adequate to represent the

Page    5 of    9    DEPT. 69

| |
|---|
| **MINUTES ENTERED**<br>02/08/06<br>**COUNTY CLERK** |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS    JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| 10 E | | |
| A. AYALA, C.A.    Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC313383 | Plaintiff Counsel | |
|---|---|---|---|
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Defendant Counsel | |

**NATURE OF PROCEEDINGS:**

Class:

To maintain a class action, the representative plaintiff must adequately represent and protect the interests of other members of the class.  Simons v. Horowitz (1984) 151 Cal.App.3d 834, 846.

There are two criteria that a Class Representative has to meet in order to be deemed adequate: (1) that they are zealous fiduciaries; and (2) that there are no existing antagonisms or conflicts with the class members.  City of San Jose v. Superior Court (Lands Unlimited) 1974 12 Cal.3d 447, 464.

The court finds that Plaintiff is a zealous fiduciary that has pursued all of the viable claims on behalf of other similarly situated employees of Radio Shack. There is no evidence of Plaintiff having any interests that are antagonistic to the putative class members'.
-----------------------------------------------------
Superiority:

The superiority criterion is manifest in the determination that a class action brought under CCP §382 would produce substantial benefits to the litigants and the judicial system.  Schneider v. Vennard (1986) 183 Cal.App.3d 1340, 1347.

The court has considered both the benefits that a class action would yield, as well as the potential

Page   6 of   9   DEPT. 69

| MINUTES ENTERED |
|---|
| 02/08/06 |
| COUNTY CLERK |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | DEPT. 69 |
|---|---|---|
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER DEPUTY CLERK |
| HONORABLE 10 F | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A. | Deputy Sheriff | NONE Reporter |

| | | |
|---|---|---|
| 8:30 am | BC313383 | Plaintiff Counsel |
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Defendant Counsel |

**NATURE OF PROCEEDINGS:**

unfairness to the Defendant, which might result
from a litigation of the underlying claims through
aggregate procedures rather than through separate
trials. As discussed above, the court finds that
the Plaintiff did not meet his burden of proof with
regard to Class I. Nonetheless, with regard to
Class II, Plaintiff has established that he may use
common evidence to prove facts and resolve legal
issues which apply to every Class Member's claim
since common issues would be the principal issues
in any individual action.
-----------------------------------------------------------
Judicial Notice:

The Court grants Defendant's request for judicial
notice of the administrative materials contained in
Exhibits A-B. The Court denies judicial notice  of
the Memorandum dated December 20, 2004, and the
June 16, 2005, Minute Order attached as Exhibits
C and D.

OTHER ORDERS

A case management conference is set for hearing on
4-5-2006 at 8:30 a.m. in Department 69.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not

Page    7 of    9    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 02/08/06 | | **DEPT.** 69 |
| HONORABLE EDWARD A. FERNS      JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 10 G      JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A.      Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| 8:30 am | BC313383 | Plaintiff Counsel |
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Defendant Counsel |

**NATURE OF PROCEEDINGS:**

a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
2-8-2006 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

Date: 2-8-2006

John A. Clarke, Executive Officer/Clerk

By: _____*L. Markmiller*_____
            L. MARKMILLER

Scott A. Brooks
DANIELS, FINE ISRAEL & SCHONBUCH, LLP
1801 Century Park East, 9th Floor
Los Angeles, CA 90067

Stephen Glick
LAW OFFICES OF STEPHEN GLICK
3580 Wilshire Blvd., Suite 1260
Los Angeles, CA 90010

Page    8 of    9    DEPT. 69

| |
|---|
| **MINUTES ENTERED** 02/08/06 **COUNTY CLERK** |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/08/06                                                          **DEPT. 69**

HONORABLE EDWARD A. FERNS          JUDGE | L. MARKMILLER          DEPUTY CLERK

HONORABLE                         JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR
10 H

A. AYALA, C.A.          Deputy Sheriff | NONE                      Reporter

| | | |
|---|---|---|
| 8:30 am | BC313383 | Plaintiff Counsel |
| | MORRY BROOKLER VS RADIOSHACK CORPORATION | Defendant Counsel |

**NATURE OF PROCEEDINGS:**

Ian Herzog
LAW OFFICES OF IAN HERZOG
233 Wilshire Blvd., Suite 550
Santa Monica, CA 90405


Robert S. Brewer, Jr.
Randy S. Grossman
McKENNA LONG & ALDRIDGE LLP
750 B Street, Suite 3300
San Diego, CA 92101

Page    9 of    9    DEPT. 69

**MINUTES ENTERED**
**02/08/06**
**COUNTY CLERK**

# EXHIBIT B

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 02/08/06 | | DEPT. 69 |
| HONORABLE EDWARD A. FERNS      JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE                JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| 9 | | |
| A. AYALA, C.A      Deputy Sheriff | NONE | Reporter |

| | | | |
|---|---|---|---|
| 8:30 am | BC321485 | Plaintiff<br>Counsel | |
| | JESUS GONZALEZ<br>VS<br>NESTLE WATERS NORTH AMERICA<br>HOLDINGS | Defendant<br>Counsel | |

**NATURE OF PROCEEDINGS:**

MOTION OF PLAINTIFFS JESUS GONZALEZ AND ROBERT
STAFFORD FOR CLASS CERTIFICATION (TAKEN UNDER
SUBMISSION ON 12-16-2005);

After further consideration of the pleadings, the
evidence, the relevant authority and the oral
argument of counsel, the court rules as follows on
Plaintiff's Motion for Class Certification:

---

■ THE FACTS

This is a purported class action filed by Jesus
Gonzalez and Robert Stafford ("Plaintiffs") against
their employer, Nestle Waters North America
Holdings, Inc. dba Arrowhead Mountain Spring Water
("Defendant") alleging that Defendant's compensation
plan resulted in missed meal periods and rest
periods and a variety of unpaid wages for the
persons employed as Route Sales Representatives
("RSR").

The four proposed Classes in the instant action are
defined as:

Class I (Overtime Class): All California based
hourly RSR employees who worked overtime for
defendant from September 14, 2000 through to the
present and received any revenue share component in
his/her compensation.

Page    1 of  10    DEPT. 69

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | | DEPT. 69 |
|---|---|---|---|
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 9 A | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A | Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC321485 | Plaintiff Counsel | |
|---|---|---|---|
| | JESUS GONZALEZ VS NESTLE WATERS NORTH AMERICA HOLDINGS | Defendant Counsel | |

**NATURE OF PROCEEDINGS:**

Class II (Rest Period Class): All California based
hourly non-exempt RSRs who were or are employed by
defendants from September 14, 2000 to present who
were subject to defendant's rest period policy.

Class III (Meal Period Class): All California based
hourly non-exempt RSRs who were or are employed by
defendants from September 14, 2000 to the present
who were subject to defendant's meal period policy.

Class IV (Waiting Time Penalty Class): All
California based hourly non-exempt RSRs employed in
in California any time from September 14, 2000 to
the present who left employment with the defendant
and did not receive all wages due as a result of
revenue sharing, meal and break violations on
termination.

---

■ ANALYSIS

Class certification is appropriate when "the
question is one of a common or general interest, of
many persons, or when parties are numerous and it
is impracticable to bring them all before the
court." Code of Civil Procedure § 382. "To obtain
certification, a party must establish the existence
of both an ascertainable class and a well-defined
community of interest among class members.
[Citation] The community of interest requirement

MINUTES ENTERED
02/08/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 02/08/06 | | DEPT. 69 |
| HONORABLE EDWARD A. FERNS    JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 9B    JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A    Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| 8:30 am | BC321485 | Plaintiff Counsel |
| | JESUS GONZALEZ VS NESTLE WATERS NORTH AMERICA HOLDINGS | Defendant Counsel |

**NATURE OF PROCEEDINGS:**

involves three factors: '[1] predominant questions of law or fact; [2] class representatives with claims or defenses typical of the class; and [3] class representatives who can adequately represent the class. The party seeking certification has the burden of establishing the prerequisites for a class action." Sav-On Drug Stores, Inc. v. Superior Court (2004) 34 Cal.4th 319, 326, citing Lockheed Martin Corporation v. Superior Court (2003) 29 Cal.4th 1096, 1104.

For the reasons that follow, after considering all of the relevant factors, the court finds that the Plaintiffs have not met that burden with regard to Class I, but Plaintiffs have met this burden for Classes II-IV.
-----------------------------------------------------
Ascertainability:

Ascertainability is required in order to give notice to putative class members who may be affected by the judgment.  It is defined in terms of "objective characteristics and common transactional facts making the ultimate identification of class members possible.  Hicks v. Kaufman & Broad Home Corp. (2001) 89 Cal. App. 4th 908, 915.  Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members. Reyes v. Board of Supervisors of San Diego County (1987) 196

Page  3 of  10    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 02/08/06 | DEPT. 69 |
| HONORABLE EDWARD A. FERNS     JUDGE | L. MARKMILLER     DEPUTY CLERK |
| HONORABLE 9C     JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A     Deputy Sheriff | NONE     Reporter |

| | | |
|---|---|---|
| 8:30 am | BC321485<br><br>JESUS GONZALEZ<br>VS<br>NESTLE WATERS NORTH AMERICA<br>HOLDINGS | Plaintiff<br>Counsel<br><br>Defendant<br>Counsel |

**NATURE OF PROCEEDINGS:**

Cal.App.3d 1263, 1271.

In a wage and hour action the class is typically
ascertainable as the employer is forced to maintain
an employee's personnel file for a specific period
of time. Both parties agree that the class member's
number more than 1000 thus numerosity is met and
joinder is impracticable.
--------------------------------------------------------
Common questions of law or fact:

In order to determine whether common questions of
fact predominate the trial court must examine the
issues framed by the pleadings and the law
applicable to the causes of action alleged. Hicks
v. Kaufman & Broad Home Corp. (2001) 89 Cal. App.
4th 908, 916.The Court must consider whether the
theory of recovery advanced by the proponents of
certification, is, as an analytical matter, likely
to prove amenable to class treatment. Sav-On Drug
Stores, Inc. v. Superior Court (2004) 34 Cal.4th
319, 327.

The court finds the following issues common to the
class as a whole and sufficient in importance so
that their adjudication on a class basis will
benefit both the litigants and the court (Vasquez
v. The Superior Court of San Joaquin County (Karp)
(1971) 4 Cal. 3d 800, 811) (1) Whether the policy
to deduct 30 minutes off of every employee's wages
for lunch is valid;  and (2) Whether the employees

Page  4 of  10    DEPT. 69

**MINUTES ENTERED**
02/08/06
**COUNTY CLERK**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/08/06

DEPT. 69

HONORABLE EDWARD A. FERNS    JUDGE    L. MARKMILLER    DEPUTY CLERK

HONORABLE
9 D    JUDGE PRO TEM    ELECTRONIC RECORDING MONITOR

A. AYALA, C.A    Deputy Sheriff    NONE    Reporter

8:30 am | BC321485

JESUS GONZALEZ
VS
NESTLE WATERS NORTH AMERICA
HOLDINGS

Plaintiff
Counsel

Defendant
Counsel

NATURE OF PROCEEDINGS:

are due wages for failure to compensate for the
missing meal/rest periods. Both parties proffered
deposition testimony wherein the deponent discussed
the existence of the thirty minute deductions from
the wages of employees for meal periods  without
any regard for whether or not the employee actually
received his/her break.

The Plaintiffs did not provide the Court with
sufficient evidence to support their theory that
common evidence could be utilized to determine
liability for Defendant's revenue sharing/overtime
policy. As a result, the court finds that the
inquiry into whether each Plaintiff was entitled to
overtime does not prove to be amenable to class
treatment. Sav-On Drug Stores, Inc. supra 34
Cal.4th at page 327.
--------------------------------------------------------
Class representatives with claims or defenses
Typical of the Class:

The class representative's claim are typical of
class claims if the individual facts applicable to
the class representative are very similar, but not
necessarily identical, to the facts which are
common to the class.  Classen v. Weller (1983) 145
Cal. App. 3d 27, 46.

Nestle argues that Plaintiffs were RSRs but they
were not assigned to a typical route, thus, they
had ample time to take breaks or to choose to

Page    5 of    10    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 02/08/06 | **DEPT. 69** |
| HONORABLE EDWARD A. FERNS          JUDGE | L. MARKMILLER          DEPUTY CLERK |
| HONORABLE                    JUDGE PRO TEM<br>9E | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A          Deputy Sheriff | NONE          Reporter |

| | | |
|---|---|---|
| 8:30 am | BC321485<br><br>JESUS GONZALEZ<br>VS<br>NESTLE WATERS NORTH AMERICA<br>HOLDINGS | Plaintiff<br>Counsel<br><br>Defendant<br>Counsel |

**NATURE OF PROCEEDINGS:**

forego their break. Plaintiffs argue that that they
are typical because the same alleged unlawful
conduct was directed at all of the RSRs employed by
Nestle.  The California appellate court has decided
that employers have an affirmative obligation to
ensure that workers are actually relieved of all
duty. They also have a duty, under Cal. Code Regs.,
tit. 8, § 11090, known as Wage Order No. 9, to
record their employees' meal periods. Albert H.
Cicairos et al. v. Summit Logistics, Inc. (2005)
133 Cal. App. 4th 949, 963. Since Plaintiffs' route
is not a factor in violation of the Labor Code
and/or IWC Order No.9 Plaintiffs' claims are
similar to the claims of the putative class
members.
--------------------------------------------------------
Class representatives are Adequate to represent the
Class:

To maintain a class action, the representative pl
aintiff must adequately represent and protect the
interests of other members of the class.  Simons v.
Horowitz (1984) 151 Cal. App. 3d 834, 846.

There are two criteria that a Class Representative
has to meet in order to be deemed adequate: (1)
that they are zealous fiduciaries; and (2) that
there are no existing antagonisms or conflicts with
the class members.  City of San Jose v. Superior
Court (Lands Unlimited) 1974 12 Cal.3d 447, 464.

Page    6 of    10    DEPT. 69

**MINUTES ENTERED**
**02/08/06**
**COUNTY CLERK**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 02/08/06 | | DEPT. 69 |
| HONORABLE EDWARD A. FERNS    JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 9 F    JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A    Deputy Sheriff | NONE | Reporter |

8:30 am | BC321485

JESUS GONZALEZ
VS
NESTLE WATERS NORTH AMERICA
HOLDINGS

Plaintiff
Counsel

Defendant
Counsel

---

**NATURE OF PROCEEDINGS:**

The court finds that Plaintiffs could vigorously
represent the absent class member as Plaintiffs
pursued all of the viable claims on behalf of other
employees that were similarly situated and
Plaintiffs do not have any interests that are
antagonistic to the putative class members'.
--------------------------------------------------
Superiority:

The superiority criterion is manifest in the
determination that a class action brought under CCP
§382 would produce substantial benefits to the
litigants and the judicial system.  Schneider v.
Vennard (1986) 183 Cal. App. 3d 1340, 1347.

Plaintiffs' cite the Court's ruling in Cicairos
supra (2005)133 Cal. App. 4th 949, to support their
position that class adjudication is superior based
upon the instant facts. Since Cicairos held that an
employer has an affirmative obligation to ensure
that workers receive their meal and rest breaks,
Plaintiffs aver that it would be beneficial to the
Court and the litigants to utilize common proof to
find liability for all of Nestle 's employees that
were affected by their actions.

The court has considered both the benefits that a
class action would yield, as well as the potential
unfairness to the Defendant, which might result
from a litigation of the underlying claims through
aggregate procedures rather than through separate

Page    7 of  10    DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 02/08/06 | | | DEPT. 69 |
|---|---|---|---|
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 9 G | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A | Deputy Sheriff | NONE | Reporter |

| 8:30 am | BC321485 | Plaintiff Counsel | |
|---|---|---|---|
| | JESUS GONZALEZ VS NESTLE WATERS NORTH AMERICA HOLDINGS | Defendant Counsel | |

**NATURE OF PROCEEDINGS:**

trials. As discussed above, the court finds that
the Plaintiffs did not meet their burden with
regard to Class I. On the contrary, with regard to
Classes II-IV, Plaintiffs have established that
they can use common proof to prove facts and
resolve legal issues which apply to every Class
Members' claims as common issues would be the
principal issues in any individual action.

--------------------------------------------------------

Judicial Notice:

The Court grants Plaintiffs two requests for
judicial notice pursuant to Evidence Code §§ 452
and 453 with the understanding that Judicial notice
may be taken of: Regulations and legislative
enactments issued by or under the authority of the
United States or any public entity in the United
States; and Official acts of the legislative,
executive, and judicial departments of the United
States and of any state of the United States. In
addition, the court may take judicial notice of the
existence of each document in a court file, but can
only take judicial notice of the truth of facts
asserted in documents such as orders, findings of
fact and conclusions of law, and judgments." Day v.
Sharp (1975) 50 Cal.App.3d 904, 914.

OTHER ORDERS

A case management conference is set for hearing on
4-5-2006 at 8:30 a.m. in Department 69.

Page   8 of  10   DEPT. 69

MINUTES ENTERED
02/08/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 02/08/06 | | | DEPT. 69 |
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER | DEPUTY CLERK |
| HONORABLE 9 H | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A | Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| 8:30 am | BC321485 | Plaintiff Counsel |
| | JESUS GONZALEZ VS NESTLE WATERS NORTH AMERICA HOLDINGS | Defendant Counsel |

---

**NATURE OF PROCEEDINGS:**

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
2-8-2006 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

Date: 2-8-2006

John A. Clarke, Executive Officer/Clerk

By: _____ *L. Markmiller*
            L. MARKMILLER

Joseph Antonelli
Janelle Carney
LAW OFFICE OF JOSEPH ANTONELLI
1000 Lakes Drive, Suite 450
West Covina, CA 91790

Page   9 of   10   DEPT. 69

> **MINUTES ENTERED**
> 02/08/06
> **COUNTY CLERK**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/08/06

DEPT. 69

| | | |
|---|---|---|
| HONORABLE EDWARD A. FERNS | JUDGE | L. MARKMILLER    DEPUTY CLERK |
| HONORABLE 9I | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| A. AYALA, C.A | Deputy Sheriff | NONE    Reporter |

8:30 am  BC321485

JESUS GONZALEZ
VS
NESTLE WATERS NORTH AMERICA
HOLDINGS

Plaintiff Counsel

Defendant Counsel

## NATURE OF PROCEEDINGS:

Kevin T. Barnes
Gregg Lander
LAW OFFICE OF KEVIN T. BARNES
5670 Wilshire Blvd., Suite 1460
Los Angeles, CA 90036

Michael D. Ryan
Patrick J. Grady
Monica M. Quinn
ALLEN MATKINS LECK GAMBLE & MALLORY LLP
515 S. Figueroa St., 7th Floor
Los Angeles, CA 90071

James H. Coil, III
Thomas H. Christopher
Robert K. Haderlein
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309

MINUTES ENTERED
02/08/06
COUNTY CLERK

# EXHIBIT C

LEXSEE 2007 US APP LEXIS 1515

**MARK MIGUEL; JOHN MUNOZ; JESUS REGALDO, Plaintiffs - Appellants, v.
INLAND PAPERBOARD AND PACKAGING, INC., Defendant - Appellee.**

**No. 05-16324**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**2007 U.S. App. LEXIS 1515; 153 Lab. Cas. (CCH) P10,788**

**October 20, 2006, Argued and Submitted, San Francisco, California
January 18, 2007, Filed**

**NOTICE:**    [*1] PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:**    Appeal from the United States District Court for the Northern District of California. D.C. No. CV-04-05324-MJJ. Martin J. Jenkins, District Judge, Presiding.

**COUNSEL:** For MARK MIGUEL, JOHN MUNOZ, JESUS REGALDO, Plaintiff - Appellant: W. David Holsberry, Esq., Michael T. Anderson, Esq., Michael C. Hughes, Esq., DAVIS, COWELL & BOWE LLP, San Francisco, CA.

For INLAND PAPERBOARD AND PACKAGING, INC., Defendant - Appellee: James L. Payne, Esq., Jeffrey K. Brown, Esq., James R. Moss, Jr., PAYNE & FEARS, LLP, Irvine, CA.

**JUDGES:** Before: KLEINFELD and BYBEE, Circuit Judges, and WHALEY ** , US District Judge.

> **    The Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation.

**OPINION**

MEMORANDUM *

> *    This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

[*2]  Before: KLEINFELD and BYBEE, Circuit Judges, and WHALEY**, US District Judge.

Mark Miguel, *et al,* are former employees of Inland Paperboard and Packaging, Inc. and members of the Association of Western Pulp and Paper Workers, Local 249. A collective bargaining agreement between Inland Paperboard and Local 249 governed their terms of employment.

Miguel claims Inland Paperboard violated California Labor Code § 512 and IWC Wage Order 1-2001 by failing to provide a 30-minute off-duty meal period. Under California Labor Code § 512(a), employers must provide a half-hour meal period to certain employees working shifts of five hours or longer. Under IWC Wage Order 1-2001, a § 512 meal period must be off-duty unless "the nature of the work prevents an employee from being relieved of all duty" and "by written agreement between the parties an on-the-job paid meal period is agreed to." [1]

> 1    IWC Wage Order 1-2001 § 11.

Miguel filed an action in California Superior [*3] Court, claiming *inter alia* Inland Paperboard failed to provide off-duty meal periods. Inland Paperboard removed the action to the United States District Court under § 301 of the Labor Management Relations Act, based on the collective bargaining agreement. [2] Miguel moved to remand, arguing his meal period claim was based entirely on California law. Inland Paperboard opposed the motion to remand and filed a motion for summary judgment based on complete preemption under § 301. The district court denied Miguel's motion for remand and granted Inland Paperboard's motion for summary judgment, finding § 301 preempts Miguel's claim because it requires interpretation of the collective bargaining agreement. Miguel appealed the district court's rulings on preemption and jurisdiction.

> 2    29 U.S.C. § 185.

This court reviews *de novo* the district court's finding of § 301 federal preemption. [3] Under the complete preemption exception to the well-pleaded complaint rule, § 301 preempts state [*4] law claims brought to enforce collective bargaining agreements. [4] However, it does not preempt state law claims based on "non-negotiable rights" [5] unless their resolution is "substantially dependent upon analysis of the terms" of a collective bargaining agreement. [6]

[3]    Cramer v. Consol. Freightways, 255 F.3d 683, 689 (9th Cir. 2001) (en banc) (as amended).

[4]    See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 403, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988). See also Balcorta v. Twentieth Century-Fox Film Corp., 208 F.3d 1102, 1107 (9th Cir. 2000).

[5]    Livadas v. Bradshaw, 512 U.S. 107, 123-24, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994).

[6]    Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985).

The district court found § 301 preemption because Miguel's meal period claim "necessarily requires the court to interpret an existing provision of a CBA that can reasonably be said to be relevant to the resolution of the dispute." [7] However, in Valles v. Ivy Hill Corp., this [*5] court subsequently held § 301 does not preempt § 512 meal period claims because the right to a § 512 meal period "is plainly nonnegotiable." [8] Under Valles, Miguel's claim is not preempted and we lack jurisdiction.

[7]    Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 693 (9th Cir. 2001).

[8]    Valles v. Ivy Hill Corp., 410 F.3d 1071, 1082 (9th Cir. 2005).

**REVERSED.**

# EXHIBIT D

LEXSEE 2007 US DIST LEXIS 48308

**RAYMUNDO PEREZ, et al., Plaintiff, v. SAFETY-KLEEN SYSTEMS, INC., Defendant. DAVID STEGALL, Plaintiff, v. SAFETY-KLEEN SYSTEMS, INC., Defendant.**

**No. C 05-5338 PJH, No. C 07-0886 PJH**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 48308**

**June 27, 2007, Decided**
**June 27, 2007, Filed**

**COUNSEL:** [*1] For Reymundo Perez, Jerrel Doane, individually, on behalf of all others similarly situated, and on behalf of the general public, Plaintiffs: Barron Edward Ramos, LEAD ATTORNEY, Kristen Elizabeth Caverly, Henderson & Caverly, Rancho Santa Fe, CA.; Jeremy R. Fietz, LEAD ATTORNEY, Donald S. Edgar, Rex Grady, The Law Office of Donald S. Edgar, Santa Rosa, CA.

For Safety-Kleen Systems, Inc., Safety-Kleen Corp., Defendants (3:05-cv-05338-PJH): Janine Syll Simerly, LEAD ATTORNEY, Cassandra H. Carroll, Robert W. Tollen, Seyfarth Shaw LLP, San Francisco, CA.

For David Stegall, an individual, on behalf of himself, those similarly situated and on behalf of the general public, Plaintiff: Barron Edward Ramos, LEAD ATTORNEY, Rancho Santa Fe, CA.; Donald S. Edgar, Jeremy R. Fietz, LEAD ATTORNEYS, The Edgar Law Firm, Santa Rosa, CA.; Jeremy R. Fietz, LEAD ATTORNEY, The Law Office of Donald S. Edgar, Santa Rosa, CA.; Kristen Elizabeth Caverly, LEAD ATTORNEY Henderson & Caverly, Rancho Santa Fe, CA.

For Safety-Kleen Systems, Inc., a Wisconsin corporation, Defendant (307-cv-00886-PJH): Janine Syll Simerly, LEAD ATTORNEY, Cassandra H. Carroll, Robert W. Tollen, Seyfarth Shaw LLP, San Francisco, CA.

**JUDGES:** PHYLLIS [*2] J. HAMILTON, United States District Judge.

**OPINION BY:** PHYLLIS J. HAMILTON

**OPINION**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant's Motion for Summary Judgment came on for hearing on May 30, 2007. Barron Ramos, Jeremy Fietz, Donald Edgar, and Kristin Caverly appeared for plaintiffs; Robert Tollen and Janine Simerly appeared for defendant. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS in part and DENIES in part defendant's motion for the following reasons and for the reasons stated at the hearing.

**BACKGROUND**

These actions arise from defendant Safety-Kleen Systems, Inc.'s ("Safety-Kleen") alleged failure to provide meal and rest breaks to its employees. There are two separate complaints at issue. Plaintiffs Reymundo Perez and Jerrell Doane allege the following causes of action in their complaint: (1) Unlawful Failure to Pay Required Overtime (Wage Order No. 7-2001, California Labor Code Sections 510, 1194, 1198); (2) Unjust Enrichment/ Quantum Meruit; (3) Conversion; (4) Waiting Time Penalties (California Labor Code Section's 201-203); (5) Failure to Provide Itemized Wage Statements (California Labor Code Section 226); [*3] (6) Failure to Provide Meal Periods and Rest Breaks (California Labor Code Sections 226.7, 512, and Wage Order No. 7-2001); and (7) Unfair Practices Under Unfair Competition Act (California Business and Professions Code Sections 17200-17208). David Stegall's complaint alleges claims for: (1) Failure to Provide Meal Periods and Rest Breaks (California Labor Code Section 226.7); and (2) Unfair Practices Under Unfair Competition Act (California Business and Professions Code Sections 17200). Perez

2007 U.S. Dist. LEXIS 48308, *

and Doane's first and fourth causes of action (overtime and waiting time claims) were dismissed by stipulation on May 23, 2006. Defendant moves for summary judgment with respect to all other remaining causes of action in the two complaints.

A. Statutory Background

California Labor Code § 512 governs the provision of meal periods. This provision was enacted as part of the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999, 1999 Stats. Ch. 124 (AB 60). This statute provides that:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per [*4] day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

It also states that the Industrial Welfare Commission ("IWC") may adopt an order "permitting a meal period to commence after six hours of work if the commission determines that the order is consistent with the health and welfare of the affected employees." Cal. Labor Code § 512.

In September of 2000, the California Labor Code was further amended to add another provision regarding meal and rest periods, providing that "[n]o employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission." Cal. Labor Code § 226.7(a). It further states that if "an employer fails to provide an employee a meal period or rest period in [*5] accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." Cal. Labor Code § 226.7(b).

Both labor code sections refer to IWC wage orders. Prior to enactment of Labor Code § 512, the IWC's wage orders required meal periods. It issued new wage orders in 2000, including Wage Order 7-2001 (effective January 1, 2001). [1] While the IWC was de-funded by the California Legislature effective July 1, 2004, its wage orders, which govern wages, hours and working conditions in California, are still in effect. Regarding meal periods, the IWC order states:

> Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke [*6] the agreement at any time.

Wage Order 7-2001 P 11. It also governs rest periods, providing that:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

---

1    Safety-Kleen concedes that Wage Order 7-2001 applies to its business. Plaintiff notes that Wage Order 4-2001 may also apply to Safety-Kleen's business, but acknowledges Wage Order 7-2001 applies for purposes of this motion.

In addition to providing for meal and rest periods, California law requires that employers provide itemized wage statements to their employees:

Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher   [*7] paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, . . . and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

Cal. Labor Code § 226(a).

B. Factual Background

Plaintiff Stegall was employed by Safety-Kleen from November 1998-November 2004 as a Customer Service Representative ("CSR"), an employee who drives a truck and visits Safety-Kleen's customers to service their equipment as part of Safety-Kleen's waste management services. Upon his employment, Stegall signed an agreement limiting his ability to commence suit against the company to six months after the employment action in dispute. He knew that employees in California had the right to take rest and meal breaks, but nobody at Safety-Kleen ever told him he was entitled to do so or  [*8] that he could not do so. He felt that there was too much pressure to make his numbers to stop for breaks, but admitted that a person could arrive at work an hour earlier and take their breaks. He usually ate while driving, but took lunch breaks a few times a month. Safety-Kleen paid him a base salary plus commission.

Plaintiffs Jerrell Doane and Reymundo Perez were also employed by Safety-Kleen as CSRs. Doane was paid salary plus commissions. He was not paid by the hour, nor was he paid overtime. He knew that he was entitled to take breaks, but did not do so because he had too much work to do. Plaintiff Perez was paid salary plus commissions, but not overtime. Sometimes he took meal breaks. No supervisor ever told him not to, but none ever told him to do so. He did not know that he was entitled to take breaks.

All three plaintiffs received bi-monthly pay stubs that reflected they had worked 80 hours per pay period.

Plaintiffs maintain that, on average, they worked in excess of 100 hours per pay period.

DISCUSSION

A. Legal Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show [*9] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof  [*10] at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.

"To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant probative evidence tending to support the complaint." *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted). The court must view the evidence in the light most favorable to the non-moving party. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323. Regardless

2007 U.S. Dist. LEXIS 48308, *

of whether plaintiff [*11] or defendant is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." *Id.* at 322.

## B. Defendant's Motion

Safety-Kleen moves for summary judgment on the following bases. First, it argues that all of Stegall's claims must be dismissed because his claims are limited by a contractual limitations clause. Second, Safety-Kleen argues that plaintiffs' claims for meal and rest period violations fail, because it provided them with those break periods. Third, Safety-Kleen maintains that plaintiffs cannot recover for its failure to accurately record their hours worked, because they cannot show the requisite injury and intent.

### 1. Stegall's Claims

Safety-Kleen first argues that Stegall's claims must be dismissed because he signed an agreement with Safety-Kleen that he would not commence any action or suit against it more than six months after the employment action in dispute. He terminated his employment in November 2004 and did not commence suit until September 28, 2006. Specifically, Stegall signed the same agreement twice -- on October 27, 1998 and November 30, 1998 -- which stated that "Employee [*12] further agrees. . . [t]hat Employee will not file a charge or complaint or commence any action or suit relating to Employee's employment with Safety-Kleen more than six months after the employment action in dispute and that Employee waives any statute or limitations to the contrary."

The Ninth Circuit has analyzed contractual six-month limitation provisions under California law, noting that "[m]any California cases have upheld contractual shortening of statutes of limitations in different types of contracts, including employment situations." *Soltani v. W. & S. Life Ins. Co.,* 258 F.3d 1038, 1042 (9th Cir. 2001) (upholding summary judgment in defendant's favor). The Ninth Circuit has found that such provisions are not unconscionable under California law. Even though plaintiffs in *Soltani* submitted evidence of procedural unconscionability, the court found that "California case law strongly indicates that the six-month limitation provision is not substantively unconscionable." *Id.* at 1043 (citations omitted). "Given a sliding scale analysis, even assuming that the contract was a non-negotiable adhesion contract, the substantive prong controls. Indeed, California courts have upheld shortened [*13] limitation periods in insurance contracts, which are quintessential adhesion contracts." *Id.* at 1044-45.

The contractual agreement signed by Stegall is therefore valid and enforceable. While Stegall argues

that the contract lacks foundation and has not been properly authenticated, Stegall admits that the signatures on the contracts are his own. While he testified that he does not recall signing the contracts, he authenticated the document by authenticating his signature on the contract. *See* Fed. R. Evid. 901(b)(2). Plaintiff provides no evidence suggesting that the document is fraudulent, and it is therefore admissible.

Stegall also maintains that California Labor Code § 219 makes the contract unenforceable, as it states "[n]othing in this article shall in any way limit or prohibit the payment of wages at more frequent intervals, or in greater amounts, or in full when or before due, but no provision of this article can in any way be contravened or set aside by private agreement, whether written, oral, or implied." The article to which Labor Code § 219 refers includes Labor Code § 226.7, which governs the right to meal and rest periods. The contract Stegall signed, however, did not "contravene" [*14] or "set aside" his right to meal and rest periods -- it shortened the time period in which he could bring suit against Safety-Kleen. The statute of limitations for meal and rest period claims is not governed by the Labor Code -- it is set by Code of Civil Procedure § 338. *See Murphy v. Kenneth Cole Productions, Inc.,* 40 Cal. 4th 1094, 1101, 56 Cal. Rptr. 3d 880, 155 P.3d 284 (2007). Labor Code § 219, therefore, does not invalidate Stegall's contract.

Stegall also argues that Safety-Kleen waived the 6-month contractual limitation defense. However, "an affirmative defense based upon a contractual limitations period may be raised for the first time on summary judgment if no prejudice is caused to the nonmoving party." *Han v. Mobil Oil Corp.,* 73 F.3d 872, 878 (9th Cir. 1995). Stegall does not claim prejudice. In any event, Safety-Kleen specifically asserted the contractual limitation defense in its answer to Stegall's amended complaint.

Finally, Stegall claims that Safety-Kleen's May 2004 employee handbook superseded the agreement containing the contractual limitations clause, because the handbook explicitly supersedes "all previously issued handbooks, prior statements by the Company or by any employee of the Company, and [*15] any other document inconsistent with this Employee Handbook and the policies and procedures herein." However, a contract in writing may be modified only by another contract in writing, by an oral agreement to the extent it is executed by the parties, or by an oral agreement supported by new consideration. Cal. Civil. Code § 1698. The handbook explicitly states that it is not a contract and may be unilaterally changed by the company, so it does not have the power to alter the 1998 contracts. In addition, the handbook does not address when suit may be brought against the company and does not contradict the con-

tracts. Nor does the handbook's provision that state law "shall control" in "the event of a conflict" between such laws and the handbook invalidate the contractual limitation, as state law allows contractual modification of statute of limitations. Summary judgment, therefore, is proper as to all of Stegall's claims, as they are barred by the contractual limitations clause.

2. Meal and Rest Period Claims

"An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes," although the [*16] meal period may be waived by "mutual consent" under certain S conditions. Nor may an employer "employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes" except that this period may also be "waived by mutual consent" in certain circumstances. Cal. Lab. Code § 512(a).

Safety-Kleen argues that the statute only requires that an employer "provide" an employee with a meal period, meaning that defendant need only "furnish, supply, make available, or afford" such breaks. Safety-Kleen argues that "the nature of plaintiffs' work" provided them with the opportunity to take meal periods, because plaintiffs were truck drivers working solo away from the employer's premises. There is no authority to support Safety-Kleen's argument that merely being off-site and away from management constitutes "provision" of breaks. Certainly, employers could instruct their drivers not to take breaks, or otherwise imply that they may not take breaks. Just because an employee works on the road does not end the inquiry as to whether meal periods were provided under the statute.

The court has examined all of the facts here in [*17] a light most favorable to plaintiffs and finds a dispute as to whether Safety-Kleen "provided" meal periods. Safety-Kleen has no policy regarding meal breaks for CSRs. Safety-Kleen does not have a method of determining how many hours a CSR in California works during the day. See Williams Depo. Tr. at 102, 135. Only since May 2004 have Safety-Kleen's employees had an employee handbook which states "your manager is responsible for providing you the local procedures regarding breaks and meal periods, subject to state and local laws and regulations. If you are a non-exempt employee, you are required to take one meal break of at least 30 minutes each workday." This handbook does not state that exempt employees have a right to a meal period as well.

Stegall, Perez, and Doane all declare that they were never relieved of all duty during any meal or break period. They were on call at all times and were required to carry a company cell phone to maintain constant contact with the branch. They were required to complete a detailed log each day which specifically stated they were on duty from the time they arrived at the branch until going home at the end of the day. See Stegall Decl. P 7; Perez [*18] Decl. P 6; Doane Decl. P 6.

At his deposition, Stegall testified that the Safety-Kleen managers never told him to stop and take a meal or rest breaks during the day. Nor did they tell him not to. See Stegall Depo Tr. at 43-44. He knew there were posters at the branch where he worked, but never saw a poster about the right to take rest breaks and meal breaks. Id. at 45. He recalls one time when another employee was criticized by the manager for stopping to have breakfast with another employee. Id. at 46. There was a lot of pressure to hit revenue numbers each day, and the customers they were servicing closed around 4:00 or 5:00 p.m. The CSRs attended weekly meetings stressing revenue and productivity, and the employees were questioned about how many customers they serviced during the day. Id. at 51, 83.

While Stegall knew he had a right to breaks based on prior work experience, Perez testified that he knew nothing about his right to take a rest or meal break when he worked for Safety-Kleen. Perez Depo. Tr. at 22. He was never told to make sure he took his break, or that he had a right to a break, or to record his breaks. He was only told to go out there and get his work done. Id. at 23. [*19] He also said that he did not take breaks because he had too much work to do, and he did not want to work later. Nobody ever told him not to take breaks, but he does not recall anyone telling him to take breaks. He speculated that I other employees decided whether or not to take a rest break. Id. at 72. Doane stated that the handheld he was given by Safety-Kleen would say "break" on it, but sometimes it would i list no breaks on a given day. Doane knew from prior experience that he had a right to take a meal break and that he was entitled to two short rest breaks for an eight hour shift, but he did not know how long these breaks were supposed to be. Id. at 57. His supervisor did not encourage him to take breaks. He speculates that "the ultimate decision [whether to take breaks] was mine." Id. at 71.

There is a genuine issue of material fact as to whether Safety-Kleen provided meal periods to plaintiffs, particularly given the lack of a policy for meal breaks, the fact that plaintiffs were never told to take breaks, the fact that Perez did not even know he had a right to take breaks, the general pressures of the position, and the fact that plaintiffs were required to fill out a call log [*20] stating they were on duty all day long. These facts also reveal a dispute as to whether Safety-Kleen "authoriz[ed] and permit[ted] rest periods" as required by Wage Order 7-2001 P 12. See also Cal. Labor Code §

Case 3:07-cv-03953-PJH    Document 22-3    Filed 01/09/2008    Page 34 of 127

Page 6
2007 U.S. Dist. LEXIS 48308, *

226.7 (authorizing pay where "employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission").

In light of the above, the court need not resolve plaintiffs' argument that California law "does not permit an employee . . . to decide to take a break or not take a break." The court, however, notes that the applicable IWC Wage Order indicates that an employer must do something affirmative to provide a meal period, and may not merely assume such breaks are taken. The Wage Order states that "[n]o employer shall employ any person for a work period of more than five hours without a meal period of not less than thirty minutes," and also states that "unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked." IWC Wage Order 7-2001. While Safety-Kleen argues that this IWC Order is not within the scope of [*21] the authority conferred by the legislature because its mandatory language contradicts Labor Code § 512, the court need not resolve this issue. At the very least, consistent with Labor Code § 512, the Wage Order requires the employer to affirmatively provide a meal break and provide the opportunity for the employee to be "relieved of all duty during a 30 minute meal period."

This result is consistent with California court decisions on meal and rest period provision. In *Cicairos v. Summit Logistics, Inc.,* 133 Cal. App. 4th 949, 35 Cal. Rptr. 3d 243 (2005), the California Court of Appeals reversed the trial court's grant of summary judgment in defendant's favor on violations of California statute and regulations relating to meal periods, rest breaks, and itemized wage statements. Regarding meal periods, the court first noted that the evidentiary burden rests with the employer, and the employer's failure to keep the required statutory records falls on it. *Id.* at 961. Defendant's manager declared that the drivers were protected by a collective bargaining agreement that provided them with meal breaks, and that they were constantly on the road, had the power to decide whether to take breaks, and so their activity [*22] could not be regulated by defendant. Defendant assumed that the drivers took breaks. *Id.* at 962. The court found that defendant had the ability to monitor its drivers' activities, and did so with respect to other activities. The court found "defendant's obligation to provide the plaintiffs with an adequate meal period is not satisfied by assuming that the meal periods were taken, because employers have 'an affirmative obligation to ensure that workers are actually relieved of all duty.'" *Id.* (citing DLSE Opinion Letter No. 2002.02.28 (Jan. 28, 2002)). The court also found that defendant did not "authorize and permit" rest periods as required, noting that defendant's computer system did not contain a code for

rest breaks and that drivers felt pressured not to take such breaks because they were not on a list of paid delays. *Id.* at 963. The employer petitioned for review, but the petition for review by the Supreme Court was denied.

Similar to the employer in *Cicairos,* Safety-Kleen assumed that plaintiffs knew they had the right to take a meal break without ever actively providing breaks (or even telling its employees they had that right) or monitoring whether breaks were taken. Safety-Kleen [*23] argues that *Cicairos* carries little weight, because it relied on a DLSE opinion letter which has no legal force or effect, and, in any event, DLSE subsequently changed its position to state that the Labor Code required that the employer "make a meal period available and to give the employee an opportunity to take it." But even if Safety-Kleen is correct and it had no "affirmative obligation to ensure" that its workers are actually relieved of duty, it was obligated to provide off-duty meal and rest breaks. *See Murphy,* 40 Cal. 4th 1094, 56 Cal. Rptr. 3d 880, 155 P.3d 284 (California's meal time provisions are to be "interpreted broadly in favor of protecting employees").

In light of the disputed facts here, summary judgment is not proper as to Perez and Doane's claims for meal and rest period violations. Stegall's claims, however, fail for the contractual limitations reasons discussed above. Summary judgment is also denied as to Perez and Doane's derivative claims (California Business and Professions Code § 17200, unjust enrichment, quantum meruit, and conversion). These claims are predicated on Safety-Kleen's alleged failure to provide meal and rest periods, and Safety-Kleen argued no separate grounds for dismissing these [*24] claims.

### 3. Itemized Wage Statement Claim

Safety-Kleen concedes it failed to record total hours worked on plaintiffs' wage statements as it was obligated to do under California Labor Code § 226(a)(2). But it argues that plaintiffs cannot prove the requisite intent or injury under the statute, which provides that "[a]n employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover . . . not exceeding an aggregate penalty of four thousand dollars." Cal. Labor Code § 226(e).

Safety-Kleen maintains that its failure to accurately record the number of hours was not "knowing and intentional" because defendant was unaware that recording the number of hours was required under California law. Defendant, however, concedes that it knowingly and intentionally provided wage statements containing the incorrect total hours worked. Ignorance of the law, however, does not excuse Safety-Kleen. *See People v. Snyder,* 32 Cal. 3d 590, 592-593, 186 Cal. Rptr. 485, 652 P.2d 42 (1982) ("It is an emphatic postulate of both civil and

penal law that ignorance of a law is no excuse for a violation thereof."). In *Wang v. Chinese Daily News, Inc.,* 435 F. Supp. 2d 1042 (C.D. Cal. 2006), [*25] the court found a violation of California Labor Code § 206, noting that defendants conceded they knew their wage statements did not comply with California law, citing to evidence that the wage statements always listed their hours at 86.66. *Id.* at 1051. So too here, where Safety-Kleen's statements always list 80.00 hours per two week period regardless of hours actually worked. The *Wang* court also noted that defendants had the "responsibility to ameliorate the problem," but their failure to do so and their position that the "violations are merely technical also demonstrate that the violations were knowing and intentional." *Id.* Here, Safety-Kleen's own person most knowledgeable testified that Safety-Kleen has no method of calculating how many hours a CSR works in a given day, indicating it has not ameliorated the problem, even though it issued a California law handbook in 2005. Therefore, there is a question of fact as to Safety-Kleen's intent, and summary judgment is improper on this basis.

Regarding the statute's injury requirement, Safety-Kleen argues that neither Perez nor Doane were injured by the omission of accurate hours on their wage statement, because they were salaried employees [*26] who were not paid overtime. While plaintiffs do not make any claim that they are entitled to overtime, the "lawsuit, and the difficulty and expense Plaintiffs have encountered in attempting to reconstruct time and pay records, is . . . evidence of the injury suffered as a result of [the] wage statements." *Wang,* 436 F. Supp. 2d at 1050. Plaintiffs will need to engage in "discovery and mathematical computations" in order to calculate meal and rest period payments they claim they are entitled to. *Id.* Plaintiffs testified that they typically worked 100 hours or more per two week period, and took rest and meal periods rarely, if at all. While it is true that the employer bears "the consequences for . . . failure" to keep records under the statute, plaintiffs will have to determine their own damages for missed meal and rest periods due to the absence of records. *Cicairos,* 133 Cal. App. 4th at 961. This is sufficient to establish a triable issue as to injury. Summary judgment on this claim is therefore not proper at this time.

**CONCLUSION**

In accordance with the foregoing, the court GRANTS in part and DENIES in part defendant's motion.

Summary judgment is GRANTED as to Stegall's claims. This order [*27] terminates the *Stegall* case (Case No. C 07-0886 PJH) and any pending motions in that case. The clerk shall close that case file.

Summary judgment is DENIED as to the claims in the *Perez* case (Case No. C 05-5338 PJH).

IT IS SO ORDERED.

Dated: June 27, 2007

PHYLLIS J. HAMILTON

United States District Judge

# EXHIBIT E



*2199458*

1

2          SUPERIOR COURT OF CALIFORNIA          **FILED**

3                COUNTY OF ALAMEDA                ALAMEDA COUNTY

4                                                NOV 0 6 2003

5                                                CLERK OF THE SUPERIOR COURT
                                                 By _Charlotte Marie_
                                                                    Deputy

6   ANDREA SAVAGLIO, JAMES DAVIS,        )   Case No.: C-835687
    JERRILYN NEWLAND, and CHARLOTTE      )
7   JOHNSON, on behalf of themselves and all others )
    similarly situated,                  )
8                                        )
                              Plaintiffs, )   ORDER (1) GRANTING CLASS
9                                        )   CERTIFICATION IN PART AND (2)
         v.                              )   DENYING CLASS CERTIFICATION IN
10                                       )   PART.
    WAL-MART STORES, INC., a Delaware    )
11  corporation, SAM'S WEST, INC., a California )   DATE:  September 15, 2003
    corporation, GEORGE RODRIGUEZ, VINCENT )   TIME:  9:00 am
12  MARTINEZ, and DOES 1 through 100,    )   DEPT:  22
                                         )
13                            Defendants. )

14  ─────────────────────────────────────

15      The motion by plaintiffs for class certification came on regularly for hearing on

16  March 19, 2003, in Department 22, the Honorable Ronald M. Sabraw, presiding.

17
18  Plaintiffs and Defendant appeared at the hearing through counsel of record.

19      The oral argument of the parties on March 19, 2003, was very helpful and assisted

20  the Court in focusing on the issues in the motion. Because the Court identified issues not

21  briefed thoroughly by the parties, the Court requested further briefing and set a second

22
    hearing. The parties submitted additional briefing and evidence, and the Court held a
23
24  second hearing on September 15, 2003.

25      IT IS HEREBY ORDERED that plaintiffs' motion for class certification is

26  GRANTED IN PART and DENIED IN PART.

27

1

SUMMARY

This is a purported class action by associates of Wal-Mart (Wal-Mart refers to its employees as associates). Plaintiffs divided the factual basis for their claims into three categories (1) failure to pay for work off the clock ("OTC") (2) failure to pay when rest breaks were missed, shortened or interrupted; and (3) failure to pay when meal periods were missed, shortened or interrupted. The legal theories of recovery in the Second Amended Complaint filed March 27, 2002, fall into four categories: (1) contract claims (causes of action 1-4, 8); (2) Labor Code claims (causes of action 5, 9-11); (3) equitable claims based on unjust enrichment and conversion (causes of action 6-7); and (4) a claim under the Unfair Competition Law, Business and Professions Code 17200 ("UCL") (cause of action 13). Plaintiffs are not seeking class certification on their claim for promissory estoppel (cause of action 12).

Because commonality must be determined with reference to the claims in the case, the Court defines the elements of the OTC, rest break, and meal period claims. Under California law Plaintiffs must prove the following to establish their claims:

OTC Claims - Plaintiffs must prove that Defendant knowingly did not pay them for all the time they worked or were under Defendant's control.

Rest Break Claims – Plaintiffs must prove that Defendant coerced or encouraged them not to take the full rest breaks permitted by the Labor Code or by contract.

Meal Period Claims – Plaintiffs must prove that Defendant did not ensure that they took the full meal periods required by the Labor Code or by contract.

Applying the analytical categories of *Bell v. American Title Ins. Co.* (1991) 226 Cal. App. 3d 1589, 1603-1609, and Federal Rules of Civil Procedure ("F.R.C.P.") Rule

1  23, the Court considers separately whether to certify each claim to pursue injunctive relief

2  and monetary relief.

3      The Court holds (1) Plaintiffs may represent a class to pursue OTC claims and

4  seek injunctive relief under the Labor Code and the UCL; (2) Plaintiffs may represent a

5  class to pursue rest break claims and seek injunctive relief under the Labor Code and the

6

7  UCL; (3) Plaintiffs may represent a class to pursue meal period claims and seek

8  injunctive relief under the Labor Code and the UCL; and (4) Plaintiffs may represent a

9  class to pursue meal period claims and seek monetary relief under the Labor Code and the

10  UCL.

11

12      Below is a table identifying the claims that will proceed on behalf of a class:

| | Contract | Labor Code | Equitable | UCL Unlawful | UCL Unfair | UCL Fraudulent |
|---|---|---|---|---|---|---|
| OTC – Injunction | | OTC Class | | OTC Class | OTC Class | OTC Class |
| OTC – Money | | | | | | |
| Rest Breaks - Injunction | | Rest Break Class | | Rest Break Class | Rest Break Class | Rest Break Class |
| Rest Breaks – Money | | | | | | |
| Meal Periods- Injunction | | Meal Period Class | | Meal Period Class | Meal Period Class | Meal Period Class |
| Meal Periods - Money | | Meal Period Money Class | | Meal Period Money Class | Meal Period Money Class | Meal Period Money Class |

24

25  ///

26  ///

27

3

LEGAL FRAMEWORK

The guiding principles for deciding a motion for class certification are well defined. "To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class-members." *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4[th] 429, 435 (citing *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462); *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4[th] 1096, 1104. The latter inquiry involves the following three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Richmond, supra,* 29 Cal.3d at 470.

Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing. *Linder*, 23 Cal.4[th] at 429. In addition, the trial court should assess whether a class action is superior to alternative procedures for handling the controversy. *Basurco v. 21st Century Ins. Co.* (2003) 108 Cal. App. 4th 110, 120-122; *Caro v. Procter & Gamble Co.* (1993) 18 Cal. App. 4th 644, 660-662.

The determination of whether a class should be certified is a procedural question and does *not* include a weighing of whether the action is legally or factually meritorious. *Linder*, 23 Cal.4[th] at 439-40.

The Court rejects any suggestion that doubts as to the propriety of class certification must be resolved in favor of certification, subject to later modification by the

4

1    Court. (P's MPA at 12:9-11)  *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.

2    4th 906, 923, 924, states that "at the time of certification" a plaintiff must provide

3    sufficient information for the trial court to determine whether a class action will be

4    manageable and that the court cannot simply rely on counsel's assurances of

5    manageability.  Similarly, *Reyes v. Board of Supervisors* (1987) 196 Cal. App. 3d 1263,

6    

7    1275, states, "[W]here the court finds, on the basis of substantial evidence . . . that there

8    are serious problems *now appearing*, it should not certify the class merely on the

9    assurance of counsel that some solution will be found."

10          Class certification should be decided "when practicable," C.R.C. 1854(b), so that

11    the parties will know the contours of the case well prior to trial and absent class members

12    

13    can be provided notice and an opportunity to opt out of the class.  C.R.C. 1856.  The

14    Court may not certify a claim for class treatment and leave it to a jury to determine

15    whether the plaintiffs can prove their theory that there is a common practice that affects

16    all class members.  It is the duty of the Court, not the jury, to determine whether common

17    issues predominate to such a degree that absent class members may, after notice, be

18    

19    bound by and benefit from the judgment and the defendant may be held liable to such

20    persons.

21          Although California Courts rely on and refer to federal law, *Washington Mutual*

22    *Bank v. Superior Court* (2001) 24 Cal. 4th 906, 922, C.C.P. section 382 does not include

23    specific standards and analytical categories such as those found in F.R.C.P. 23.  A party

24    moving for class certification in a California Court is not required to state whether class

25    certification is sought under the equivalent of F.R.C.P. 23(b)(1), (2), or (3).  Therefore,

26    

27    

5

1   the parties rarely present the issue of whether a case should proceed as an injunction only

2   class (as under 23(b)(2)) or as an injunction and damages class (as under 23(b)(3)).

3       Consistent with the direction in *Vasquez v. Superior Court of San Joaquin County*

4   (1971) 4 Cal. 3d 800, 821, that "we must rely upon the ability of trial courts to adopt

5   innovative procedures which will be fair to the litigants and expedient in serving the

6   judicial process," the Court has considered each claim from two perspectives.  First, the

7

8   Court has considered whether it would be appropriate to certify a class to pursue claims

9   regarding the content and overall implementation of Wal-Mart's policies (similar to class

10  certification under F.R.C.P. 23(b)(2)).  The Court notes that there is a substantial overlap

11  between the attributes of a representative UCL claim and the attributes of an injunction

12  only class claim.  Second, the Court has considered whether it would be appropriate to

13

14  certify a class to pursue an aggregation of individual claims seeking monetary relief

15  (similar to class certification under F.R.C.P. 23(b)(3)).  Considering class certification

16  issues related to claims for injunctive relief and claims for monetary relief separately is

17  consistent with California law.  *Bell v. American Title Ins. Co.* (1991) 226 Cal. App. 3d

18  1589, 1603-1609 (applying analytical categories of the federal rules in California class

19  action).  See also *Volkswagen of America, Inc. v. Superior Court* (2001) 94 Cal.App.4th

20  695, 704-705 (noting that complex cases require "exceptional judicial management" and

21  to achieve that end the trial courts "have the authority to take whatever exceptional

22  management actions are necessary to accomplish that result.")

23

24  ///

25  ///

26

27

6

ASCERTAINABILITY

Ascertainability requires that the Court and the parties be able to determine who is in the class based on objective characteristics and common transactional facts. *Hicks,* 89 Cal.App.4th at 913-916; *Bartold v. Glendale Federal Bank* (2000) 81 Cal. App. 4th 816, 828. Several cases hold that a class is not readily ascertainable if the class definition requires the Court to conduct individual inquiries to determine whether each potential class member is included in the class. *Kenro, Inc. v. Fax Daily* (S.D. Ind. 1997) 962 F. Supp. 1162, 1169; *Petty v. Wal-Mart Stores, Inc.* (Ohio App. 2002) 773 N.E.2d 576, 579-580, *rev. denied,* 772 N.E.2d 1203.   Although *Hicks* states that a class definition can include a reference to the elements of the claim, *Hicks,* 89 Cal.App.4th at 915-916, the reasoning of *Hicks* suggests that this is to be discouraged.

Plaintiffs propose a class of all hourly associates during the relevant time frame. Plaintiff's proposed class is ascertainable, and can be identified through payroll records and other documents in the possession of Wal-Mart. Consistent with *Hicks,* the class definition does not incorporate the element of the claim.

Wal-Mart argues that the proposed class definition is overbroad because it encompasses many persons who are not similarly situated with the named Plaintiffs. This argument raises issues of commonality, but does not concern whether the proposed class is ascertainable.

The Court finds that the class proposed by Plaintiff is ascertainable and appropriate for the OTC, rest break, and meal period claims. Wal-Mart and absent class members can determine membership in the class without a detailed inquiry into the circumstances or time records of any given class member.

7

1

2     NUMEROSITY

3          Wal-Mart has admitted that the proposed class includes over 5,000 members, and

4     other evidence indicates that the class includes over 50,000 members.  (PX 43, RFA #10

5     and PX 44.)  Wal-Mart does not contest the numerosity requirement.

6

7

8     COMMONALITY  - INTRODUCTION

9          Plaintiffs' burden on moving for class certification is not merely to show that

10    some common issues exist.  Plaintiffs must place substantial evidence in the record that

11    common issues predominate.  *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th

12    1096, 1108.

13

14         The commonality analysis requires the Court to examine the elements of each

15    cause of action.  If the law applicable to a cause of action is unclear, then the Court may

16    need to ascertain the law before it can determine whether common issues predominate on

17    the cause of action.  *Hicks,* 89 Cal.App.4th at 916, fn22 and 917-918 ("In order to

18    determine whether common questions of fact predominate the trial court must examine

19    the issues framed by the pleadings and the law applicable to the causes of action

20    alleged.")

21

22         In the initial round of briefing it became apparent that the parties did not agree on

23    the elements of rest break and meal period claims.  Therefore, the Court requested further

24    briefing and set a second hearing.  See *Bacon v. Southern Cal. Edison Co.* (1997) 53

25    Cal.App.4th 854, 860.  As a result, in defining the elements of the claims the Court is not

26    impermissibly reaching merits issues without adequate notice to the parties.  *Linder,* 23

27

8

1   Cal.4[th] at 443, states expressly that "trial courts retain broad discretion to conduct the

2   proceedings in an orderly and just manner" and may address the merits of a case on class

3   certification where the merits are enmeshed with class action requirements.  This is such

4   a case, although even here the Court determines only the elements of the claims, not

5   whether Plaintiffs are likely to prevail when the law is applied to the facts of the case.

6

7           Commonality is determined separately with reference to each cause of action, for

8   there may be causes of action where common facts and issues of law predominate and

9   other causes of action where they do not.  *Fletcher v. Security Pacific National Bank*

10  (1979) 23 Cal.3d 442, 447-454 (class certified on claims where individual reliance not at

11  issue and not certified on contract claim where individual knowledge was at issue).

12

13          The Court finds that the claims break down into three categories: (1) work OTC;

14  (2) rest breaks, and (3) meal periods.  There are significant distinctions among these

15  claims, so they must be treated differently.

16

17  COMMONALITY - ELEMENTS – OTC CLAIM

18

19          Although there is no single California statute or Wage Order that states so

20  explicitly, it is the law that employers must pay employees the agreed upon wage for "all

21  hours worked."  Addressing this issue indirectly, paragraph 4 of the applicable California

22  Wage Orders states that employers must pay their employees the minimum wage for "all

23  hours worked."  Paragraph 2(g) of the Wage Orders define "hours worked" as "the time

24  during which an employee is subject to the control of an employer, and includes all the

25  time the employee is suffered or permitted to work, whether or not required to do so."

26

27  *Morillon v. Royal Packing* (2000) 22 Cal.4[th] 575, 585, indicates that "hours worked"

9

1   includes all time that an employee is subject to the control of the employer or is working

2   with the knowledge of the employer.  Therefore, to state their OTC claims, Plaintiffs must

3   prove that Wal-Mart did not pay them for all the time they were under its control or

4   worked with its knowledge.

5

6

7   COMMONALITY - ELEMENTS - REST BREAK CLAIM

8        The rest break claims are based on paragraph 12 of the applicable California

9   Wage Orders, which state, "Every employer shall authorize and permit all employees to

10  take rest breaks …"  The rest breaks are to be "at the rate of 10 minutes net rest time per

11  four (4) hours or major fraction thereof."  Regarding pay, "Authorized rest period time

12  shall be counted as hours worked for which there shall be no deduction from wages."

13

14  Wage Orders Nos. 7-80, 7-98, 7-2001 at ¶12(A).

15       There is no clear statutory or case law guidance on what elements an employee

16  must prove to establish a violation of the rest break provisions.  The Court must

17  determine the elements of the claim so it can determine whether common facts

18  predominate with respect to the claim.

19

20       The Court holds that the Wage Orders require employers to make rest breaks

21  available to employees, but do not require employers to ensure that the employees take

22  the full time allotted for those breaks.  The Court reaches this conclusion based on its

23  consideration of (1) the language in the Wage Orders; (2) recent amendments to the Labor

24  Code; (3) applicable case law; (4) DLSE advice letters and the DLSE Manual, (5) the

25  relevant public policies, and (6) the practicalities of the workplace.

26

27

10

First, the Wage Orders state that "Every employer shall authorize and permit all

employees to take rest breaks ..." The critical phrase is "authorize and permit."

Plaintiffs argue this term means "require," and Wal-Mart argues the term means "allow."

When used by the Legislature in other contexts, the phrase "authorize or permit" appears

to be synonymous with "allow." In several statues the phrase "authorize or permit" could

be replaced with "allow" without altering the apparent meaning of the statute, whereas

replacement of "authorize or permit" with "require" would lead to strained or nonsensical

language. See, e.g., Business and Professions Code 20999(c); Cal. Ed Code 1270.1; Cal

Gov Code § 6546.1; Cal. Health and Safety Code 1371.3; Unemployment Insurance Code

1095(t).

Case law addressing other issues indicates that "authorize and permit" means that

the subject matter is allowed, not that it is required. In *Haggis v. City of Los Angeles*

(2000) 22 Cal. 4th 490, 498, the Court held that a city could not be held liable to a

purchaser of real estate for failing to record information about landslide conditions. In

reaching that decision, the Court applied Government Code 815.6 and stated, "First and

foremost, application of section 815.6 requires that the enactment at issue be *obligatory*,

rather than merely discretionary or permissive, in its directions to the public entity; it

must *require*, rather than merely authorize or permit, that a particular action be taken or

not taken." In that context, the Court equates the phrase "authorize and permit" with

matters that are discretionary or permissive and places them in contrast to matters that are

obligatory or required.

Second, the Legislature has recently enacted two statutes that address rest breaks.

11

1    Labor Code 2695.2(d) (effective 2001) deals with sheepherders and states, "To the
2    extent practicable, every employer shall authorize and permit all sheepherders to take rest
3    periods." The Legislature presumably intended the phrase "authorize and permit" to have
4    the same meaning as in other statutes ("allow") and that this meaning be consistent with
5    the meaning of "authorize and permit" in the Wage Orders.
6
7    Labor Code 226.7 (effective on January 1, 2001) deals with all hourly employees
8    and states, "No employer shall require any employee to work during any meal or rest
9    period" and "If an employer fails to provide an employee a meal period or rest period ... ,
10   the employer shall pay the employee one additional hour of pay at the employee's regular
11   rate of compensation for each work day that the meal or rest period is not provided." The
12   language in this section is ambiguous as to whether rest breaks must be allowed or
13   required. The section states "No employer shall require" and "If an employer fails to
14   provide ... ," neither of which addresses the allow/require distinction. Noticeably absent
15   is direct mandatory language such as "An employer must require ..." or "If an employer
16   fails to ensure ... ."
17
18   Third, case law does not clarify whether rest breaks must be allowed or required.
19   *California Manufacturers Assn. v. Industrial Welfare Com.* (1980) 109 Cal.App.3d 95,
20   115, states paragraph 12 in California wage orders "provides a mandatory 10-minute rest
21   period net, for every 4 hours work, without wage deductions." *California Manufacturers*
22   did not, however, concern the distinction between a mandate that rest periods be offered
23   by employers and a mandate that they be taken by employees. *In re Marriage of Cornejo*
24   (1996) 13 Cal.4th 381, 387-388 ("It is axiomatic that cases are not authority for
25   propositions not considered.").
26
27

12

1    Fourth, documents issued by the California Division of Labor Standards

2    Enforcement ("DLSE") indicate that employers must allow employees to take rest breaks

3    but are not required to ensure that employees take those breaks.  The Court takes judicial

4    notice of DLSE advisory letters dated September 17, 2001, and January 28, 2002, where

5    

6    the DLSE states "an employer is not subject to any sort of penalty or premium pay

7    obligation if an employee who was truly authorized and permitted to take a rest break, as

8    required under the applicable wage order, freely chooses without any coercion or

9    encouragement to forego or waive a rest period." (D's RJN filed 6/9/03 at Exh C and D.)

10   Advice letters of this sort "while not controlling upon the courts by reason of their

11   authority, do constitute a body of experience and informed judgment to which courts and

12   litigants may properly resort for guidance." *Bell v. Farmers Ins. Exch.* (2001) 87 Cal.

13   App. 4th 805, 815.

14   

15        The Court has also taken judicial notice of the DLSE Enforcement Policies and

16   Interpretations Manual.  (PX 81.)  Plaintiffs argue that the reference to "net" time

17   indicates that employers must ensure a full 10 minute rest period.  (PX 81, para 45.3.3.)

18   The Court finds that although the Policies and Interpretations Manual clarifies that

19   employers must make 10 minutes of "net" time available for employees, it does not state

20   that employers must require employees to take full net 10 minute breaks.

21   

22        The Court observes that section 45.2.1 concerning meal periods is entitled

23   "Regulation Clearly Places Burden on Employer to Insure [sic] Meal Period" and states in

24   the text, "It is the employer's duty to compel the worker to cease work during the meal

25   period." Section 45.3 et seq concerning rest breaks contains no similar heading or text,

26   

27   

13

1   indicating that the DLSE does not interpret the Wage Orders to require employers to

2   compel workers to cease work during rest breaks.

3        The Court also notes that the express statements in the advice letters are

4   considerably more specific than the general statements in the Manual. Where a specific

5
6   statement conflicts with a general inference, the Court is inclined to follow the specific

7   statement. C.C.P. 1859.

8        Fifth, the Court has considered the relevant public policies. There is a public

9   policy that employees must have the option of taking rest breaks to rest, go to the toilet,

10  and similar matters. *California Manufacturers,* 109 Cal. App. 3d 95, 115; DLSE

11
12  Enforcement Policies and Interpretations Manual, para 45.3.3 (PX 81). It is less clear

13  whether public policy would require employees to take their breaks.

14       Sixth, the Court has considered the practicalities of the workplace. Employers

15  generally determine when any given employee gets to take his or her break. In legal

16  terms, rest periods are paid time that counts as "hours worked" and "hours worked" is

17
18  defined as when an employee is subject to the control of an employer. *Morillion v. Royal*

19  *Packing* (2000) 22 Cal.4th 575, 578. Therefore, a rest period can be viewed as an

20  assignment from the employer that an employee accepts just as the employee would

21  accept an assignment to stock shelves or work a cashier. Plaintiffs assert that when a

22  Wage Order requires an employer to assign an employee to a 10 minute break, that the

23  employer must require the employee to take a full 10 minute break. The Court finds that

24
25  the better view is that the Wage Orders require employers to assign employees to rest

26  breaks, and that if an employee completes the assignment to his or her satisfaction in less

27  than 10 minutes then the employee can voluntarily elect to move on to other assignments.

14

1        The Court concludes that employers must allow their employees to take net 10

2   minute rest breaks, but employer are not liable if their employees voluntarily elect not to

3   take all the allotted rest time.  The phrase "authorize and permit" in the Wage Orders and

4   in Labor Code 2695.2(d) indicates that the employees must be provided the option to take

5   rest breaks, not that they must take those breaks.  Furthermore, the DLSE advice letters

6   are compelling evidence that the DLSE does not expect employers to require employees

7   to take rest breaks.  The relevant public policies are served even if an employee who is

8   truly authorized and permitted to take a rest break freely chooses without any coercion or

9

10  encouragement to forego or waive his or her rest break.

11

12

13  COMMONALITY - ELEMENTS - MEAL BREAK CLAIMS

14       The meal break claims are based on Labor Code 512 and paragraph 11 of the

15  applicable California Wage Orders.  Labor Code 512 states, "An employer may not

16  employ an employee for a work period of more than five hours per day without providing

17  the employee with a meal period of not less than 30 minutes … ."  The applicable

18  California Wage Orders state at paragraph 11,  "No employer shall employ any person for

19  a work period of more than five (5) hours without a meal period of not less than 30

20  minutes …"  Wage Orders Nos. 7-80, 7-98, 7-2001 at ¶11(A).

21

22       The Court holds that the Labor Code and the Wage Orders require employers to

23  ensure that employees take full 30 minute meal breaks.  The Court reaches this

24  conclusion based on its consideration of (1) the language in the Labor Code; (2) the

25  language of the Wage Orders; (3) applicable case law; (4) the DLSE Manual, and (5) the

26  relevant public policies.

27

15

1    First, the language of the statute is vague. Labor Code 512 is ambiguous as to

2    whether an employer's obligation to "provide" a meal break requires the employer to

3    make a meal break of 30 minutes available or to ensure that a meal break of 30 minutes is

4    taken. Labor Code 226.7 (effective on January 1, 2001) is similarly ambiguous.

5

6    Second, the Wage Orders indicate that every person who works for more than five

7    hours must be offered and must take a meal period of not less than 30 minutes. Paragraph

8    11 of the Wage Orders state "No employer shall employ any person for a work period of

9    more than five (5) hours without a meal period of not less than 30 minutes ..." "No

10   employer shall employ" is mandatory and directive language. The remainder of the

11   sentence does not include the "authorize and permit" language, and avoids the ambiguous

12   term "provide."

13

14   A review of the Wage Orders as a whole supports the same conclusion.

15   Employers are to provide meal periods of not less than 30 minutes, the time spent on

16   meal breaks is not "hours worked," and "hours worked" is any time in which an employee

17   is "suffered or permitted to work, whether required to do so or not," Paragraph 2(G). In

18   addition, employers must maintain time records of when meal periods begin and end,

19   Paragraph 7(A)(3), so employers should know if employees are taking their assigned meal

20   breaks, DLSE Manual 45.2.9.1. Reading these sections as a whole suggests that an

21   employer must not knowingly suffer or permit an employee to work during an assigned

22

23   meal period.

24

25   Third, the Court has been unable to locate any case law directly applicable to

26   determining the elements of a meal break claim. *California Manufacturers Assn. v.*

27   *Industrial Welfare Com.* (1980) 109 Cal. App. 3d 95, 114-115, states that the general

16

1  experience of mankind is that it takes 30 minutes to eat a meal, but does not address

2  whether the Wage Orders permit employees to elect voluntarily to eat quickly and return

3  to work in fewer than 30 minutes.

4         Fourth, the DLSE Manual states explicitly that an employer must ensure that its

5  workers take full 30 minute meal breaks. (PX 81.) Section 45.2.1 states, "It is the

6

7  employer's duty to compel the worker to cease work during the meal period" and "'the

8  employer is not entitled to excuse the fact that he or she employs an employee for a

9  period of more than five hours without a meal period on the failure of the employee to

10  take the meal period." The DLSE advisory letter dated September 17, 2001, states that

11

12  during meal periods "an employer has an affirmative obligation to ensure that workers are

13  relieved of all duty, not performing any work, and free to leave the workplace." (D's

14  RJN, Ex C, p4.) These DLSE documents, although not binding, are informative. *Bell v.*

15  *Farmers Ins. Exch.* (2001) 87 Cal. App. 4th 805, 815.

16         Fifth, the relevant public policy behind meal periods is to provide employees

17

18  substantial time to relax and the opportunity to nourish themselves in the middle of their

19  work day. *California Manufacturers Assn., supra,* 109 Cal. App. 3d at 114-115

20  (indicating that a 30 minute meal period is one of "the most basic demands of an

21  employee's health and welfare.") The Legislature's decision to enact legislation

22  regarding meal periods but not rest breaks indicates that the Legislature considers meal

23  periods to be of greater importance than rest breaks.

24         The Court concludes that the Labor Code and the Wage Orders require employers

25  to ensure that employees take meal periods of not less than 30 minute. The Wage Orders

26

27  suggest strongly that every person who works for more than five hours must be offered

1   and must take a meal period of not less than 30 minutes.  The DLSE Manual and the

2   advisory letter of September 17, 2001, confirm that employers have an affirmative

3   obligation to ensure that workers are relieved of all duty during their meal periods.  The

4   importance of meal periods relative to rest breaks is apparent in the Legislature's decision

5   to address meal periods in Labor Code 512.

6

7

8   COMMONALITY - OTC CLAIMS - POLICIES.

9        The Court holds that common issues predominate on the OTC claims insofar as

10  those claims concern Wal-Mart's policies and the implementation of those policies.

11       Plaintiffs assert that Wal-Mart had common policies that as uniformly

12  implemented tended to cause associates to work off the clock.  Specifically, Plaintiffs

13  assert that Wal-Mart's "New Hire Checklist" states a policy of requiring employees to

14  assist customers at all times (PX 34, 61), its "Labor Guidelines" cause systematic

15  understaffing (PX 10a, PX 11 at 322-324, 337-340, 444-445, 665-670), and its policy of

16  restricting the use of overtime (PX 23, 62, para 3, 4, 8) have a combined effect of

17  requiring Associates to routinely work OTC.  Wal-Mart asserts that although it had

18  uniform policies, the managers at its California stores exercised considerable discretion in

19  the implementation of the policies.

20

21

22       The Court finds that Plaintiffs have presented substantial evidence that Wal-Mart

23  had uniform policies of encouraging employees to assist customers at all times, staffing

24  stores according to the "Labor Guidelines," and discouraging overtime work.  A review

25  of the written policies presents common issues.  A review of how the written policies

26  were implemented in California will also involve common evidence and permit a

27

18

1   common inquiry into whether Wal-Mart's policy was to encourage associates to work

2   OTC or knowingly permit them to work OTC.

3         If Wal-Mart's policies encouraged or permitted work OTC, the Court could order

4   appropriate injunctive relief to ensure that Wal-Mart complied with the requirements of

5   the Wage Orders.

6         Therefore, the Court finds that common issues predominate on the OTC claims

7

8   insofar as those claims concern Wal-Mart's policies and the implementation of those

9   policies. The commonality is in the nature of the commonality required under F.R.C.P.

10  23(b)(2) because Wal-Mart "has acted or refused to act on grounds generally applicable to

11  the class, thereby making appropriate final injunctive relief or corresponding declaratory

12  relief with respect to the class as a whole."

13

14

15  COMMONALITY - OTC CLAIMS – INDIVIDUAL CLAIMS.

16        The Court holds that common issues do not predominate on the OTC claims

17  insofar as those claims seek monetary relief on behalf of individual associates.

18        The OTC claims require employees to prove that Defendant knowingly permitted

19

20  them to work and did not pay them for all the time they worked.

21        Plaintiffs provide anecdotal and statistical evidence that members of the putative

22  class worked OTC on a routine basis and that Wal-Mart discouraged associates from

23  submitting Time Adjustment Reports (TARs) to ensure that the time records reflected the

24  actual time worked. (PX 62, para 7-10). Wal-Mart asserts that its policy was to require

25  associates to swipe in and out whenever they started and stopped work and that it

26

27  enforced that policy (PX 74, DX 61). Wal-Mart also asserts that individual issues will

19

1    predominate because any associates who worked OTC could submit TARs to get paid for

2    any unrecorded time and that any OTC claims will necessarily involve not just whether its

3    employees may have worked OTC, but why they did so, why they did not submit TARs,

4    and whether Wal-Mart knew that they had worked OTC.

5        The anecdotal evidence of work OTC offered by Plaintiffs is balanced by

6
7    anecdotal evidence that Wal-Mart discouraged OTC work, permitted and encouraged

8    employees to submit TARs when they worked OTC, and disciplined the Associates who

9    worked OTC without submitting TARs.

10       The statistical evidence in the Russell Report indicates that 60% of the class

11   members worked OTC at some time in the course of their employment.  (PX 48, p8.)  The

12
13   survey does not address the frequency or duration of the OTC work.  Taken in the best

14   light, the Russell Report indicates that 60% of the proposed class worked OTC at some

15   time and 40% of the class never worked OTC.  Therefore, the Russell Report indicates

16   that of the approximately 50,000 Wal-Mart associates in California, 30,000 worked off

17   the clock at least once in the course of their employment and 20,000 never worked off the

18   clock.  (PX 44)  This does not support a finding that the proposed putative class members

19
20   share common claims for OTC work.

21       Therefore, Plaintiffs have not established that common issues predominate

22   regarding the OTC claims for monetary relief.

23       The Court does not reach the issue of whether some or many individual associates

24   may have worked OTC.  The Court holds only that Plaintiffs cannot pursue OTC claims

25   and seek monetary relief on behalf of a class of similarly situated associates.

26

27

20

COMMONALITY - REST BREAK AND MEAL PERIOD CLAIMS – POLICIES.

1   The Court holds that common issues predominate on the rest break and meal

2   period claims insofar as those claims concern Wal-Mart's policies and the

3   implementation of those policies.

4   Plaintiffs have presented substantial evidence that Wal-Mart has uniform policies

5   regarding rest breaks and meal periods. (PX 2, PX 22, DX 13). A review of the written

6   policies presents common issues.

7   Plaintiffs have also presented substantial evidence that there were commonalities

8   in how Wal-Mart's stores in California implemented the rest break and meal period

9   policies. Plaintiffs have presented evidence that Wal-Mart gave uniform directives to its

10  managers and supervisors (PX 22), Wal-Mart had a policy of creating and reviewing

11  records of rest breaks and meal periods, (PX 9c, 20, 21, 22, 23), and Wal-Mart's

12  management monitored in some respects whether employees were taking rest breaks and

13  meal periods (PX 11 at p114-115; 20; 68). This common evidence will permit a common

14  inquiry into whether Wal-Mart's policy as implemented (1) was to authorize and permit

15  employees to take rest breaks of 10 minutes and (2) was to ensure that associates took

16  meal periods of not less than 30 minutes.

17  The statistical evidence supports the inference that the common polices tended to

18  have a common effect. Regarding rest breaks, the Drogin Report (PX 3A) states that over

19  97% of Associates took rest breaks of less than 15 minutes at some point (Table 1), that

20  45% of the rest breaks were shorter than the 10 minutes permitted by California law

21  (Table 2), and that 66% of the rest breaks were shorter than the 15 minutes permitted by

22  Wal-Mart's policies (Table 2). Regarding meal breaks, the Drogin Report states that

21

1   approximately 90% of Associates took short meal periods at some point (Table 1), that

2   27% of the meal periods were shorter than the 30 minutes permitted by California law

3   (Table 2), and that 64% of the meal periods were shorter than the 60 minute maximum

4   break allowed by Wal-Mart's policies (Table 2).

5        The statistical evidence does not demonstrate that on each day all associates were

6
7   denied their 10 minute rest breaks and 30 minute meal periods.  In fact, the Drogin report

8   states that Wal-Mart associates took the full time permitted by California law on 55% of

9   their rest breaks and on 73% of their meal periods.  The statistics do, however, suggest

10  that Wal-Mart's policies had a common effect of causing associates to take short rest

11  breaks and meal periods on a weekly basis.  As in *Stephens v. Montgomery Ward* (1987)

12  193 Cal. App. 3d 411, class certification is appropriate where a common policy manifests

13
14  itself "in the same general fashion" through the organization.

15       The claims concerning Wal-Mart's policies on rest breaks and meal periods

16  concern the policies, not whether any particular individual took or was denied a break or

17  meal.  The trier of fact may determine liability on these class claims without a detailed

18
19  examination of whether or why any individual associate took a short break or did not

20  receive a 30 minute meal period.

21       If Wal-Mart's policies as written or implemented discouraged employees from

22  taking their full rest breaks or routinely failed to ensure that they took their meal breaks,

23  the Court could order appropriate injunctive relief to ensure that Wal-Mart complied with

24  the requirements of the Wage Orders.

25
26       Therefore, the Court finds that common issues predominate on the rest break and

27  meal period claims insofar as those claims concern Wal-Mart's policies and the

22

1  implementation of those policies.  The commonality is in the nature of the commonality

2  required under F.R.C.P. 23(b)(2).

3

4  COMMONALITY - REST BREAK CLAIMS – INDIVIDUAL CLAIMS.

5       The Court holds that common issues do not predominate on the rest break claims

6

7  insofar as those claims seek monetary relief on behalf of individual associates.

8       An individual rest break claim requires an employee to prove that he or she was

9  not truly authorized and permitted to take a rest break.  The mere fact that an employee

10  missed or took a short rest break is insufficient to state a claim – an employee must

11  demonstrate that the employer coerced or encouraged the employee to forego their break

12  or take a short break.

13

14       There is no evidence that Wal-Mart had an express policy of discouraging rest

15  breaks.  Therefore, whether any given associate was discouraged from taking a rest break

16  will depend on fact specific matters such as the context of the rest break and the content

17  and tone of oral communications from supervisors.  This is not a case such as *Vasquez v.*

18  *Superior Court of San Joaquin County* (1971) 4 Cal. 3d 800, 810-811, where the

19  defendant had a script and the Court could assume that the defendant made the same

20

21  representations to each putative class member.  This case is more like *Hamwi v.*

22  *Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, 473, where the Court denied

23  certification because resolution of the contract claims would depend on individual

24  discussions the defendant had with substantially all putative class members.

25

26

27

23

COMMONALITY - MEAL PERIOD CLAIMS – INDIVIDUAL CLAIMS.

1

2          The Court holds that common issues predominate on the meal period claims

3   insofar as those claims seek monetary relief on behalf of individual associates.

4          An individual meal period claim requires an employee to prove that he or she did

5   not take a 30 minute meal period. Unlike rest break claims, it is immaterial why an

6

7   employee did not take a 30 minute meal period. Therefore, there is no need to make

8   individualized determinations as to why any given associate did not receive a 30 minute

9   meal period.

10         Wal-Mart had a legal obligation to maintain accurate records, Wage Order, para

11  7(A)(3) and (5), and any determination of damages would necessarily rely in large part on

12  Wal-Mart's time records. Aggregate class wide damages and the damages due to any

13

14  given class member could be determined based on Wal-Mart's time records. *Acree v.*

15  *General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 396-398. Plaintiffs could

16  assert that the records are accurate or that Wal-Mart is estopped from asserting that they

17  are not accurate. Wal-Mart could assert that its records are inaccurate or inadequate due

18  to measurement error caused by the use (or non-use) of TARs, management edits,

19

20  employee errors, employee fraud, and otherwise. (DX 8, Switzer Dec, p 7-9 discussing

21  measurement error.) The trier of fact could determine whether the records are sufficiently

22  accurate to support an award of damages and, if so, the amount of damages. *Anderson v.*

23  *Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687-688; *Hernandez v. Mendoza* (1988)

24  199 Cal. App. 3d 721, 726-727. The Court expresses no opinion as to whether Wal-

25  Mart's time records accurately report the meal periods taken by each associate, only that

26

27  the issue is common to all class members.

24

1    Variations among the damages that might be awarded to individual class members

2    would not preclude class certification.  A class action can be maintained even if each

3    class member will at some point individually show his or her eligibility for recovery or

4    the amount of his or her damages.  *Acree, supra,* 92 Cal.App.4th at 401.

5

6

7    COMMON QUESTIONS OF LAW.

8    Plaintiffs' theories of recovery fall into four categories: (1) Labor Code claims; (2)

9    contract claims based on the employee handbook, implied contracts, and the contractual

10   duty of good faith and fair dealing; (3) a claim under the Unfair Competition Law,

11   Business and Professions Code 17200 ("UCL"); and (4) equitable claims based on unjust

12   enrichment and conversion.

13

14   Contract claims (Causes of action 1-4, 8).  Common issues do not predominate on

15   the claims for breach of written contract (the Employee Handbook), breach of an implied

16   contract, and breach of the implied contractual duty of good faith and fair dealing.  The

17   claim for breach of written contract is individualized because Associates sign

18   acknowledgements that the Employee Handbook is not a contract (DX 9, 15), so

19   individual testimony would be necessary to determine whether any given Associate was

20

21   told or lead to believe that it was an enforceable contract.  *Hamwi, supra,* 72 Cal.App.3d

22   at 473 (common contract held not basis for class certification).  The claim for breach of

23   implied contract is also individualized.  The nature of an implied contract is that it is not

24   written, and therefore specific determinations must be made based on what the parties to

25   the implied contract said, heard, performed, or communicated.  The claim for breach of

26   an implied term in a written or implied contract is even more individualized.  See *Guz v.*

27

25

1  *Bechtel National, Inc.* (2000) 24 Cal. 4th 317, 339-340 (parol evidence is admissible to

2  explain, supplement, or even contradict the terms of an employee handbook); *Wal-Mart*

3  *Stores, Inc. v. Lopez* (Tex. App. 2002) 93 S.W.3d 548 (class not certified to pursue

4  OTC/short-break claims because individual issues of contractual formation and breach

5  predominated over common issues); *Petty v. Wal-Mart Stores, Inc.* (Ohio App. 2002) 773

6  

7  N.E.2d 576, *rev. denied*, 772 N.E.2d 1203 (class not certified to pursue OTC/short-break

8  claims arising under "policies and oral agreements")' *Basco v. Wal-Mart Stores, Inc.*

9  (E.D. La 2002) 216 F. Supp.2d 592 (rejecting class certification for OTC/short-break

10  claims under contract and unjust enrichment theories)

11      <u>Labor Code claims  (Causes of action 5, 9-11).</u>  Common issues predominate in

12  

13  the Labor Code claims because the Labor Code affects Wal-Mart uniformly and each

14  associate identically.

15      <u>Equitable claims (Causes of action 6-7).</u>  Common issues do not predominate on

16  the equitable theories of unjust enrichment and conversion.  A review of the equitable

17  

18  considerations will require an inquiry into the specifics of each employee's knowledge,

19  expectations, and situation.  For example, an employee may waive or compromise his or

20  her equitable claims through action or inaction.  This is in contrast to the Labor Code

21  claims, which may not be waived.  Labor Code 219.

22      <u>UCL Claim (Cause of action 13).</u>  Class certification is determined with reference

23  

24  to each claim asserted, and must take into account whether a class is appropriate for each

25  claim. *Hicks, supra,* 89 Cal.App.4th at 916 fn 22.  This can be daunting when a plaintiff

26  seeks to certify a claim under the UCL.

27

1   Certifying a class to pursue a claim under the UCL presents many of the same

2   challenges as determining the statute of limitations under the Unruh Act.  In *Gatto v.*

3   *County of Sonoma* (2002) 98 Cal.App.4th 744, 754-760, the Court held that although the

4   Unruh Act comprises *only* Civil Code section 51, all Unruh Act claims are not subject to

5

6   the same statute of limitations.  The Court noted that the Unruh Act "is increasingly

7   treated as an omnibus anti-discrimination statute no longer limited to merely ensuring

8   equal access to accommodations," that Courts should not assume that all Unruh Act

9   claims are subject to the same statute of limitations, and that such an assumption "fails to

10  attend to the complexity of the Unruh Act and the variety of claims that may be

11

12  adjudicated under its rubric."  The Court concluded that no single statute of limitations

13  applies to all claims under the Unruh Act and that the nature of the claim will determine

14  the applicable limitations period.  Similarly, although the UCL is a single statute all UCL

15  claims should not be treated equally.   The statute is complex, and a variety of claims may

16  be adjudicated under its rubric.  Common issues may predominate for some claims and

17

18  not for others.

19      A claim under the UCL may allege unlawful, unfair, or fraudulent business

20  practices and there is a separate jurisprudence for each prong of the UCL.  The unlawful

21  prong borrows from any "law, be it civil or criminal, federal, state, or municipal,

22  statutory, regulatory, or court-made," *Wang v. Massey Chevrolet* (2002) 97 Cal. App. 4th

23  856, 871; the unfair prong rests on policies that "must be "tethered" to specific

24  constitutional, statutory or regulatory provisions," *Gregory v. Albertson's, Inc.* (2002) 104

25  Cal. App. 4th 845, 854; and the fraudulent prong concerns the probable effects of

26

27  statements on hypothetical "reasonable consumers," *Lavie v. Procter & Gamble Co.*

27

1   (2003) 105 Cal. App. 4th 496, 506-507   Therefore, a plaintiff must clarify whether a

2   UCL claim alleges an unlawful, unfair, or fraudulent business practice.

3        Insofar as a UCL claim alleges an unlawful or unfair business practice, a plaintiff

4   must identify with particularity the state and federal statutes that support those claims.

5   The Court will not certify a UCL "unlawful" or "unfair" claim that purports to borrow or

6

7   rest on unspecified statutes or common law rules.  This differentiation is required because

8   common issues may predominate with regard to UCL claims based on one statute but not

9   on another.  In addition, a class of persons asserting generalized claims of unlawfulness

10  or unfairness is an invitation to problems regarding the res judicata effect of any

11  judgment. *Corbett v. Superior Court* (2002) 101 Cal. App. 4th 649, 671 (judgments in

12

13  UCL actions that have been certified as class actions are binding on absent class

14  members).

15       Finally, a plaintiff must identify the "business practice" at issue with some

16  specificity.  Common issues may predominate with regard to one business practice but

17  not another.

18

19       For these reasons, the Court will not certify a class to pursue an undefined UCL

20  claim.

21       The Court will certify UCL unlawful and unfair claims that overlay the certified

22  Labor Code claims.  The Court will not certify those UCL unlawful and unfair claims that

23  overlay the claims that are not otherwise certified.

24

25       The Court will certify the UCL fraudulent claim regarding OTC work, rest breaks,

26  and meal periods based on representations made in the Handbook.  The Handbook is a

27  uniform document that meets the commonality requirement and Plaintiffs have identified

28

1    the following specific representations in the Handbook that they allege to be fraudulent:

2    (1) "we want to pay you for this work" (PX 2 and DX 11 at p25); (2) "Associates will be

3    provided break and meal periods during their scheduled work shift" (PX 2 and DX 11 at

4    p26); (3) "No associate should work over six hours without taking at least a 30 minute

5    meal period" (PX 2 and DX 11 at p 26); and (4) Wal-Mart will provide rest breaks (PX 2

6    and DX 11 at p 26; DX 13). (P Supp Brief at 11:9-20.) Differences in how individual

7

8    associates interpreted the Handbook are irrelevant to the UCL fraudulent claim because

9    the claim concerns the effect on a "reasonable employee," not the effect on the actual

10   class members. *Lavie v. Procter & Gamble Co.* (2003) 105 Cal. App. 4th 496, 506-507.

11

12

13   TYPICALITY OF REPRESENTATION.

14       Plaintiffs' claims are sufficiently typical of the common claims presented. A class

15   representative's claims need not be identical to the claims of other class members and it is

16   only required that the representative be similarly situated so that he or she will have the

17   motive to litigate on behalf of all class members. *Classen v. Weller* (1983) 145

18   Cal.App.3d 47, 46. The named plaintiffs are sufficiently typical to represent the class.

19

20

21   ADEQUACY OF REPRESENTATION.

22       Wal-Mart presents evidence that Wal-Mart terminated the employment of

23   Plaintiffs Savaglio and Newland for cause. The reasons for their termination do not

24   concern directly whether they worked OTC or did not receive rest breaks or meal periods.

25

26   The Court holds that Savaglio, Newland, and Davis are adequate class representatives.

27

29

1   The named Plaintiffs have demonstrated that they will aggressively and competently

2   assert the interests of the class and that they have retained competent counsel.

3

4   POLICY CONSIDERATIONS.

5

6       The Court may consider whether a class action is a superior to individual claims

7   and the suitability of alternative procedures for handling the controversy. *Basurco*, 108

8   Cal. App. 4th at 120-122; *Caro*, 18 Cal. App. 4th at 660-662.

9       The UCL is a suitable alternative procedure for handling the claims insofar as they

10  concern Wal-Mart's policies and the implementation of those policies. The pending UCL

11  claim permits plaintiffs to stand in the shoes of the general public (like the DLSE) and to

12  obtain injunctive and declaratory relief to address an unlawful business practice (as in

13

14  class actions under F.R.C.P. 23(b)(2)). To the extent this case concerns the propriety of

15  Wal-Mart's business practices, the UCL claim is an effective alternative to certifying a

16  class to pursue injunctive and declaratory relief regarding those business practices. (A

17  representative UCL claim is arguably a superior alternative because it offers a streamlined

18  procedure.) The Court is, however, reluctant to deny class certification on the basis that

19

20  the UCL is an effective alternative given that representative UCL claims can themselves

21  proceed as class claims. *Corbett v. Superior Court* (2002) 101 Cal. App. 4th 649. The

22  better course is to certify the UCL claim as an injunction and declaratory relief class

23  similar to a class under F.R.C.P. 23(b)(2).

24

25      An investigation by the DLSE is another alternative procedure, and the DLSE has

26  initiated an investigation into Wal-Mart's timekeeping practices. (DSuppX 19.) The

27  DLSE investigation is at its early stages, so there would be a substantial delay in

30

1  resolving the claims of absent class members if the Court were to defer to the DLSE.  In

2  addition, Plaintiffs presented the Court with a letter from the DLSE to counsel for

3  Plaintiff dated September 12, 2003, stating, "[I]t would make little sense for us to

4  continue to investigate Wal-Mart's meal period practices in the face of the class action

5  that your firm is litigating over these same issues.  Indeed, we believe that this class

6  action now offers the best vehicle for vindicating the rights of Wal-Mart's employees.

7  Therefore, you may represent to the court in your action that DLSE has concluded that it

8  will stay its investigation of Wal-Mart's meal practice practices, and that we do not

9

10  anticipate resuming our investigation unless class certification is denied." (Grant Dec.

11  filed 9/15/03, Exh A.)  Therefore, the Court will not deny class certification based on the

12  pending administrative investigation. .

13

14  Individual claimants may pursue individual wage claims through an

15  administrative process under California Labor Code 98.  The administrative process is

16  "designed to provide a speedy, informal, and affordable method of resolving wage

17  claims" and "to avoid recourse to costly and time-consuming judicial proceedings in all

18  but the most complex of wage claims." *Post v. Palo/Haklar & Associates* (2000) 23

19  Cal.4[th] 942, 947.  The administrative process is not, however, an exclusive remedy. *Id.* at

20  946.  The Court holds that the class approach is a superior means to address policies and

21

22  practices that may cause consistent denials of rest breaks and meal periods.  The

23  administrative process is a better means to address the OTC and rest break claims of

24  individuals.

25

26  ///

27  ///

31

1

2    CLASS DEFINITION

3          The Court certifies four overlapping classes to pursue the four categories of class

4    claims.  The classes are (1) an "OTC Class" to pursue the Labor Code and UCL unlawful,

5    unfair, and fraudulent claims regarding Wal-Mart's OTC policies and to seek injunctive

6    and declaratory relief; (2) a "Rest Break Class" to pursue the Labor Code and UCL

7    unlawful, unfair, and fraudulent claims regarding Wal-Mart's rest break policies and to

8    seek injunctive and declaratory relief; (3) a "Meal Period Class" to pursue the Labor Code

9    and UCL unlawful, unfair, and fraudulent claims regarding Wal-Mart's meal period

10   policies and to seek injunctive and declaratory relief; and (4) a "Meal Period Money

11   Class" to pursue the Labor Code and UCL unlawful, unfair, and fraudulent claims

12   regarding whether associates were denied meal periods and to seek monetary relief.

13

14          All four classes are defined as follows: "All current and former hourly employees

15   of Wal-Mart Stores, Inc. (including Wal-Mart Stores and Supercenters) in the state of

16   California from February 6, 1997, through the date judgment is entered in this action,

17   excluding all employees who hold or held the following positions during the Class

18   Period: salaried manager, customer service manager, pharmacist, and/or personnel

19   manager."

20

21

22

23   EVIDENCE

24          Except as stated otherwise, all evidentiary objections by the parties are

25   OVERRULED.  The Court notes, however, that its consideration of the evidence is

26

27

1    limited to the motion for class certification only and should not be construed as an

2    indication of admissibility in future motions or at trial.

3

4    ISSUES NOT REACHED

5

6         Consistent with *Linder*, 23 Cal.4[th] at 439-40, the Court does not address the merits

7    issues raised in the briefing, including (1) whether individual losses of de minimus break

8    time that might not support individual claims can be aggregated and support a class

9    claim; and (2) whether there is a private right of action under Labor Code 226.7. The

10   Court likewise does not address the remedies issues raised in the briefing, including (1)

11   whether an employee can recover compensation for a short rest break given that rest

12   break time is paid time; (2) whether an employee can recover compensation for a short

13

14   meal period given that employees start receiving pay when their meal periods conclude;

15   (3) whether paragraph 11 of the Wage Orders require payment for the entire meal period

16   when meal periods are interrupted or just when an employee is "on-duty" during an entire

17   meal period.

18

19

20   FURTHER PROCEEDINGS

21        The Court sets a case management conference for November 21, 2003, at 2:00

22   p.m. At the case management conference the parties should be prepared to discuss the

23   necessity of providing class notice, the mechanics and form of any such notice, and

24   whether a formal motion on class notice will be required. C.R.C. 1856. The OTC Class,

25

26   the Rest Break Class, and the Meal Period Class are certified to seek injunctive and

27   declaratory relief only, so the Court is inclined to order that it is not necessary to provide

33

1   class members with notice and an opportunity to opt out of the class.  C.R.C. 1856(b)(1)

2   and (2) and (c)(1) and (2).  See also *Frazier v. City of Richmond* (1986) 184 Cal. App. 3d

3   1491, 1500-1501.  The Meal Period Money Class is certified to seek monetary relief, so

4   the Court is inclined to order notice and provide absent class members an opportunity to

5   opt out. *Bell v. American Title Ins. Co.* (1991) 226 Cal. App. 3d 1589, 1609, suggests

6   that this procedure may be appropriate.

7

8       At the case management conference the parties should also be prepared to discuss

9   (1) whether either side intends to seek writ relief from the class certification order; (2) the

10  nature, scope, and length of time expected to complete any merits related discovery; (3)

11  further motion practice; (4) mediation and settlement possibilities; and (5) setting a trial

12  date.

13

14      Prior to trial, the Court will require Plaintiffs to present a plan on how the case

15  will be tried.  The burden rests with Plaintiffs to present a manageable trial plan.

16  *Washington Mutual Bank v. Superior Court* (2001) 24 Cal. 4th 906, 924-925.  Defendant

17  will have the opportunity to present the Court with its concerns and offer a competing

18  trial plan.  The Court's goal will be to proceed to trial in a manner that will protect the

19

20  due process rights of Defendant and the absent class members, be comprehensible to the

21  jurors, and respect the time of the jurors.

22      The Court also encourages Plaintiffs to consider the nature and scope of the

23  injunctive relief they seek.  If Plaintiffs were to prevail on liability, Plaintiffs must

24  propose injunctive relief that is consistent with the proper role of the Court. *Diaz v. Kay-*

25  *Dix Ranch* (1970) 9 Cal.App.3d 588, 599 (dismissing claim for injunctive relief because

26

27  the remedy sought was impracticable and alternative enforcement means were available);

34

1  Weil & Brown, *Cal. Practice Guide: Civil Procedure Before Trial* (The Rutter Group

2  2003) § 9:541 (discussing judicial tendency to avoid injunctions that require continuing

3  judicial supervision).  Absent compelling circumstances, the Court is not likely to assume

4  ongoing supervision of Wal-Mart's staffing, scheduling, timekeeping, and payroll

5  operations.

6

7

8  Dated____11/6/03_____          _____

                                     Judge of the Superior Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

35

(RCD-11/00)

## CLERK'S CERTIFICATE OF MAILING

    I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served a copy of this Order by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States Mail at Alameda County, California, following standard court practices.


Frederick P. Furth, Esq.
Thomas P. Dove, Esq.
Jessica L. Grant, Esq.
Jonathan M. Watkins, Esq.
THE FURTH FIRM, LLP
201 Sansome Street, Suite 1000
San Francisco, CA 94104


Teresa A. Beaudet, Esq.
John Nadolenco, Esq.
MAYER, BROWN, ROWE & MAW, LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503


William I. Edlund, Esq.
BARTKO, ZANKEL, TARRANT & MILLER, P.C.
900 Front Street, Suite 300
San Francisco, CA 94111


Dated: November 7, 2003

ARTHUR SIMS
Executive Officer/Clerk of the Superior Court

By *Charlotte Marin*

*Charlotte Marin, Clerk of Dept. 22*


Certificate of Mailing

# EXHIBIT F

LEXSEE 2006 US DIST LEXIS 22546

**KEN SMITH, Plaintiff, v. HEARST COMMUNICATIONS, INC., Defendant.**

**No. C-06-00254 EDL**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2006 U.S. Dist. LEXIS 22546**

**April 13, 2006, Decided**
**April 13, 2006, Filed**

**COUNSEL:** [*1] For Ken Smith, Plaintiff: Richard J. Vaznaugh, Law Offices of Richard J. Vaznaugh, San Francisco, CA.

For Hearst Communications Inc. doing business as San Francisco Chronicle doing business as SFGate.com, Defendant: Baldwin J. Lee, Lindbergh Porter, Jr., Allen Matkins Leck Gamble & Mallory LLP, San Francisco, CA.

**JUDGES:** ELIZABETH D. LAPORTE, United States Magistrate Judge.

**OPINION BY:** ELIZABETH D. LAPORTE

**OPINION**

**ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND TO STATE COURT AND DENYING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**

**I. INTRODUCTION**

Defendant Hearst Communications, Inc. removed this case on the ground that Plaintiff Ken Smith's claims were completely preempted by section 301 of the National Labor Relations Act ("Section 301"). 29 U.S.C. § 185(a). However, because Smith's claims are grounded in non-waivable rights arising under the California Labor Code, they are not preempted.

**II. FACTUAL BACKGROUND**

Smith was an account executive at SFGate, a subsidiary of Hearst Communications, Inc. See Notice of Removal, Ex. C (Memorandum of Understanding ("MOU")) at 1. As an account executive, he solicited new advertising business for SFGate. [*2] Id. at 7. His position was covered by the Collective Bargaining Agreement ("CBA") negotiated between his union and Hearst. Id. at 1, 4, 7. When Smith decided to relocate to Arizona in May 2004, he allegedly negotiated a separation agreement whereby Hearst agreed to pay him commissions on all business that Smith booked through his last day of work as long as those advertisements ran within three months of his departure. Smith's manager allegedly assured him that he would receive this three month "tail" both verbally and in writing. Smith continued to make sales until his last day of work. Without the tail, Smith would have had no incentive to keep working, because he was working on a commission-only compensation basis.

After Smith resigned, Hearst refused to pay tails on Smith's two biggest accounts, Google, Inc. and Intercept Interactive (the "Disputed Accounts"). After his union and the NLRB declined to pursue his grievances, Smith sued his former employer in Superior Court. Smith's complaint alleged only violations of California Labor Code section 200 et seq., specifically sections 202 (wages payable upon resignation), 203 (waiting time penalties), [*3] 218.5 (attorneys' fees and costs), 218.6 (interest), and of California Business & Professions Code section 17200, et seq. (unfair competition). Hearst removed the case on the basis that Smith's state-law claims were preempted by Section 301 of the National Labor Relations Act because they all arose out of the CBA. Smith then filed a motion to remand and for attorneys' fees.

**III. DISCUSSION**

A. Removal Jurisdiction and the Complete Preemption Doctrine.

Where a civil action over which the federal courts have original jurisdiction is brought in state court, the defendant may remove the action to federal district court.

See 28 U.S.C. § 1441. A case may be removed pursuant to 28 U.S.C. section 1441 only where a federal question appears on the face of the properly pleaded complaint. See Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987). The Ninth Circuit has consistently held that 28 U.S.C. section 1441 is to be strictly construed against removal jurisdiction, and that "[f]ederal jurisdiction must be rejected if there is any doubt as to the right [*4] of removal in the first instance." Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992) (citing Libhart v. Santa Monica Dairy Co., 592 F.2d 1062, 1064 (9th Cir. 1979)). On its face, the complaint, which asserts state law claims only, does not provide any ground for removal. Hearst argues, however, that the claims are artfully pled and are in fact claims for breach of the CBA, triggering preemption by Section 301 of the National Labor Relations Act. Section 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). Accordingly, the only ground for federal jurisdiction arises out of Hearst's construction of Smith's claims, and its anticipated defenses.

Normally, a defendant may not rely on an affirmative defense to establish preemption and removal jurisdiction. See Caterpillar, 482 U.S. at 393 ("[I]t [*5] is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." (citing Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. Cal., 463 U.S. 1, 12, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983))); see also Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 809, n.6, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."). Nevertheless, in the area of labor relations and collective bargaining, "the preemptive force of a statute is so extraordinary' that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" Caterpillar, 482 U.S. at 393 (quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)); see also Olguin v. Inspiration Consol. Copper Co., 740 F.2d 1468, 1472-73 (9th Cir. 1984) (courts must look behind artful pleading and ascertain whether state claim is [*6] really a Section 301 claim in disguise). This "complete preemption" doctrine "is applied primarily in cases raising claims preempted by § 301" of the Labor Management Relations Act. Caterpillar, 482 U.S. at 393. Where the heart of a state-law complaint is a violation of a CBA, that complaint arises under federal law, whether or not the plaintiff has mentioned the CBA. Id. at 394 ("'[T]he preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.'" (quoting Franchise Tax Bd., 463 U.S. at 23))). Preemption also applies if the state claims are "substantially dependent on analysis'" of the CBA. Caterpillar, 482 U.S. at 394 (quoting Int'l Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 859, n.3, 107 S. Ct. 2161, 95 L. Ed. 2d 791 (1987)).

By contrast, state law claims that are independent from the CBA or that only require a court to refer to or consult a CBA are not preempted. See [*7] Caterpillar, 482 U.S. at 399 ("But a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. . . . Congress has long since decided that federal defenses do not provide a basis for removal."); Livadas v. Bradshaw, 512 U.S. 107, 124-25, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994) ("simple need to refer" to a CBA does not trigger Section 301 preemption); Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 410-13, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1998) (CBA can provide helpful terms in state law action without triggering preemption).

B. Smith's Claims Are Not Completely Preempted by Section 301 of the NLRA.

Hearst mistakenly argues that Smith's claims are arise from the CBA, or at least would require a state court to analyze the CBA and as such are completely preempted.

1. Smith's Claims Are Based on Non-Negotiable State Rights, not on Contract Law.

The Ninth Circuit has made clear that the rights Smith invokes under the Labor Code are "non-negotiable" and could not have been bargained away by Smith's union. See Valles v. Ivy Hill Corp., 410 F.3d 1071, 1076, 1082 (9th Cir. 2005) [*8] (holding that employees' California state law claim regarding unlawful meal period policy of their employer was not preempted because employees had based their claim on California state law, "without any reference to expectations or duties created by their" CBA); see also Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 748 (9th Cir. 1993) ("[C]auses of action which assert nonnegotiable state-law rights . . . independent of any right established by contract'" are not preempted by Section 301.); Balcorta v. Twentieth Century-Fox Film Corp., 208 F.3d

1102, 1111 n.3 (9th Cir. 2000) (Section "301 does not permit parties to waive, in a [CBA], nonnegotiable state rights."). Because Smith pled only claims under state statutes governing basic workplace rights rather than a claim for breach of an employment contract, this case differs from both Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993 (9th Cir. 1987), and Olguin, 740 F.2d 1468. In Young, the court held that the plaintiff's claim for breach of contract based on an oral promise by her employer to discharge her only for cause was preempted by Section 301 [*9] because the plaintiff's position was covered by a CBA (which allowed the employer to discharge probationary employees like plaintiff without cause), See Young. 830 F.2d at 996. In Olguin, 740 F.2d at 1474, the court similarly held that an employee's claim for breach of contract based on a personnel policy manual requiring the use of "progressive discipline" before termination of an employee was preempted because a CBA existed between the employee's union and his employer. By contrast, Smith did not file a breach of contract claim, but instead sought to vindicate rights protected by the California Labor Code. [1]

> [1] Hearst emphasizes that Smith, in complaining to the NLRB, made a sworn statement that his employer "in violation of the [CBA]" failed to pay his commissions. See Notice of Removal, Ex. D. According to Hearst, this statement constitutes a binding admission by Smith that his claims arise under the CBA and contradicts the declaration that he filed in support of his motion to remand. See Opp'n at 5-6. This argument is not persuasive. First, Smith states that he made the earlier declaration based on the NLRB's instructions and that he, as a non-lawyer, was not qualified to determine what rights had been violated or what those rights arose under. See Smith Decl. PP 2-4. Second, the original declaration did not state that his claim for commissions arose *solely* under the CBA. Third, the case upon which Hearst relies, Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999), is inapposite. There, the plaintiff had previously filed a declaration stating that she was unable to work in support of her application for Social Security Disability Income benefits. She then sued her employer for disability discrimination. The employer moved for summary judgment, arguing that the plaintiff could not meet one of the elements of her case since she had sworn that she was unable to work. The plaintiff failed to explain the discrepancy between her earlier statement and her position opposing summary judgment. The court held that: "When faced with a plaintiff's previous sworn

statement asserting total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an [Americans with Disabilities Act] claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions' of her job, with or without reasonable accommodation.'" Id. at 807. Smith's earlier declaration does not rise to the same level of definitiveness as the declaration in Cleveland, and he has provided a sufficient explanation for the discrepancy.

[*10] Hearst argues that Smith's claims nonetheless are preempted because Labor Code section 203 only applies to situations where an employer *wilfully* fails to pay wages owed, and that whether or not Hearst's decision not to pay was willful can be determined only by reference to the CBA. As explained below, resolving this issue will not require the type of analysis that is prohibited by Section 301. At the hearing, Hearst also argued that the uncertainty of what amount was owed to Smith distinguished Balcorta, 208 F.3d 1102 and Ramirez, 998 F.2d 743. However, Hearst did not provide any authority for the proposition that the California Legislature intended to limit "non-negotiable" rights to those situations where the amount of the payment owed was already determined. Smith did not allege a breach of contract, and Hearst cannot invoke federal jurisdiction by redrafting the claims that Smith has pleaded.

2. Smith's Claims Do Not Require a State Court to Interpret the CBA.

The CBA and the MOU governed the terms of Smith's employment. See Notice of Removal, Exs. B (CBA)-C (MOU). Section 4 of the MOU specifically allowed Hearst [*11] to have a percentage of its sales staff on a commission-only compensation basis, exempted such employees from Article XX of the CBA, and specified that the employer "shall determine the commission structure" for SFGate commissions-only employees like Smith Id., Ex. C § 4 P 9. By amendment, the MOU clarified that:

> Commission sales employees shall be permitted to solicit only new advertising business; defined as . . . advertising accounts which have not been active in the Chronicle for 13 months and . . . advertising accounts which have run other paid advertising in print or direct mail in our market and have not been active in the

Chronicle for 6 months. . . . Once a new account becomes regular, it shall be turned over to a member of the salaried sales staff who shall continue to service the account. A new account becomes "regular" after it has placed advertisements in each of 12 consecutive months within a 14 month period. . . . The Employer shall determine the commission structure.

Id., Am. at 7. The MOU accordingly provides readily calculable, time-based definitions of "new" accounts for which account executives are entitled to commissions, and of [*12] "regular" accounts for which they are not.

Because the CBA gave it the right to set the commission structure, including percentage and qualifying accounts, Hearst argues that Smith's claims under the Labor Code for unpaid commissions will require a court to analyze terms of the CBA in a manner prohibited by Section 301. See Caterpillar, 482 U.S. at 394; see also Young, 830 F.2d at 997. Unlike the collateral agreements at issue in Young and Olguin, however, Smith's alleged collateral agreement only supplements terms that are entirely missing from the CBA. See MOU; see also March 14, 2006 Declaration of Linda Frediani ("Frediani Decl.") P 3 ("[C]ommissioned-only salespeople like Mr. Smith worked under commission arrangements that were established between them and the company outside the CBA. Typically, the Guild was not involved in setting these commission agreements and this was true in Mr. Smith's case, as well. To my knowledge, nothing in the CBA in 2004 prevented the Company from negotiating a separate agreement for commissions of the type Mr. Smith told me about. Indeed, there had to be separate agreements between the company [*13] and its salespeople because no commission plans were included in the CBA."). [2] The complaint therefore only implicates the CBA to the extent that Hearst will defend its refusal to pay commissions by claiming that the Disputed Accounts were "regular" accounts (a term defined in the CBA) for which Smith was not entitled to any commissions.

   2   Ms. Frediani submitted two declarations in connection with this motion. The first declaration was filed in support of Plaintiff's motion for remand; the second was filed late in support of Hearst's opposition. As the Court noted at the hearing, the declarations conflicted. The Court ordered the parties to make Ms. Frediani available at the hearing, but her attorney was unable to appear on such short notice.

Determining whether this defense is valid will not require a state court to analyze the CBA in a prohibited manner. That a court will eventually look to Amended paragraph 9(3) of the MOU to find the definition of a "regular" account versus a "new" account does not mean [*14] that the court will have to interpret the CBA. With the definition in hand, the court will only have to consult a calendar and accounting records to determine whether the Disputed Accounts had placed advertisements in the Chronicle for the thirteen months prior to Smith's resignation. Smith's claims therefore are not completely preempted by Section 301. See Livadas, 512 U.S. at 124 ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." (citing Lingle, 486 U.S. at 413 n.12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled."))).

For example, in Ramirez, the Ninth Circuit refused to extend Section 301 preemption to cases that only involved a reference to or consideration of a clause in a CBA:

> Fox errs in equating "reference" with "interpret." The resolution of Ramirez's action will not require the interpretation [*15] of the Bargaining Agreement. The Bargaining Agreement will likely be referred to by Ramirez and Fox to determine the terms and conditions of her employment. But her underlying cause of action is that Fox discriminated against her in applying and/or altering those terms and conditions. Although the inquiry may begin with the Bargaining Agreement, it certainly will not end there. . . . reference to or consideration of the terms of a collective-bargaining agreement is not the equivalent of interpreting the meaning of the terms. . . . Although the line between reference to and interpretation of an agreement may be somewhat hazy, merely referring to an agreement does not threaten the goal that prompted preemption -- the desire for uniform interpretation of labor contract terms.

998 F.2d at 748-749 (citing Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04, 82 S. Ct. 571, 7 L. Ed. 2d 593 (1962)). Similarly, in Balcorta, the Ninth Circuit explained that: "[w]e have stressed that, in the

context of § 301 complete preemption, the term interpret' is defined narrowly -- it means something more than consider,' refer to,' or apply.'" 208 F.3d at 1108 (quoting [*16] Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers, 109 F.3d 1353, 1357 (9th Cir. 1997)). The court accordingly affirmed the denial of summary judgment on preemption grounds, holding that it was not necessary to interpret the terms of the CBA to decide what constituted a "discharge" or "timely payment of wages" for purposes of plaintiff's claim:

> Although the provisions [of the CBA] do detail fairly complicated procedures and contain a hefty dose of industry jargon, their meaning is neither uncertain nor ambiguous. A court may be required to read and apply these provisions in order to determine whether an employee was discharged from his "call" at the end of his shift, but no interpretation of the provisions would be necessary. . . . We have difficulty understanding why Fox thinks this straightforward language requires interpretation. . . .

Balcorta, 208 F.3d at 1109-10. The CBA terms that Hearst will rely on to defend against Smith's claims will be those defining "regular" accounts and "new" accounts. See Notice of Removal, Ex. C (MOU) at 7. These unambiguous provisions use similarly "straightforward [*17] language" that does not require interpretation.

Finally, because the Court has determined that Smith is suing to enforce non-negotiable state rights, which do not trigger Section 301 preemption, the Court need not reach Plaintiff's alternate argument based on Price v. Georgia-Pacific Corp., 99 F. Supp. 2d 1162 (N.D. Cal. 2000). C. Motion for Attorney's Fees.

Absent unusual circumstances, court usually award attorneys' fees under 28 U.S.C. section 1447(c) only if the removing party "lacked an objectively reasonable basis for seeking removal." Martin v. Franklin Capital Corp., 126 S. Ct. 704, 711, 163 L. Ed. 2d 547 (2005). As the Ninth Circuit has stated, "[l]abor preemption is a complex and confused area of the law." Olguin, 740 F.2d at 1473. Hearst removed the case based on the "objectively reasonable basis" that Smith's claims were completely preempted, and the Court does not find any "unusual circumstances" that warrant fee shifting.

## IV. CONCLUSION

For the reasons stated above, pursuant to 28 U.S.C. § 1447(c), the Court remands the case to the Superior Court and denies Smith's motion for [*18] attorneys' fees.

**IT IS SO ORDERED.**

Dated: April 13, 2006

ELIZABETH D. LAPORTE

United States Magistrate Judge

# EXHIBIT G





1

2

3

4

5

6

7

8

9

10

11

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| 12 JAMES STEVENS, an individual and on behalf of all others similarly 13 situated, | ) ) ) CASE NO.:  SACV 04-1337 CJC (CTx) ) |
| 14 Plaintiff, | ) ORDER GRANTING IN PART AND ) DENYING IN PART DEFENDANTS' ) MOTION FOR SUMMARY JUDGMENT |
| 15 v. | ) AND DENYING PLAINTIFF'S MOTION ) FOR CLASS CERTIFICATION |
| 16 GCS SERVICE, INC., a Delaware corporation; ECOLAB INC., a 17 Delaware corporation, and DOES 1 through 200, inclusive, | ) ) ) ) |
| 18 | ) |
| 19 Defendants. | ) |



20

21       Plaintiff James Stevens asserts claims for unpaid overtime and meal and rest

22  period violations on behalf of himself and a putative class of current and former

23  employees of Defendant GCS Service, Inc., a kitchen equipment repair company.

24  Before the Court are (1) GCS's motion for summary judgment on Mr. Stevens'

25  individual claims, and (2) Mr. Stevens' motion for class certification.  Because the

26  undisputed evidence shows that Mr. Stevens is not entitled to compensation for his

27  commuting time to and from work, partial summary judgment for GCS is

28  GRANTED as to Mr. Stevens' overtime claim.  However, partial summary

1  judgment is DENIED as to his meal and rest break claims because he presents

2  evidence that GCS discouraged him from taking the breaks and imposed

3  productivity demands that did not permit them. Finally, because Mr. Stevens has

4  not met his burden to show that the meal and rest break claims are appropriate for

5  class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) or (b)(3),

6  his motion for class certification is DENIED.

7

8  **I.    Background**

9

10  GCS Service, Inc. ("GCS") provides repair services for commercial kitchen

11  appliances across the nation. (Bogen Depo., 16:24-27:3.)  Mr. Stevens worked as

12  a service technician for GCS in Los Angeles from October 1992 until he quit his

13  job in June or July 2004, with a brief hiatus between April 2001 and February

14  2002. (Plaintiff's Statement of Genuine Issues, "SGI," Nos. 1, 4.)  While he

15  worked for GCS, Mr. Stevens repaired and maintained cooking and food

16  preparation equipment for restaurants, hospitals, and nursing homes. (SGI No. 2;

17  Stevens Depo. 25:17-24.)

18

19  GCS technicians have no fixed job site. (SGI Nos. 3, 6, 8; Stevens Depo.

20  78:44-12.)  Instead, they drive to customers' locations in vans owned and provided

21  by GCS, which contain tools used in the repair jobs. (SGI Nos. 3, 6, 8; Stevens

22  Depo. 78:44-12.)  GCS pays for fuel and maintenance for the vans, and charges

23  each customer a flat "trip charge" to cover those costs. (Bogen Depo., 8-24;

24  Motion for Summary Judgment, p.10 n.5; Lenarz Depo., 22:2-19.)  Before 2002,

25  GCS charged each customer for the actual amount of the technician's travel time

26  to the site. (Pelaske Decl., ¶ 8.)  Technicians are required to use the vans, and may

27  not drive their personal vehicles to job sites. (Lenarz Decl., ¶ 5; Pelaske Decl., ¶

28  5.) Tzannakos Decl., ¶ 5.)  The vans have stickers displaying an (800) number,

1    that allow other drivers to report the technicians' driving habits to GCS. (Stevens

2    Decl., ¶5.) If GCS receives too many complaints about a technician's driving

3    habits within a specific time period, the technician may be fired. (*Id.*; Exh. C to

4    Stevens Decl., at 5.) All service technicians are required to undergo a successful

5    completion of a Motor Vehicle Record check and drug test before they are hired.

6    (Exh. A to Stevens Decl.)

7

8       Technicians spend their days driving GCS' vans between jobs. In the

9    morning, they drive the vans from their homes to the first job site, and in the

10   evening they drive the vans from the last job site back to their homes. (Stevens

11   Depo. 60:16-61:16.) They are required to call dispatchers several times a day to

12   communicate their locations and movements, receive new assignments, and update

13   the dispatchers on the status of their work. (*Id.*, 71:3-19; Bogen Depo., 62:22-

14   63:1.)

15

16       Technicians differ in the timing of their first and last calls of the day to the

17   dispatcher, and in the activities they perform on the way to their first job and home

18   from their last job. Mr. Stevens typically would make his first call of the day to

19   the dispatcher after he had arrived at his first job site, and would learn the location

20   of the first job site for the following day in the evening, when he called at the end

21   of his last job before going home. (Stevens Depo., 131:2-25.) However, a current

22   GCS technician named Michael Lenarz states that he typically makes his final call

23   after arriving home in the evening, and then makes an additional call to GCS'

24   parts center to tell it what parts have been used during the day and what parts need

25   to be ordered. (Lenarz Depo., 32:3-15; 45:2-48:22.) Mr. Lenarz also states that he

26   stops approximately once a week on the way to his first call of the day to pick up

27   parts and supplies for work, and that he stops on the way home at a mailbox to

28   mail paperwork to GCS. (Lenarz Depo., 52:9-23.) Another current GCS

3

1  technician, Peter Tzannakos, makes the final call from his car while driving home.

2  (Tznnakos Decl., 24:12-25:6.) Mr. Lenarz and Mr. Tzannakos also state that they

3  regularly inspect their vans before starting to drive to their first job site.

4  (Tzannakos Decl., ¶28:11-17.)

5

6  　　　　Technicians generally are not allowed to use the vans for personal purposes,

7  or to carry passengers in the vans.   (Stevens Decl., ¶ 5; Stevens Depo:123:3-25;

8  Lenarz Depo. 54:18-25; Tzannakos Decl., ¶20-23.) However, GCS has a written

9  vehicle policy which allows "[l]imited personal use of company service vehicles

10 within the associate's geographical work area ... subject to approval by the driver's

11 manager." (Exh. C to Stevens Decl., at 3.)  Mr. Stevens was disciplined once for

12 violating the personal use policy, because he picked his grandson up from daycare

13 on his way home at the end of the day. (Stevens Decl., ¶ 5; Stevens Depo:123:3-

14 25; Lenarz Depo. 54:18-25; Pelaske Depo., 37:22-24.)   However, a technician

15 named Paul Morrison received permission from a supervisor named Dave

16 Santilena in 2005 to use his van for errands on weekends. (Morrison Depo., 38:4-

17 22.) Mr. Morrison states that another supervisor, Ralph Turner, gave him a

18 contrary instruction that he could never use the van for personal use, and that

19 different supervisors have different policies regarding personal use of the vans.

20 (Morrison Depo., 39:2-40:9.) One former GCS supervisor, William Pelaske, states

21 that the technicians he supervised at GCS  regularly used the vans for personal

22 errands on the way home from their last job site, and that he knew they did so but

23 never disciplined them for it. (Pelaske Depo., 36:14-37:13.)

24

25 　　　　Technicians also vary in the number of personal errands they run between

26 home and their first and last job sites. Mr. Stevens states that he never stopped for

27 coffee or to run errands on the way to work or going home, but that he would stop

28 for fuel. (Stevens Depo., 124:21-125:8; 126:1-19.) He also states that he used the

4

1  van approximately twenty times to drop his grandson off at day care. (Stevens

2  Depo., 123:3-25.) Several times during his 2002-2004 stint at GCS, Mr. Stevens

3  stopped to visit friends and/or meet with his lawyer on the way home from his last

4  job site. (Stevens Depo., 133:12-135:5; 138:1-12.) Mr. Morrison states that he

5  has stopped on the way to work for a snack or coffee. (Morrison Depo., 32:23-

6  33:5.) Mr. Lenarz states that he never stops on the way to work, other than to buy

7  fuel or pick up supplies, but that he has occasionally stopped at the grocery store

8  on the way home. (Lenarz Depo., 53:13-54:12; 55:2-7; 61:13-25.) Mr. Tzannakos

9  states that he would only stop on the way to work for fuel, and would occasionally

10  buy coffee on those stops. (Tzannakos Decl., 34:9-25.) Bill Burker and Greg

11  King, technicians in Northern California, state that they occasionally run personal

12  errands or stop for coffee during their commutes. (Burker Decl., ¶3; King Decl.,

13  ¶4.)

14

15         Technicians can choose what routes to take on the way to the first job site of

16  the day and home from the last site, and what speed to drive. (Stevens Depo.,

17  74:20-25.) They are required to have a GCS cell phone, and to use it during the

18  commute, including on the commute to the first job site of the day. (*Id.*, 119:22-

19  24; 120:3-121:3.) Mr. Stevens periodically would receive calls on his GCS cell

20  phone from GCS dispatchers on the way to his first job site, regarding changes in

21  the job site arrangement. (Stevens Depo., 155:23-156:17.) He was also permitted

22  to use his personal cell phone during the drive, and to make personal calls. (*Id.*,

23  112:10-14.) In 2005, after Mr. Stevens quit, GCS installed global positioning

24  satellite devices in its service vans to allow it to monitor technicians' locations.

25  (Tzannakos Depo., 79:12-23.) Mr. Tzannakos states that, since the GPS device

26  was installed in his van, he has received one telephone call from GCS during his

27  drive, telling him to slow down and that GCS was monitoring his speed.

28  (Tzannakos Depo., 82:8-13.) In February 2005, after the GPS systems were

1   installed, GCS sent a memorandum to its technicians entitled "Technician Use of

2   Time Tracking, Mapping & Communication Device-Basic Operation." (Plaintiff's

3   Exh. 22.) The memorandum instructed technicians to enter messages into the GPS

4   device, including hitting "send" "when you have started your day and in route to

5   your first stop." (Id.)

6

7       At all times during Mr. Stevens' employment, GCS had a policy of not

8   compensating its Los Angeles technicians for up to one hour of commuting time

9   from their home to the first service call of the day, and from the last service call of

10  the day back to their homes. (Stevens Depo., 35:9-36:2; Bogen Depo. 49:16-

11  50:25.) This policy was called the "reasonable commute" policy. (Bogen Depo.,

12  47:8-50:11.)  GCS adopted the reasonable commute policy for the Northern

13  California area in late 2003, and it is now uniform through GCS's California

14  operations. (Id., 51:12-57:25.) Prior to 2002, GCS's various regions had different

15  policies regarding commuting time. (Bogen Depo., 43:4-9.)  In Northern

16  California, commute time was not reimbursed before 2002 absent extenuating

17  circumstances. (Id., 43:10-13.)

18

19      During the day, technicians record their travel time and time spent at each

20  work site on dispatch logs. (Pelaske Decl., ¶7.)[1] Every week, the technicians fill

21  out a weekly log sheet with time totals for regular, overtime, doubletime, and

22  vacation pay, and personal leave, and submit them to a regional supervisor called a

23  "Field Service Manager" ("FSM"). (Id.; Exh. C to Pelaske Decl.)  FSMs are

24  responsible for ensuring CGS' compliance with overtime laws, promoting sales,

25  and managing CGS' workforce in their specific areas. (Bogen Depo., 31:19-23;

26

27      [1] Until 2002, technicians were required to call their dispatchers before they left for
28  their first job site of the day, because prior to 2002 GCS billed each client for the actual
    amount of travel time the technician spent en route to the site. (Pelaske Decl., ¶ 8.)

1   32:2-6.) FSMs also review technicians' time tracker reports and log sheets. (Exh.

2   8 to Bogen Depo.)

3

4          During Mr. Stevens' employment at GCS, GCS had a formal written policy

5   establishing a 40-hour work week for technicians, with business hours from 8:00

6   to 5:00, which provided that employees were to take meal and rest breaks. (GCS

7   Exh. 23.) The policy stated, "It is the manager's responsibility to ensure that

8   policies regarding hours, meal breaks and rest periods are followed and that any

9   authorized exceptions are supported and documented on time records." (*Id.*) The

10  policy further stated that "the duration of meal breaks varies by division/location."

11  (*Id.*) While technicians generally were not permitted to work through meal breaks

12  to make up lost time, they were permitted to do so "in exceptional cases and with

13  manager approval." (*Id.*) When they did so, the policy stated, the time spent

14  working through the break "will be considered paid time." (*Id.*)

15

16         Despite GCS' written policy, Mr. Stevens did not take any lunch or rest

17  breaks during the day while he worked for GCS because his schedule and GCS'

18  productivity requirements did not allow it. (Stevens Depo., 272:15,18; 274:1-22.)

19  At one point, a GCS supervisor called Mr. Stevens and several other technicians

20  into a meeting and told them their production billing numbers were too low. (*Id.*,

21  287:4-7; 288:2-18.) Mr. Tzannakos states that he has never taken rest breaks and

22  did not take lunch breaks before March 2005, when GCS began insisting

23  employees do so. (Tzannakos Depo., 66:17-67:25.) Although GCS managers

24  periodically told technicians to take rest and meal breaks before March 2005, most

25  technicians in Los Angeles and Orange County did not. (Tzannakos Depo., 66:17-

26  21.) At a meeting with technicians in August 2004, GCS' Los Angeles FSM, Jim

27  Frisbee, told Mr. Stevens, Mr. Tzannakos, and Mr. Lenarz that GCS had been

28  contacted by an attorney about violations of the meal and rest break laws, and

7

1    instructed them to write down lunch breaks even if they did not take them.

2    (Stevens Depo., 274:13-275:2; 294:20-22; Tzannakos Depo., 63:9-24.)[2] Mr.

3    Frisbee also encouraged Mr. Stevens to travel to his next job site during his lunch

4    breaks to increase his productivity. (Stevens Depo., 274:13-275:2; 294:20-22.)

5    Mr. Lenarz states that, before March of 2005, GCS managers would tell

6    technicians that "they would prefer you do the job," and "they want[] you to get

7    the job done first." (Lenarz Depo., 99:2, 13-14.) Mr. Lenarz was never told

8    before March 2005 to take a meal break, and was routinely encouraged to work

9    through meal and rest breaks. (*Id.*, 99:23-25; 108:1-12.)

10

11       Several GCS technicians in Northern and Southern California, however, say

12    they have always been encouraged to take meal and lunch breaks, have never been

13    instructed to miss a break, and commonly take rest breaks throughout the day.

14    (King Decl., ¶¶ 6-7; Stanzione Decl., ¶¶6-7; Segner Decl., ¶¶6-7; Zastrow Decl.,

15    ¶¶6-7.) John Borsari, who has worked as a GCS technician for four years in

16    Northern California, states that the Pacific Regional Manager, Jeff Dahlin, and his

17    own supervisor told him shortly after he started working at GCS to take lunch

18    breaks. (Borsari Decl., 4.) He also states that he takes several rest breaks during

19    the day while waiting for equipment. (*Id.*, ¶3.) Andrew Speegle, who has worked

20    as a technician in Northern California for two years, states that his FSM told him

21

22       [2] A copy of the minutes from that meeting is attached as Exhibit G to Mr. Lenarz'

23    Declaration. One item in the minutes states:

24       Lunch Breaks were discussed. Jim mentioned to all that the policy has been
discussed on more than one occasion in the past and that the policy is that

25       each technician should take a 1 hour per day break. Jim said that because of

26       the call back log in LA, we won't enforce the one hour rule but he needs
everyone to take 30 minutes per day and show that time off on the time

27       tracker.

28    (Exh. G to Lenarz Decl., ¶8.)

1  during orientation to take a half-hour meal break, and that the FSM reminds

2  technicians at least once a month to do so. (Speegle Decl., ¶4.)

3

4      On October 8, 2004, a GCS employee named Rita J. Garcia sent an e-mail to

5  GCS' Service Management Team. (Plaintiff's Appendix of Evidence, Exh. 21.)

6  The e-mail stated, among other things, that "[s]ervice technicians are indicating

7  that they have worked through lunch and have put in their eight hours." (*Id.*) It

8  instructed the GCS Service Management Team to "insure that the Service

9  Technician is in fact taking lunch vs. working through," and stated, "[t]his is both

10  a safety issue and a work hour[s] issue." (*Id.*)

11

12      Mr. Stevens' Complaint sets forth claims for (1) violation of California

13  Labor Code 202 and 1198, for failure to pay overtime; (2) violation of California

14  Labor Code Section 204; (3) violation of California Labor Code Sections 512 and

15  226.7, (4) failure to pay overtime compensation, (5) violation of California's

16  Unfair Competition Law ("UCL"), Business and Professions Code Section 17200

17  et seq., (6) declaratory relief, and (7) an accounting.  Defendant moves for

18  summary judgment of Mr. Stevens' individual overtime and meal and rest break

19  claims, and Mr. Stevens moves to certify a class "consisting of non-exempt

20  technician employees of Defendants GCS Service Inc. and Ecolab, Inc....who work

21  or have worked for Defendants in California from 2000 to the present." (Motion

22  for Class Certification, p.1.)

23

24  **II.    Defendants' Motion for Summary Judgment**

25

26      Federal Rule of Civil Procedure 56 states that a party is entitled to summary

27  judgment where "there is no genuine issue as to any material fact and the moving

28  party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is

1  material if it "might affect the outcome of the suit under the governing law."

2  *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).  The moving party on a

3  summary judgment motion bears the initial burden of proving the absence of a

4  genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

5  If the moving party does so, the burden shifts to the nonmoving party to

6  "designate specific facts showing that there is a genuine issue for trial."  *Celotex*,

7  477 U.S. at 324 (citation omitted).  Where, as here, the non-moving party bears the

8  burden of proof at trial on an element essential to its case, that party must present

9  evidence sufficient to establish a genuine dispute of fact with respect to the

10  existence of that element in order to avoid summary judgment.  *Id.* at 322.

11

12  **A.    Mr. Stevens' Overtime Claims**

13

14      Mr. Stevens asserts that he was entitled to overtime pay for time spent

15  commuting to and from work.  In California, overtime compensation in particular

16  industries is governed by orders issued by the Industrial Welfare Commission

17  ("IWC"), the agency empowered to formulate regulations governing employment

18  in the state.  *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 581 (2000);[3] CAL.

19  LAB. CODE §§ 70-74, 1173, 1178, 1178.5, 1182.  So far, the IWC has promulgated

20  18 wage orders.  Twelve of them cover specific industries,[4] four  cover certain

21

22      [3] Employees are subject to state law regarding minimum wages and maximum

23  work weeks where the state standards are more protective of employees than federal law.
   29 U.S.C. §218; *Aguilar v. Assn. for Retarded Citizens*, 234 Cal. App. 3d 21, 34 (1991).

24

      [4] *See* 8 C.C.R. §§ 11010 (manufacturing industry), 11020 (personal service
25  industry), 11030 (canning, freezing, and preserving industry), 11050 (public housing
   industry); 11060 (laundry, linen supply, and dry cleaning, and dyeing industry); 11070
26  (mercantile industry); 11080 (industries handling products after harvest); 11090
   (transportation industry); 11100 (amusement and recreation industry); 11110
27  (broadcasting industry); 11120 (motion picture industry); 11130 (industries preparing
28  agricultural products for market, on the farm).

occupations,[5] one is a general minimum wage order,[6] and one applies to industries and occupations not covered by, and all employees not specifically exempted in, the wage orders in effect in 1997.[7] *See* CAL. CODE REGS., tit.8, 11000-11170.

The parties agree that the applicable IWC order in this case is 8 C.C.R. §11040, which applies to "all persons employed in professional, technical, clerical, mechanical, and similar occupations." 8 C.C.R. §11040(1). The order provides that covered employees:

> shall not be employed more than eight (8) hours in any workday or
> more than 40 hours in any workweek unless the employee receives
> one and a half (1 ½) times such employee's regular rate of pay for all
> hours worked over 40 hours in the workweek.

8 C.C.R. §11040(3)(A)(1).

"Hours worked" means:

> the time during which an employee is subject to the control of an
> employer, and includes all the time the employee is suffered or
> permitted to work, whether or not required to do so.

8 C.C.R. §11040(2)(K).

---

[5] *See* 8 C.C.R. §§ 11040 (professional, technical, clerical, mechanical, and similar occupations); 11140 (agricultural occupations); 11150 (household occupations); 11160 (certain on-site occupations in the construction, drilling, logging, and mining industries).

[6] *See* 8 C.C.R. § 11000.

[7] See 8 C.C.R. § 11170 (miscellaneous employees).

11

1    Interpreting identical language in a different wage order, the California

2  Supreme Court has held that "subject to the control of the employer" and "suffered

3  or permitted to work," establish two separate standards, each of which is sufficient

4  to give rise to "hours worked." *Morrillion*, 22 Cal. 4th at 582. "Thus, an

5  employee who is subject to an employer's control does not have to be working

6  during that time to be compensated under [the wage order]." *Id.* Similarly, an

7  employer must pay overtime to an employee who is "suffered or permitted to

8  work," even if not required to do so, whenever the employer knows or should

9  know that the employee is working overtime. *Id.* at 585. "Ordinary commute"

10  time, however, is not compensable under California law, *Morrillion*, 22 Cal. 4th at

11  587-88. The question, therefore, is whether Mr. Stevens has presented sufficient

12  evidence to create a genuine issue of material fact regarding whether he was

13  "subject to the control" of GCS during his commutes, or was "suffered or

14  permitted to work" during those commutes, so as to entitle him to overtime pay for

15  commuting time beyond eight hours in a day.

16

17    **1.    "Subject to the Control of the Employer"**

18

19    In *Morrillion*, the California Supreme Court addressed the meaning of

20  "subject to the control of the employer." The plaintiffs were a class of agricultural

21  workers who sought compensation for time spent traveling on buses to their

22  employer's work site. They would gather every day at specified parking lots or

23  assembly areas, and the employer would transport them in buses that it provided

24  and paid for to the fields where they worked. *Id.* at 537. At the end of the day, the

25  employer would transport the employees on its buses back to the departure point.

26  *Id.* The employees provided their own transportation to and from the departure

27  points. The employer had rules prohibiting employees from using their own

28  transportation to and from the fields. *Id.*

1   The Court first distinguished between two types of travel to work: "travel

2   that the employer specifically compels and controls," which is compensable, and

3   "an ordinary commute that employees take on their own," which is not. *Id.* at 579

4   n.2. The agricultural workers' bus trips, the Court stated, fell into the former

5   category because the workers were on the employer's buses and not able "to use

6   'the time effectively for [their] own purposes.'" *Id.* at 586. The Court emphasized

7   that they could not drop off their children at school, stop for breakfast on the way

8   to the fields, or run other errands requiring the use of a car. *Id.* The fact that they

9   were allowed to read or perform other personal activities on the bus, the Court

10  held, did not diminish the employer's control over their activities and use of the

11  time. *Id.* The Court contrasted the agricultural workers from employees who

12  commute to work on their own, stating "[i]n contrast to [Defendant's] employees,"

13  commuter employees "decide when to leave, which route to take to work, and

14  which mode of transportation to use." *Id.* at 586-87. "By commuting on their

15  own," the Court stated, "employees·may choose and may be able to run errands

16  before work and to leave from work early for personal appointments." *Id.* at 587.

17  The Court stated that "the level of the employer's control over its employees,

18  rather than the mere fact that the employer requires the employees' activity, is

19  determinative." *Id.* However, the Court cautioned that not all travel time to and

20  from work was compensable, and that the time employees spent traveling to and

21  from the bus departure points was not "hours worked." *Id.*

22

23  In 2003, an advice letter was issued by the Department of Labor Standards

24  Enforcement ("DLSE") addressing payment for commuting time.[8] The letter was

25

26  ───────────────

27  [8] The DLSE is the state agency empowered to enforce California's labor laws and
    IWC wage orders. *Huntington Memorial Hosp. v. Superior Court*, 131 Cal. App. 4th 893,

28  902 (2005). The California Supreme Court has held that DLSE policies intended to have
    general prospective application, such as interpretive policies contained in the DLSE's

1   entitled "Travel Time for Employees with Alternative Worksites," and addressed

2   the situation of a non-exempt employee who spends five days in Bakersfield,

3   where he resides, and then five days at a work site in Palmdale. (Defendant's

4   Appendix of Authorities, Exh. 4.) The employee drives directly from his home to

5   the Palmdale site, and does not transport any significant materials from one work

6   site to the other. (*Id.*) Because it is an hour and a half commute between

7   Bakersfield and Palmdale, the employee incurs three hours of travel time on days

8   he drives to the Palmdale work site. (*Id.*) The DLSE responded by giving

9   examples of employees, such as carpenters, in industries "not assigned to a

10   specific workplace and routinely required to travel reasonable distances to job

11   sites on a daily basis." *Id.* at 3. A carpenter who is "employed by a contractor to

12   perform framing work would, under normal circumstances, have an expectation

13   that he or she was to report for work at the job site the contractor is currently

14   working," the DLSE said. "[I]f this is the routine, the framing carpenter could not

15   expect to be paid for the time commuting from his home to the job site if that job

16   site was within a reasonable distance." *Id.* However, the DLSE stated,

17   compensation could be required for "unreasonably extended travel," or if the

18   employee was required to deliver any "equipment, goods, or materials for the

19   employer." *Id.*

20

21       GCS argues that, under *Morrillion* and the DLSE letter, Mr. Stevens was

22   not "subject to [GCS'] control" during his commutes because GCS did not

23   determine his route, timing or activities. The Court agrees. Unlike the workers in

24   *Morrillion*, Mr. Stevens was able to choose when to leave for work in the morning

25

26   1989 Operations and Procedures Manual, are void unless promulgated pursuant to the
rulemaking procedures of the Administrative Procedure Act. *Tidewater Marine Western,*

27   *Inc. v. Bradshaw,* 14 Cal. 4th 557, 571-72 (1996). However, DLSE advice letters are not
subject to the APA's rulemaking provisions and are not void if not promulgated in

28   accordance with those provisions. *Id.* at 571; *Morillion,* 22 Cal. 4th at 584.

1   and from work in the evening and what route to take, and was able to pick his

2   grandson up from day care. Mr. Stevens also periodically stopped and spent time

3   with friends on the way home from work, and once stopped to consult his attorney.

4   Although Mr. Stevens was not free to choose which mode of transportation to use,

5   and was subject to Defendant's policy regarding use of the vehicle, these factors

6   do not create the all-encompassing physical control exercised by the employer in

7   *Morrillion*, where the employer dictated when and where the employers would

8   convene for the bus ride, and the bus route. Like the hypothetical carpenter in the

9   DLSE letter, Mr. Stevens had "an expectation" that he would have to report to the

10  first job site to which he was assigned to work that day. Therefore, absent an

11  unreasonably long commute, Mr. Stevens was not entitled to compensation under

12  the "subject to the control of the employer" test.

13

14  **2.     "Suffered or Permitted to Work"**

15

16      Mr. Stevens also argues that he was "suffered or permitted to work" during

17  his commute. In *Morrillion*, the California Supreme Court held that "'suffered or

18  permitted to work, whether or not required to do so' encompasses a meaning

19  distinct from merely 'working,'" and refers to any situation in which "[t]he

20  employer knows or has reason to believe that [the employee] is continuing to work

21  and the time is working time." *Morrillion*, 22 Cal. 4th at 584. In such cases, the

22  Court held, "it is the duty of the management to exercise its control and see that

23  the work is not performed if it does not want it to be performed." *Id.*

24

25      Mr. Stevens argues that he was "suffered or permitted to work" during his

26  commutes, because (1) driving was an "integral" part of the technician job, (2) he

27  delivered parts and supplies to worksites, and (3) technicians performed work

28  activities before and during the drive to the first job site and during and after

1  leaving the last job site. Specifically, Mr. Stevens presents evidence that some

2  technicians inspected the vans before starting their commute to the first job site,

3  talked to GCS' parts technician and other manufacturers on the phone during the

4  commute, stopped to pick up or drop off parts on the way to the first job site, and

5  stopped on the way home from the last job site to fax documents to GCS or from a

6  GCS authorized mailbox. (Lenarz Depo., 32:3-15; 45:2-48:22; 52:9-23; Tznnakos

7  Decl., 24:12-25:6.) GCS argues that Mr. Stevens was not suffered or permitted to

8  work because there is no evidence that he personally performed any work-related

9  tasks before or during the commute to the first job site, or during or after the

10  commute from his last job site home.

11

12      The Court agrees with GCS. As to Mr. Stevens' first argument, Mr. Stevens

13  appears to base his argument that the driving is "integral" on cases interpreting the

14  federal Portal to Portal Act, 29 U.S.C. §254(a). The Portal to Portal Act bars

15  employers from being liable under the FLSA for failing to pay employees

16  minimum wages or overtime for traveling "to and from the actual place of

17  performance of the principal activity or activities which such employee is

18  employed to perform" and "activities which are preliminary to or postliminary to

19  said principal activity or activities which occur either prior to the time on any

20  particular workday at which such employee commences, or subsequent to the time

21  on any particular workday at which he ceases, such principal activity or activities."

22  29 U.S.C. §254(a).

23

24      Activities are compensable under the Portal to Portal Act if they are an

25  "integral and indispensable" part of the principal activities for which the workers

26  are employed. *Steiner v. Mitchell*, 350 U.S. 247, 256; 76 S.Ct. 330 (1956); *IBP,*

27  *Inc. v. Alvarez*, 126 S.Ct. 514, 521; 163 L.Ed. 2d 288 (2005). Whether an activity

28  is "integral and indispensable" depends on several factors, including the degree to

1  which the activity is done for the employer's benefit, the degree to which the

2  activity is "indispensable...to the primary goal of the employee's work," the

3  amount of "choice the employee has in the matter," and the employer's ability to

4  maintain records of the time expended. *Reich v. New York City Transit Auth.*, 45

5  F.3d 646, 650 (2nd Cir. 1995). Courts interpreting the FLSA and the Portal to

6  Portal Act have held that commuting to a job is not a principal work activity, even

7  if the employee is transporting equipment or tools needed for the job, because

8  commuting does not involve any work or exertion beyond that necessary for

9  transportation to the worksite. *Id.* (automobile damage appraisers who did not

10  perform work before commuting to first site of the day, or after starting home from

11  the last site, were not entitled to compensation for commuting time under the

12  FLSA even if they transported light equipment to work, because the commute did

13  not involve work beyond that necessary for transportation); *Reich*, 45 F.3d at 651

14  (dog handlers were not entitled to compensation under the FLSA for time spent

15  commuting to work with their dogs, except to the extent they worked with the

16  dogs during the commute, because "the activity of commuting involved neither

17  exertion nor loss of time"); *Andrews v. DuBois*, 888 F. Supp. 213, 219 (D. Mass.

18  1995)(correctional officers in canine unit not entitled to compensation under the

19  FLSA for time spent commuting to work with the dogs, and commute was not

20  integral to the job, "[b]ecause the officers would make the same commute each day

21  irrespective of the dogs."); *Aiken v. City of Memphis*, 190 F.3d 753, 759 (6th Cir.

22  1999)(police officers not entitled to compensation under the FLSA for time spent

23  commuting to work in monitored police vehicles, because they performed only a

24  de minimus amount of compensable activities in the car during the commute.)

25

26      The California Supreme Court has cautioned that courts interpreting IWC

27  wage orders should give no deference to caselaw interpreting the Portal to Portal

28  Act and the FLSA, because the federal and California statutory schemes regarding

17

1  payment for travel time differ substantially. *Morrillion*, 22 Cal. 4th at 594-595.

2  Specifically, the California scheme, unlike the FLSA, does not include an express

3  exemption for travel time and was not motivated by a legislative intent to protect

4  employers from the financial burden of paying for such time. *Id.* at 590.

5  Nevertheless, because ordinary commuting time is not compensable under either

6  the FLSA or California law,[9] the Court finds the FLSA cases instructive on the

7  question of what it means to be "suffered or permitted to work" during a commute,

8  as opposed to being engaged in a noncompensable ordinary commute, and

9  concludes that the crucial question is whether the commuting employee is engaged

10  in any work-related tasks or exertion during the commute, apart from merely

11  transporting herself to work.

12

13        Principles of statutory interpretation support the conclusion that the

14  "suffered or permitted to work" prong requires that a commuter be engaged in

15  work-related tasks or exertion in addition to mere transportation.  In interpreting

16  regulations, courts must ascertain the intent of the agency according to the usual

17  meaning of the language used, and by avoiding any interpretation that renders any

18  language mere surplusage. *Modern Paint and Body Supply, Inc. v. State Board of*

19  *Equalization*, 87 Cal. App. 4th 703, 708 (2001)(*citing Brewer v. Patel*, 20 Cal.

20  App. 4th 1017, 1021 (1993)).  Webster's Ninth New Collegiate Dictionary defines

21  "work" as an "activity in which one exerts strength or faculties to do or perform

22  something" such as "sustained physical or mental effort to overcome obstacles and

23  achieve an objective or result," "the labor, task, or duty that is one's accustomed

24  means of livelihood" or "a specific task, duty, function, or assignment often being

25  a part or phase of some larger activity." WEBSTER'S NINTH NEW COLLEGIATE

26  DICTIONARY 1358 (9th ed. 1991).  In the Wage Order, the phrase "suffered or

27

28

_____

[9] *See Morrillion*, 22 Cal. 4th at 587-88.

1 | permitted to work" is used in addition to "subject to the control of the employer."

2 | As the two phrases must be construed to have independent meanings, the former

3 | must require something beyond the mere status of being under the employer's

4 | control, such as work-related exertion or the performance of work-related tasks.

5 | Because Mr. Stevens did not take any action or perform any task for GCS during

6 | the commute, apart from transporting himself to work as any other commuter

7 | would do, the Court concludes that he was not being "suffered or permitted to

8 | work" during the commute time.[10] Nor does the fact that GCS required Mr.

9 | Stevens to have a valid drivers' license and a clean safety record mean that he was

10 | "suffered or permitted to work" during the commute, as the drivers' license and

11 | safety record did not require him to engage in any work-related tasks or exertion

12 | apart from what he would have done during a commute in his own car.   For Mr.

13 | Stevens, the commute was simply a means of transportation to the site where the

14 | main job, kitchen repair work, was carried out.

15 |

16 |     Mr. Stevens' argument that he was "suffered or permitted to work" during

17 | his commute because he delivered parts and supplies to worksites also fails,

18 | because the undisputed evidence shows that Mr. Stevens did not pick the supplies

19 | up from a business location in the morning before his first job or transport them to

20 | a business location at the end of the day after his last job.   GCS had no need for

21 | the supplies to travel between Mr. Stevens' home and his first and last daily

22 | jobsites.   Consequently, between Mr. Stevens' last job of the day and the first job

23 |

24 |

25 |     [10] Mr. Stevens also argues that GCS should be required to compensate technicians for their commute time because GCS charged its customers for that time.  However, the undisputed evidence shows that since 2002 GCS has charged its customers not based on

26 | the amount of time technicians spent commuting to the job sites but instead charged a flat

27 | "trip charge." (Tzannakos Decl. re Class Certification, ¶ 9.)  Moreover, Mr. Stevens does not cite, and the Court has not found, any authority for the proposition that whether

28 | time is compensable depends on whether the employer charges customers for the time.

1  of the next day, the supplies were not taken on any delivery route for GCS but

2  were merely taken on a detour to his home while he slept and conducted personal

3  activities.  Nor did the supplies require Mr. Stevens to engage in any effort or

4  exertion during his commutes, apart from what he would do if he were driving in a

5  car without supplies.  As a practical matter, Mr. Stevens taking parts and supplies

6  from his home to his first job site and home from his last job site is

7  indistinguishable from any employee who takes to and from work tools or supplies

8  needed to perform the job, leaves them in the car overnight after driving home,

9  and drives to work again the next day.

10

11       Mr. Stevens' third argument, that technicians performed work-related tasks

12  during the commute, before the morning commute, and after the evening commute,

13  is also unavailing because Mr. Stevens presents no evidence that he performed any

14  such tasks.  Although Mr. Stevens presents evidence that Mr. Lenarz and Mr.

15  Tzannakos often inspected their vehicles before driving to the first job site, or

16  called the dispatch center or stopped for supplies en route to the first job or home

17  from their last job, Mr. Stevens admits that he himself did not call the dispatcher

18  during his commutes, and does not contend that he ever inspected his vehicle or

19  stopped en route to mail documents to GCS, pick up supplies, or do any other

20  work-related activity.  He states that he waited to make the first call of the

21  morning until he arrived at his first job site, and made his last call before he began

22  driving home from his last job.  In short, there is no evidence that Mr. Stevens

23  performed any work during his commutes so as to entitle him to overtime

24  compensation.[11]

25

26

27      [11] Mr. Stevens also argues that he is entitled to compensation under the FLSA
"whistle to whistle" doctrine, which states that "periods of time between the

28  commencement of the employee's first principal activity and the completion of his last
principal activity on any workday must be included in the computation of 'hours

1    For the foregoing reasons, Defendants are entitled to summary judgment of

2  Mr. Stevens' claims to the extent those claims rest on failure to pay overtime

3  compensation for commuting time.

4

5    **B.    Meal and Rest Break Claims**

6

7    Mr. Stevens also asserts that he was denied meals and rest breaks required

8  to be provided under Labor Code Section 512. That section and the Wage Order

9  prohibit an employer from employing an employee for a work period of more than

10  five hours per day without providing the employee with a meal break of at least 30

11  minutes, but provide that if the total work day is no more than six hours the meal

12  break may be waived by mutual consent of the employee and the employer. CAL.

13  LAB. CODE §512; 8 C.F.R. §11040(11). Section 512 also authorizes the IWC to

14  adopt a working condition order allowing a meal period to commence after six

15  hours if the IWC determines that such an order is consistent with the health and

16  welfare of affected employees. *Id.* §512(b). The Wage Order further provides:

17

18    Every employer shall authorize and permit all employees to take rest

19    periods, which insofar as practicable shall be in the middle of each

20    work period. The authorized rest period time shall be based on the

21    total hours worked daily at the rate of ten (10) minutes net rest time

22    per four (4) hours or major fraction thereof. ...Authorized rest time

23    shall be counted as hours worked or which there shall be no

24    deduction from wages.

25

26  _____

27  worked.'" 29 C.F.R. 790.6. However, this argument does not succeed because Mr.

28  Stevens has not shown that he performed any work-related activities before he arrived at
his first job site of the day or after he left his last one.

1  8 C.C.R. §11040(12)(A).

2

3      Mr. Stevens argues that GCS violated Section 512 and the Wage Order
4  because it did not require its technicians to take meal or rest breaks, imposed
5  productivity requirements that discouraged them from taking the breaks, and
6  implicitly encouraged them not to do so.  GCS argues that it is not liable for
7  failing to provide meal or rest breaks because it had a formal written policy that
8  employees were to take them, and Mr. Stevens voluntarily chose to forego them.
9  Essentially, GCS argues that an employer is not required to force its employees to
10  take meal or rest breaks.

11

12     Employers' duties under Section 512 are not satisfied by merely assuming
13  that employees have taken meal breaks, because employers have "an affirmative
14  obligation to ensure that workers are actually relieved of all duty" during meal
15  break time.  *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949
16  (2005)(quoting DLSE Opinion Letter 2002.01.28 p.1.)  In *Cicairos*, the plaintiffs
17  were truck drivers who sued their employer for violations of the meal and rest
18  break provisions and failure to provide itemized wage statements.  The employer
19  used an "activity based compensation" system to determine the plaintiffs' wages,
20  which required the employees to record such factors as speed, starts and stops, and
21  time.  *Id.* at 954.  Absent a designated reason for a delay, such as road
22  construction, a trip that took longer than expected would result in the employee
23  losing pay by not being compensated for the extra time.  *Id.*  The employer did not
24  schedule meal periods or include an activity code for them, and the plaintiffs said
25  they felt pressured not to take meal or rest breaks because they would lose money
26  if they did so.  *Id.*  The employer argued that it had not violated meal or rest break
27  provisions, because it could not control its employees' schedule while they were
28  on the road.  *Id.* at 963.  The court reversed the lower court's grant of summary

22

1  judgment for the employer, holding that the employer had not met its affirmative

2  obligation to ensure that workers were relieved of all duty for meal breaks. *Id.* It

3  also held that the employer had failed to "authorize or permit" rest breaks, because

4  "as a practical matter, [it] did not *permit* the plaintiffs to take their rest breaks."

5  *Id.* (emphasis in original.)  The court pointed out that the compensation system did

6  not allow rest breaks as a compensable excuse for delays, but docked workers'

7  compensation for the lost rest break time, and that this may have encouraged

8  drivers to skip them. *Id.*

9

10        Similarly, in this case Mr. Stevens alleges that GCS relied on technicians to

11  take meal breaks on their own schedule, discouraged him from taking breaks by

12  imposing productivity requirements that did not allow for them, and did not

13  affirmatively schedule time for breaks during the day.   According to Mr. Stevens,

14  "it's very difficult for any technician to say, no, wait, let me stop, let [me] take my

15  lunch break. Even to the point where you are in between a call, a lunch break isn't

16  practical because you are on the way to fix another piece of equipment that's

17  down, and it's very difficult...to say no to a customer." (Stevens Depo., 274:6-12.)

18  He states that GCS enforced its stringent productivity requirements against him

19  and discouraged him from taking meal breaks by calling him and several other

20  technicians into a meeting and telling them their production billing numbers were

21  too low. (*Id.*, 287:4-7; 288:2-18.) Mr. Stevens also alleges that Mr. Frisbee

22  instructed him to skip his lunch breaks but to write down that he had taken them

23  anyway: "[h]e said 'Write it down and then travel to your next call while you're

24  on lunch.'" (*Id.*, 294:15-22.) Under California law, GCS was obligated to ensure

25  that, as a practical matter, rest breaks were "authorized and permitted," and had an

26  affirmative obligation to ensure that its employees were relieved of all duty during

27  meal breaks. Mr. Stevens presents facts sufficient to allow a reasonable jury to

28  find that GCS did not meet those obligations. Consequently, GCS is not entitled

1  to summary judgment of Mr. Stevens' meal and rest break claims.

2

3  **III.   Mr. Stevens' Motion for Class Certification**

4

5         Mr. Stevens seeks to certify a class of "consisting of non-exempt technician

6  employees of Defendants GCS Service Inc. and Ecolab, Inc....who work or have

7  worked for Defendants in California from 2000 to the present." (Motion for Class

8  Certification, p.1.)  Federal Rule of Civil Procedure 23 sets forth two sets of

9  requirements for class certification.  First, the proposed class must satisfy the four

10  requirements of Rule 23(a): (1) the class is so numerous that joinder of all

11  members is impracticable, (2) there are questions of law or fact common to the

12  class, (3) the claims or defenses of the representative parties are typical of the

13  claims or defenses of the class, and (4) the representative parties will fairly and

14  adequately protect the interests of the class.  FED. R. CIV. P. 23(a).  In addition, the

15  party seeking certification must show that the action falls within one of the three

16  subsections of Rule 23(b).  Although a district court is "at liberty" to consider

17  evidence relating to the merits of the plaintiff's claim if such evidence is relevant

18  to Rule 23's requirements, it may not consider whether the party seeking

19  certification is likely to prevail on the merits.  *Cornn v. United Parcel Service*,

20  2005 WL 2072091 at *2 (N.D. Cal. Aug. 26, 2005)(*quoting Eisen v. Carlisle &*

21  *Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed. 2d 732 (1974); *Hanon v.*

22  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

23

24         Mr. Stevens seeks class certification pursuant to subsections (b)(2) and

25  (b)(3) of Rule 23.  Subsection (b)(2) requires that "the party opposing the class has

26  acted or refused to act on grounds generally applicable to the class, thereby

27  making appropriate final injunctive relief or corresponding declaratory relief with

28  respect to the class as a whole."   FED. R. CIV. P. 23(b) (2).  Subsection (b)(3)

1  allows certification where "the court finds that questions of law or fact common to

2  the members of the class predominate over any questions affecting only individual

3  members, and that a class action is superior to other available methods for the fair

4  and efficient adjudication of the controversy." FED. R. CIV. P. 23(b) (3).

5

6       Mr. Stevens has failed to meet the requirements for certification under either

7  subsection, because the evidence indicates that GCS' meal and rest break policies

8  were not uniform throughout California. GCS' written policy sets forth no

9  standard times or schedules for meal or rest breaks, but states that "the duration of

10  meal breaks varies by division/location." (GCS Exh. 23.)  While Mr. Stevens

11  presents evidence that he and some other Los Angeles and Orange County

12  technicians were encouraged to skip their meal breaks,[12] GCS presents

13  declarations from technicians in Northern and Southern California indicating that

14  FCMs were the individuals responsible for ensuring that employees took rest and

15  meal breaks, and that different FCMs imposed different requirements. (King

16  Decl., ¶¶ 6-7; Stanzione Decl., ¶¶6-7; Segner Decl., ¶¶6-7; Zastrow Decl., ¶¶6-7.)

17  John Borsari and Andrew Speegle, who have worked as GCS technicians in

18  Northern California for the last four years and two years, respectively, state that

19  their supervisors told them to take lunch breaks shortly after they started working

20  for GCS, and that their supervisors still remind them to take the breaks. (Borsari

21  Decl, ¶¶ 3, 4; Speegle Decl., ¶4.)  Mr. Borsari states that he takes several rest

22

23

24

---

25       [12] Mr. Tzannakos and Mr. Lenarz, who state that they were encouraged to skip

26  breaks, both worked in the Los Angeles and Orange County regions. While they do not
    specify which regions their testimony pertains to, they do not establish any foundation for

27  testimony regarding GCS's policies in regions other than the ones in which they worked.

28  Thus, their testimony properly is interpreted as pertaining only to GCS' practices in Los
    Angeles and Orange County.

1  breaks during the day while waiting for equipment. (Borsari Decl., ¶¶ 3, 4.)[13]

2  Banti Tsehayo, who has worked as a GCS technician in Northern California for

3  the past seven years, states that he takes meal and rest breaks every day, and that

4  his supervisor text-messages him to remind him to do so. (Tsehayo Decl., ¶¶ 4-5.)

5  Bill Segner and Robert Stanzione, technicians in Southern California, state that

6  they regularly take meal and rest breaks, and that no supervisor has ever told them

7  to skip a break. (Segner Decl., ¶¶ 6-7; Stanzione Decl., ¶¶ 6-7.) Mr. Lenarz, who

8  worked in Los Angeles, states that he was never told before March 2005 to take a

9  meal break, and that supervisors routinely encouraged him and other technicians to

10  work through meal and rest breaks. (Id., 99:23-25; 108:1-12.) Mr. Stevens states

11  that Mr. Frisbee told him to write down that he had taken breaks even if he did not

12  actually do so. (Stevens Depo., 294:15-22.) Overall, the technicians' statements

13  indicate an absence of any uniform procedures among FCMs regarding meal or

14  rest breaks.

15

16      Mr. Stevens' evidence also indicates that Los Angeles adopted unique

17  productivity requirements and meal and rest break policies during the putative

18  class period to address a work crunch that was particular to the Los Angeles

19  region. The minutes of the August 2004 meeting, at which Mr. Frisbee allegedly

20  instructed technicians to write down breaks they did not take, state that Los

21  Angeles was adopting special break policies and not enforcing GCS' formal policy

22

23      [13] Mr. Stevens urges the Court to give less weight to the technician declarations

24  submitted by GCS, arguing that those declarations are from current GCS employees who
    may be afraid to give testimony contrary to GCS' interests in this case. However, Mr.

25  Tzannakos and Mr. Lenarz, who provide declarations in support of Mr. Stevens's class

26  certification motion, also are current employees of GCS. Moreover, while the Court is
    aware of the possibility that current employees might be reluctant to make statements

27  unfavorable to GCS, the Court declines to discount their declarations entirely. Current

28  GCS employees' statements are relevant evidence bearing on the issue whether GCS had
    uniform productivity, meal, and rest break policies during the proposed class period.

1  due to "the call back log in LA." (Exh. G to Lenarz Decl.)  No evidence is

2  presented regarding the call back log in the Northern California, Orange County,

3  San Diego, or other regions, and the only reasonable inference from the August

4  2004 minutes is that those regions' workload and productivity requirements

5  differed from Los Angeles' requirements.  In sum, certification under subsection

6  (b)(2) is not proper because Mr. Stevens has not shown that GCS acted or refused

7  to act on grounds generally applicable to the proposed statewide class with regard

8  to meal and rest breaks.

9

10      Rule 23(b)(3) also is not satisfied because Mr. Stevens has not shown that

11  questions of law or fact common to the putative class are likely to predominate

12  over individual questions so as to make a class action a superior method of

13  resolving putative class members' claims.  Under California law, whether GCS

14  violated meal and rest break requirements depends on whether it imposed

15  productivity demands that did not allow for breaks, whether it failed affirmatively

16  to ensure that employees were taking meal breaks, and whether particular

17  employees failed to take the breaks as a result.  However, the only evidence that

18  has been submitted regarding GCS' policies in regions other than Los Angeles and

19  Orange County indicates that FCMs in those regions had different policies

20  regarding meal and rest breaks,  which suggests that numerous questions would

21  arise at trial regarding supervisor-and region-specific policies.  The minutes of the

22  August 2004 meeting with Mr. Frisbee reinforce the likelihood of multiple

23  inquiries, because they indicate that the Los Angeles region was adopting unique

24  meal and rest period policies due to its "call back log."  (Exh. G to Lenarz Decl.)

25

26      Mr. Stevens cites the October 8, 2004 e-mail from Rita J. Garcia, which was

27  sent to FCMs throughout California and which stated that some technicians had

28  been working through lunch, as evidence that GCS had uniform meal and rest

27

1  break policies throughout the state.  However, evidence that some technicians in

2  California indicated they had been working through lunch, and that a responsive

3  email was sent to a statewide group, is not evidence that GCS maintained

4  statewide productivity requirements and meal and rest break practices.  Rather, the

5  email appears to be simply a declaration of a general company policy that

6  technicians are to take meal and rest breaks "vs. working through." (Plaintiff's

7  Appendix of Evidence, Exh. 21.)  The e-mail does nothing to controvert the

8  evidence in the record that specific productivity requirements varied among

9  regions, and that different supervisors enforced the rest and meal break policy to

10  varying degrees and in different ways.  Overall, Mr. Stevens has not shown that

11  common questions are likely to predominate over questions regarding individual

12  employees' work habits and region- and supervisor- specific policies.  All the

13  evidence suggests that such particularized inquiries will overwhelm any questions

14  common to the class.

15

16  **IV.    Conclusion**

17

18        For the foregoing reasons, Defendants are entitled to partial summary

19  judgment on Mr. Stevens' overtime claims, and Mr. Stevens' motion for class

20  certification is DENIED.

21

22  DATED: *April 6, 2006*

23

24                                                    CORMAC J. CARNEY
                                                    UNITED STATES DISTRICT JUDGE
25

26

27

28

28

# EXHIBIT H

LEXSEE 2007 US DIST LEXIS 66010

**DONALD J. TORMEY, on behalf of himself, and all others similarly situated, and on behalf of the general public, Plaintiffs, vs. THE VONS COMPANIES, INC., a Michigan Corporation; SAFEWAY, INC., a Delaware Corporation and DOES 1 through 100, Defendants.**

**CASE NO. 07cv1587-LA (RBB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 66010**

**September 5, 2007, Decided**
**September 5, 2007, Filed**

**PRIOR HISTORY:** Tormey v. Vons Cos., 2007 U.S. Dist. LEXIS 60076 (S.D. Cal., Aug. 15, 2007)

**COUNSEL:** [*1] For Donald J. Tormey, on behalf of himself, and all others similarly situated, and on behalf of the general public, Plaintiff: Eric Maxwell Overholt, LEAD ATTORNEY, Hiden Rott and Oertle, San Diego, CA.

For The Vons Companies, Inc., a Michigan Corporation, Safeway Inc., a Delaware Corporation, Defendants: Todd Christopher Bouton, LEAD ATTORNEY, Payne and Fears, Irvine, CA.

**JUDGES:** HONORABLE LARRY ALAN BURNS, United States District Judge.

**OPINION BY:** LARRY ALAN BURNS

**OPINION**

**ORDER OF REMAND**

On June 29, 2007, Plaintiff Tormey filed this putative class action in the Superior Court of California, County of San Diego. Defendants then on August 10, 2007 removed the action to this Court, representing that the provisions of the Removal Statute, 28 U.S.C. § 1446, were met. Defendants contended this Court had federal question jurisdiction because some of Defendants claims were completely preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("Section 301"). Plaintiffs also asked the Court to exercise supplemental jurisdiction over other related state claims.

Because the Court's jurisdiction was not clear, the Court on August 15, 2007 *sua sponte* issued an order to show cause requiring Plaintiffs to [*2] show cause why this action should not be remanded. On August 22, 2007, Plaintiffs responded and, on August 29, Defendant replied to Plaintiffs' response. Defendants' response identifies federal question jurisdiction, and supplemental jurisdiction, as the sole bases for this Court's exercise of jurisdiction over this action.

**I. Legal Standards**

The Court is under an independent obligation to examine whether removal jurisdiction exists. *Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1116 (9th Cir. 2004) (citations omitted). "The removal statute is strictly construed against removal jurisdiction, and the burden of establishing federal jurisdiction falls to the party invoking the statute." *California ex rel. Lockyer v. Dynegy, Inc.,* 375 F.3d 831, 838 (9th Cir. 2004) (citation omitted). Pursuant to 28 U.S.C. § 1447(c), the Court must remand the case to state court if at any time before final judgment it appears the Court lacks subject matter jurisdiction.

**II. Discussion**

**A. Plaintiff's Claim**

Plaintiff, a pharmacist, was employed by Defendant Vons Companies, during which time Defendants represent his employment was governed by a collective bargaining agreement ("CBA"). He seeks unpaid rest and meal [*3] period compensation, penalties, disgorgement, restitution, and injunctive relief on behalf of himself and all others similarly situated. He relies on Cali-

fornia Labor Code §§ 226.7 and 512; California Business and Professions Code §§ 17200-17208; California Code of Regulations, Title 8, § 11040, and Industrial Welfare Commission ("IWC") Wage Order No. 4-2001.

Defendants contend Plaintiff's unpaid meal period compensation claim is completely preempted by Section 301. They concede, however, that the rest period claims are not, and ask the Court to exercise supplemental jurisdiction over these claims.

**B. Jurisdictional Analysis**

Under the well-pleaded complaint rule, federal jurisdiction typically exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1075 (9th Cir. 2005) (citations omitted). "A federal law defense to a state-law claim does not confer jurisdiction on a federal court, even if the defense is that of federal preemption and is anticipated in the plaintiff's complaint. *Id.* (citation omitted). "This rule makes a plaintiff the 'master of his complaint': He may generally avoid federal jurisdiction [*4] by pleading solely state-law claims." *Id.* (citation omitted).

A corollary to the well-pleaded complaint rule, however, is the "complete preemption doctrine," which may "convert[ ] an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (citation omitted). The Supreme Court has explained that "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988) (footnotes and citations omitted). However, "'not every dispute tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301.'" *Id.* at 413 n.12 (citation and alterations omitted). Furthermore, a party cannot trigger section 301 preemption merely by asserting the waiver of a state-law claim in a collective bargaining agreement. *Caterpillar*, 482 U.S. at 398.

Section 301 "is not designed to trump substantive and mandatory state law regulation of the [*5] employee-employer relationship. . . ." *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1076 (9th Cir. 2005) (citation omitted). Thus, a claim brought on the basis of a mandatory state law is not preempted, even if an identical claim could be brought under Section 301. *Id.* (citing *Livadas v. Bradshaw*, 512 U.S. 107, 123, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994)). Section 301 "cannot be read broadly

to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." *Id.* If the law were otherwise, employers could immunize themselves from suit under state labor laws of general applicability by including unlawful terms in collective bargaining agreements. *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1111 (9th Cir. 2000).

The Ninth Circuit has examined meal period requirements under California state law and has determined them to be non-negotiable and therefore not preempted by Section 301. *Valles*, 410 F.3d at 1081-82. While a state might create a non-negotiable remedy that turned on the interpretation of a collective bargaining agreement, California's meal period laws do not appear to be an example of this. *Id.* (citing *Lingle*, 486 U.S. at 407 n.7).

Defendants contend that IWC Wage Order No. [*6] 7-2001 applies to Plaintiff's claims, and authorizes special arrangements for meal periods. Defendants contend the CBA altered meal period rights, as permitted under Wage Order No. 7-2001. They argue this creates a situation where, although the right may be governed by state law, construction of the CBA will be necessary to resolve it, resulting in complete preemption.

Plaintiff argues he does not rely on Wage Order No. 7-2001, but on No. 4-2001. However, regardless of which Wage Order applies, Plaintiff has not alleged that Defendants provided meal periods as permitted in the CBA, but rather that they provided no meal periods and no meal period compensation as required under state law. (Complaint at 2:23-28, 3:25-4:2, 5:15-17, 5:22-27, 7:22-26, 8:7-11, 9:22-26, 11:8-14, 11:19-24.) The CBA purports to address whether pharmacists may be called back to duty in emergencies and, under certain circumstances requires them to take meal periods in the building where they work, but it does not purport to permit Defendants to provide no meal periods at all. Even if, as Defendants argue, the CBA provides for the waiver of meal period rights, it appears this constitutes the kind of waiver the Supreme [*7] Court warned of in *Livadas*, 512 U.S. 107, 123, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994)).

While Defendants may raise the CBA's terms as a defense, Plaintiff has not relied on them in making his claims. The Court is mindful of the teaching of the Supreme Court in *Caterpillar*:

> It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives. But the presence of a federal question,

even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule -- that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court . . . . But a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. If a defendant could do so, the plaintiff would be master of nothing.

482 U.S. at 398-99.  [*8] Should it prove that Plaintiff's complaint as pleaded is inadequate and he amends so that a federal question appears on the face of the amended complaint, Defendants might attempt removal at that time, pursuant to 28 U.S.C. § 1446(b). At present, however, the Court is not persuaded that Defendants have carried their burden of establishing the existence of federal jurisdiction over this action. *Dynegy,* 375 F.3d at 838.

### III. Conclusion and Order

For these reasons, this action is hereby **REMANDED** to the court from which it was removed.

### IT IS SO ORDERED.

DATED: September 5, 2007

### HONORABLE LARRY ALAN BURNS

United States District Judge

# EXHIBIT I

‖‖‖‖‖‖‖‖‖‖‖‖‖
*5234824*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

F I L E D
ALAMEDA COUNTY

DEC 1 2 2006

CLERK OF THE SUPERIOR COURT
By _____
                          Deputy

| | |
|---|---|
| NICK TORRES, et al,<br><br>    Plaintiffs,<br><br>    v.<br><br>ABC SECURITY SERVICE, INC., et al,<br><br>    Defendants. | No. RG04 -158744<br><br>ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF PLAINTIFFS FOR CLASS CERTIFICATION<br><br>Date:   November 30, 2006<br>Time:   2:00 p.m.<br>Dept.:  22 |

The motion by Plaintiffs for class certification came on regularly for hearing on November 30, 2006, in Department 22, the Honorable Ronald M. Sabraw, presiding. Plaintiffs and Defendants appeared at the hearing through counsel of record. The Court, after full consideration of all papers submitted in support and opposition to the motion, as well as the oral arguments of counsel, decides as follows: IT IS HEREBY ORDERED that Plaintiffs' motion for class certification is GRANTED in part and DENIED in part.

FACTUAL BACKGROUND

This is a purported class action on behalf of all persons employed by ABC Security Services., Inc. ("ABC") in any non-exempt security guard/officer positions ("security guards"). The Fourth Amended Complaint filed August 8, 2006, alleges that ABC unlawfully (1) requires SGs to make excessive deposits for their uniforms, Labor Code 402, (2) fails to pay interest on the uniform deposits, Labor Code 404, (3) imposes charges for the return of dirty or worn

1

1    uniforms, Labor Code 2802, (4) fails to reimburse SGs who incur expenses in cleaning and

2    maintaining uniforms Labor Code 2802, (5) requires SGs to pay for obtaining guard cards, (6)

3    fails to provide meal periods and rest breaks, Labor Code 512 and Wage Order section 12, (7)

4    fails to pay overtime when SGs swap shifts, and (8) fails to provide accurate wage statements.

5    The parties agree that the relevant wage order for security guards is Wage Order 4-2001, located

6    at 8 Cal.Code.Regs. 11040.  Plaintiffs seek to certify a class for all claims in the Complaint.

7

8    ASCERTAINABILITY AND NUMEROSITY

9         Plaintiffs proposes a class of all security guards during the relevant time frame.  ABC

10   does not contest the ascertainability requirement.

11        The proposed class includes approximately 500 persons, with approximately 200 persons

12   in the proposed subclass.  This is sufficiently numerous.

13

14   COMMON QUESTIONS OF LAW AND FACT - LEGAL FRAMEWORK.

15        Plaintiff's burden on moving for class certification is not merely to show that some

16   common issues exist, but, rather, to place substantial evidence in the record that common issues

17   *predominate.* ... "[T]his means 'each member must not be required to individually litigate

18   numerous and substantial questions to determine his [or her] right to recover following the class

19   judgment; and the issues which may be jointly tried, when compared with those requiring

20   separate adjudication, must be sufficiently numerous and substantial to make the class action

21   advantageous to the judicial process and to the litigants.'"  *Lockheed Martin Corp. v. Superior*

22   *Court* (2003) 29 Cal. 4th 1096, 1108.  "The ultimate question in [class actions] is whether . . . the

23   issues which may be jointly tried, when compared with those requiring separate adjudication, are

24   so numerous or substantial that the maintenance of a class action would be advantageous to the

25   judicial process and to the litigants."  *Lockheed Martin*, 29 Cal. 4th at 1104-1105.

26

2

Some cases have what the Court will refer to as "absolute commonality." In these cases every member of the proposed class was exposed to the allegedly wrongful practice and the practice was either consistently lawful or unlawful as to all members of the class. The defendant's action can be found to be wrong in the abstract without examining whether it was wrongful as to any individual classmember. *Aguiar v. Cintas Corporation No. 2* (2006) 2006 Cal. App. LEXIS 1663 (applicability of Living Wage Ordinance); *In re Cipro Cases I & II* (2004) 121 Cal. App. 4th 402, 411 (antitrust violations); *Massachusetts Mutual Life Ins. Co. v. Superior Court*, (2002) 97 Cal. App. 4th 1282, 1292-1294 (misrepresentations); *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1278 (erroneous interpretation of legislation). In cases with "absolute commonality," the Court can extrapolate liability findings from the trial witnesses to the absent class members with a great deal of certainty. In a case with absolute commonality, each member of the putative class is identically situated with regard to liability and by definition has standing to maintain the action on his or her own behalf. *Collins v. Safeway Stores, Inc.* (1986) 187 Cal. App. 3d 62, 73. To the extent there are differences among class members, they usually relate to the amount of damages that each class member can recover. *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal. 4th 319, 333.

Other cases have what the Court will refer to as "partial commonality." In these cases every member of the proposed class was exposed to a practice but the trier of fact cannot determine whether the practice was lawful as to any given member of the class without considering individualized factors. The Court can certify a class based on a demonstration of partial commonality. *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal. 4th 319, addresses this in several places, stating, "Predominance is a comparative concept," 34 Cal. 4th at 334, that the community of interest requirement does not mandate that class members' claims be uniform or identical, 34 Cal.4th at 338, that the "logic of predominance" does not require a plaintiff to prove that a defendant's policy was "either right as to all members of the class or wrong as to all members of the class," 34 Cal. 4th at 338, and "the established legal standard for

3

1  commonality ... is comparative," 34 Cal.4th at 339. The federal rules of civil procedure

2  expressly provide for partial commonality. F.R.C.P. 23(b)(2) (injunction only classes without a

3  showing of predominance); F.R.C.P. 23(c)(4) (single issue certification).

4      The determination of how much commonality is enough to warrant use of the class

5  mechanism requires a fact specific evaluation of the claims, the common evidence, and the

6  anticipated conduct of the trial. For example, it can be appropriate to certify a class of women to

7  pursue claims for sex discrimination where an employer has a pattern of denying promotions to

8  women even though not all women were denied promotions. *Stephens v. Montgomery Ward*

9  (1987) 193 Cal.App.3d 411, 416 fn1. To ensure that the class mechanism will really be useful, in

10 cases with "partial commonality" the Court usually makes some limited inquiry into whether the

11 plaintiff has an isolated claim or whether there are numerous similar incidents. *Int'l Bhd. of*

12 *Teamsters v. United States* (1977) 431 U.S. 324, 336 (defining "pattern or practice"). This can

13 take the Court close to a merits analysis. *Linder v. Thrifty Oil Co.* (2000) 23 Cal. 4th 429, 332.

14     "Partial commonality" cases pose a greater challenge than "absolute commonality" cases

15 because the Court cannot automatically extrapolate liability findings from the trial witnesses to

16 the absent class members. In these cases the Court has to devise "pragmatic procedural devices"

17 and "innovative procedural tools" to structure a trial that provides significant benefits to the

18 parties and the Court while at the same time protecting the rights of all the parties. *State of*

19 *California v. Levi Strauss & Co.* (1986) 41 Cal. 3d 460, 471. Because "partial commonality"

20 cases present greater trial management concerns, a plaintiff seeking to pursue such a case should

21 present a manageable trial plan at the class certification stage. *Washington Mutual Bank v.*

22 *Superior Court* (2001) 24 Cal. 4th 906, 923 ("the presentation must be sufficient to permit the

23 district court, at the time of certification, to make a detailed assessment of how the difficulties

24 posed by the variations in state law will be managed at trial"). See also *Southwestern Ref. Co. v.*

25 *Bernal* (Tex. Sup., 2000) 22 S.W.3d 425, 435 ("We reject [the] approach of certify now and

26 worry later.").

4

COMMON QUESTIONS OF LAW AND FACT - ANALYSIS.

Commonality is determined with reference to the claims asserted. *Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 916 fn 22. The Court examines each claim in turn.

Uniform claims. Common issues will predominate at trial concerning whether ABC unlawfully requires SGs to make excessive deposits for their uniforms, Labor Code 402, fails to pay interest on the uniform deposits, Labor Code 404, imposes charges for the return of dirty or worn uniforms, Labor Code 2802, and fails to reimburse SGs who incur expenses in cleaning and maintaining uniforms, Labor Code 2802. All of these claims are based on ABC's consistent policies. Therefore, there is "absolute commonality" – either the policies are lawful as to all SGs or they are unlawful as to all SGs. Variations in the damages that the SGs have suffered, if any, can be addressed through a claims process or accounting and do not preclude class certification.

Guard cards. Common issues will predominate at trial concerning whether ABC unlawfully requires SGs to pay for obtaining and maintaining guard cards. California's Bureau of Consumer Affairs requires that security guards take security training tests and pass a test to get a guard card. Thereafter, the guard must pay an annual $122.00 to maintain the card. ABC has a consistent policy of requiring SGs to maintain their own guard cards at their own expense. If an employee does not maintain a card independently, ABC will pay the fee and deduct the $122 charge from the guard's paycheck. There is "absolute commonality" in this claim because either the policies are lawful as to all SGs or they are unlawful as to all SGs. Variations in the damages that the SGs have suffered, if any, can be addressed through a claims process or accounting and do not preclude class certification.

Meal Period "On-Duty" Claims. The meal period "on-duty" claim is based on paragraph 11 of the applicable California Wage Order. The Wage Order states at paragraph 11, "An "on

5

duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to." Wage Orders Nos. 7-80, 7-98, 7-2001 at ¶11(A). Plaintiffs assert that the written agreements between ABC and the SGs are invalid because the nature of the work does not prevent an employee from being relieved of all duty. (Charleton Dec., Exh H – Meal; Period Waiver.)  There is "absolute commonality" in this claim because either the nature of security guard work where a SG is the only person assigned to a location prevents a SG from being relieved of all duty for a meal period or it does not.  After this common factual and legal issue is resolved, the result can be applied to all SGs who worked as the only person assigned to a location.

Meal Period Claims – Underlying law.  The meal period claims are based on Labor Code 512 and paragraph 11 of the applicable California Wage Order.  Labor Code 512 states, "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes … ."  The applicable California Wage Orders state at paragraph 11, "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes." Wage Orders Nos. 7-80, 7-98, 7-2001 at ¶11(A).

Labor Code 512 is ambiguous as to whether an employer's obligation to "provide" a meal period requires the employer to make a meal period of 30 minutes available or to ensure that a meal period of 30 minutes is taken.  Labor Code 226.7 is similarly ambiguous.  The Wage Orders indicate that every person who works for more than five hours must be offered and must take a meal period of not less than 30 minutes.  Paragraph 11 of the Wage Orders state "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes …" "No employer shall employ" is mandatory and directive language. The remainder of the sentence does not include the "authorize and permit" language, and avoids the ambiguous term "provide."  A review of the Wage Orders as a whole supports the same

6

1   conclusion.  Employers are to provide meal periods of not less than 30 minutes, the time spent

2   on meal periods is not "hours worked," and "hours worked" is any time in which an employee is

3   "suffered or permitted to work, whether required to do so or not," Paragraph 2(G).  In addition,

4   employers must maintain time records of when meal periods begin and end, Paragraph 7(A)(3),

5   so employers should know if employees are taking their assigned meal periods.  Reading these

6   sections as a whole suggests that an employer must not knowingly suffer or permit an employee

7   to work during an assigned meal period.  The Court has been unable to locate any case law

8   directly applicable to determining the elements of a meal period claim.  *California*

9   *Manufacturers Assn. v. Industrial Welfare Com.* (1980) 109 Cal. App. 3d 95, 114-115, states that

10  the general experience of mankind is that it takes 30 minutes to eat a meal, but does not address

11  whether the Wage Orders permit employees to elect voluntarily to eat quickly and return to work

12  in fewer than 30 minutes.  The Court concludes that the Labor Code and the Wage Orders require

13  employers to ensure that employees take meal periods of not less than 30 minutes.

14      Rest Break Claims – Underlying law.  The rest break claims are based on paragraph 12 of

15  the applicable California Wage Orders, which state, "Every employer shall authorize and permit

16  all employees to take rest breaks …"  The rest breaks are to be "at the rate of 10 minutes net rest

17  time per four (4) hours or major fraction thereof."  Regarding pay, "Authorized rest period time

18  shall be counted as hours worked for which there shall be no deduction from wages."  Wage

19  Orders Nos. 7-80, 7-98, 7-2001 at ¶12(A).  There is no clear statutory or case law guidance on

20  what elements an employee must prove to establish a violation of the rest break provisions.

21      The Wage Order requires employers to make rest breaks available to employees, but does

22  not require employers to ensure that the employees take the full time allotted for those breaks.

23  The critical phrase in the Wage Order is "authorize and permit."  It is unclear whether this term

24  means "require" or "allow."  When used by the Legislature in other contexts, the phrase

25  "authorize or permit" appears to be synonymous with "allow."  In several statues the phrase

26  "authorize or permit" could be replaced with "allow" without altering the apparent meaning of

7

the statute, whereas replacement of "authorize or permit" with "require" would lead to strained or nonsensical language. See, e.g., Business and Professions Code 20999(c); Cal. Ed Code 1270.1; Cal Gov Code § 6546.1; Cal. Health and Safety Code 1371.3; Unemployment Insurance Code 1095(t). Case law addressing other issues suggests a similar interpretation of "authorize and permit." *Haggis v. City of Los Angeles* (2000) 22 Cal. 4th 490, 498 (equating the phrase "authorize and permit" with matters that are discretionary or permissive and placing them in contrast to matters that are obligatory or required). Case law does not clarify whether rest breaks must be allowed or required. There is a public policy that employees must have the option of taking rest breaks to rest, go to the toilet, and similar matters. *California Manufacturers Assn. v. Industrial Welfare Com.* (1980) 109 Cal.App.3d 95, 115. It is less clear whether public policy would require employees to take their breaks. Finally, the Court has considered the practicalities of the workplace. Employers generally determine when any given employee gets to take his or her break. In legal terms, rest periods are paid time that counts as "hours worked" and "hours worked" is defined as when an employee is subject to the control of an employer. *Morillion v. Royal Packing* (2000) 22 Cal.4th 575, 578. Therefore, a rest period can be viewed as an assignment from the employer that an employee accepts just as the employee would accept an assignment to stock shelves or work a cashier. The Wage Order requires employers to assign employees to rest breaks, and that if an employee completes the assignment to his or her satisfaction in less than 10 minutes then the employee can voluntarily elect to move on to other assignments. The Court concludes that employers must allow their employees to take net 10 minute rest breaks, but employers are not liable if their employees voluntarily elect not to take all the allotted rest time.

Rest Break and Meal Period Claims – Commonality. Plaintiffs have demonstrated that common issues will predominate on the rest break and meal period claims for monetary relief. There will be common issues of fact whether ABC's staffing practices deprived SGs of meal

1   periods and the opportunity to take rest breaks. There is evidence that the many SGs worked at

2   locations where they were the only SG. (Rukin Dec. Exh C, Thrower Depo at 210-211; Index of

3   Class Member Declarations.) There is evidence that ABC required SGs to be at their post at all

4   times. (Charleton Dec., Exh H.) Therefore, there will be common issues whether SGs were

5   authorized or permitted to take the rest breaks permitted by the Wage Order. Likewise, there will

6   be common issues whether SGs were provided meal periods as required by Labor Code 512, but

7   the merit of the meal period claims is dependent on the validity of the "on duty" meal period

8   agreements.

9

10       Plaintiffs have demonstrated that common issues will predominate on the rest break and

11   meal period claims for injunctive relief. There is evidence that many SGs work alone. There are

12   common issues about whether ABC's staffing and other practices are lawful in light of the

13   requirement that SG's must be provided meal periods (unless waived by agreement) and must be

14   given the opportunity to take rest breaks.

15

16       <u>Overtime on swapped shifts.</u> Plaintiffs have not demonstrated that common issues will

17   predominate at trial concerning whether ABC unlawfully fails to pay overtime when SGs swap

18   shifts. There is no evidence that ABC has a policy of not paying overtime when a guard works

19   more than 8 hours in a day or 40 hours in a week due to a swapped shift. The record does not

20   contain evidence that ABC has an express policy of not paying overtime when a guard works

21   more than 8 hours in a day or 40 hours in a week due to a swapped shift. The record likewise

22   does not contain evidence that ABC's policies on overtime were implemented or ignored with

23   the result that there was widespread de facto policy or practice of failing to pay overtime on

24   swapped shifts. There is no basis for the Court to conclude that ABC's asserted failures to pay

25   overtime to one of the named plaintiffs were anything more than a few isolated incidents. *Int'l*

26   *Bhd. of Teamsters v. United States* (1977) 431 U.S. 324, 336 (defining "pattern or practice").

9

    <u>Wage Statements.</u>  Common issues will predominate at trial concerning whether ABC unlawfully fails to provide accurate wage statements.  The wage statement claims are in large measure derivative of the other claims.

TYPICALITY AND ADQUACY OF REPRESENTATION.

    Jones-Joseph and Torres are typical of the classes they seek to represent.  Jones-Joseph was primarily a dispatcher as opposed to a SG, but did work as a SG for some time.  (Jones-Joseph at 23-26 and 29.)  Jones Joseph can, therefore, assert claims of SGs.  The Court also notes that the fact that Jones-Joseph was primarily a dispatcher as opposed to a SG affects only her typicality to assert the meal period and rest break claims.  The experiences and claims of Jones Joseph and Torres appear to be reasonably typical of the experiences and claims of the putative class as a whole.

    Plaintiffs have demonstrated that they will adequately represent the class.  They have no conflicts with the class.

    Plaintiffs have retained competent class counsel.  The evidence that one member of one of the firms representing Plaintiffs was the subject of bar discipline does not render his law firm inadequate and is no reflection on the other law firm.  The Court also notes that the Bar can impose a range of discipline from private admonition to public admonition to suspension to disbarment.  By imposing discipline less than suspension or disbarment the Bar suggested that the attorney can represent clients adequately.

    ABC has presented the declarations of Tselentis, Minor, Polk, and Reyes, each of which state that counsel for Plaintiffs sent correspondence to the declarants and asked the declarants to sign declarations.  The declarations reveal that counsel for Plaintiffs solicited information from witnesses (permitted), requested the witnesses to sign declarations (permitted), and that the declarants refused to sign the draft declarations (permitted).  Absent evidence of

10

1    misrepresentation or coercion, the Court will not find that the efforts of counsel to gather

2    information from witnesses is improper.

3         There are individualized factors concerning Jones-Joseph (fired) and Torres (revoked his

4    on-duty meal agreement). To the extent relevant to the merits of this case, these individualized

5    issues are factually disputed and the Court will not presume that ABC's version is correct at this

6    stage in the proceedings. The individualized issues do not subject Jones-Joseph and Torres to

7    individualized defenses on the merits that will interfere with their ability to represent the class.

8

9    POLICY CONSIDERATIONS.

10         ABC argues that class certification is not appropriate because the claims are weak. The

11    Court does not consider the merits of a case on class certification. *Linder v. Thrifty Oil Co.*

12    (2000) 23 Cal.4th 429, 439-440 (determination of whether a class should be certified is a

13    procedural question and does *not* include a weighing of whether the action is legally or factually

14    meritorious).

15         ABC argues that class certification is not appropriate because the money at issue for each

16    class member is minimal and the cost of administration will outweigh any benefits to the

17    members of the class. There is some support for this argument. *Blue Chip Stamps v. Superior*

18    *Court of Los Angeles County* (1976) 18 Cal. 3d 381, 386; *Reyes v. Board of Supervisors* (1987)

19    196 Cal. App. 3d 1263, 1274-1275; *Devidian v. Automotive Service Dealers Assn.* (1973) 35 Cal.

20    App. 3d 978. Class actions do, however, serve their purposes even if they cannot provide

21    compensation to individual class members. Where the cost of claims administration outweighs

22    the benefits to be provided, the Court can use a cy pres distribution. C.C.P. 384(b); *In re*

23    *Microsoft I-V Cases* (2006) 135 Cal. App. 4th 706. In addition, even if an administrative

24    process is inefficient or a cy pres distribution is inexact, a monetary recovery serves the purpose

25    of deterring unlawful business practices.

26

11

1    There is a relatively simple administrative procedure for handling individual Labor Code

2    claims. Labor Code 98.   The administrative process is presumptively adequate for most claims.

3    In this case, however, the claims are so small that it is unlikely that even a few employees would

4    use a simple administrative process.

5

6    CONCLUSION.

7    Class certification is GRANTED to the extent that Plaintiffs seek monetary relief on the

8    guard card, meal period "on duty," meal period, rest break, and wage statement claims.  The class

9    definition for those claims is:  "All persons employed by ABC Security Service, Inc. in any non-

10   exempt security guard or security officer positions in the State of California at any time from

11   June 2, 2000, through [DATE]."  The ending date will be the date the mailing list is fixed for

12   purpose of class notice.  See *Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797, 811-812

13   (membership in class dependent on notice and an opportunity to opt-out).   The class duration is

14   set by the four year statute of limitations for the UCL claim.   The Labor Code and other claims

15   might have shorter limitations periods.

16   Class certification is GRANTED to the extent that Plaintiffs seek monetary relief on the

17   uniform claims (claim that ABC failed to pay interests on the uniform deposits and failed to

18   reimburse cleaning costs at the termination of employment).  The class definition is:  "All

19   persons who were employed by ABC Security Service, Inc. in any non-exempt security guard or

20   security officer positions in the State of California who terminated from ABC's employ at any

21   time from June 2, 2000, through [DATE]."  The ending date will be the date the mailing list is

22   fixed for purpose of class notice.

23   Class certification is GRANTED to the extent that Plaintiffs seek injunctive relief on the

24   uniform, guard card, meal period "on duty," meal period, and rest break claims.  The class

25   definition is:  "All persons employed by ABC Security Service, Inc. in any non-exempt security

26

1   guard or security officer positions in the State of California at any time from June 2, 2000,

2   through the date of judgment.

3        Class certification is DENIED to the extent that Plaintiffs seek monetary or injunctive

4   relief on the overtime on swapped shifts claims.

5        This order on class certification is not an indication of the merit of any of the claims.

6

7   EVIDENCE

8        The Court has considered all the declarations submitted, as well as the exhibits attached

9   thereto.  The Court's consideration of the evidence is limited to the motion for class certification

10  and should not be construed as an indication of admissibility in future motions or at trial.

11

12  FURTHER PROCEEDINGS.

13       The Court sets the next case management conference for January 24, 2007, at 10:00 am.

14       At the case management conference the parties should be prepared to discuss the

15  necessity of providing class notice, the mechanics and form of any such notice, and whether a

16  formal motion on class notice will be required.   C.R.C. 1856.  To the extent that Plaintiffs seek

17  monetary relief, the Court is inclined to order notice and provide absent class members an

18  opportunity to opt out.  *Bell v. American Title Ins. Co.* (1991) 226 Cal. App. 3d 1589, 1609.  To

19  the extent that Plaintiffs seek injunctive relief, the Court is inclined to order that it is not

20  necessary to provide class members with notice and an opportunity to opt out of the class.

21  C.R.C. 1856(b)(1) and (2) and (c)(1) and (2).  See also *Frazier v. City of Richmond* (1986) 184

22  Cal. App. 3d 1491, 1500-1501.

23  ///

24  ///

25  ///

26  ///

13

1    At that time, counsel should also be prepared to discuss (1) what discovery is necessary

2    before trial, (2) motions for summary adjudication or summary judgment, (3) trial setting.

3

4    Dated: December 12, 2006

Judge Ronald M. Sabraw

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

14

Case Title/No.:    **TORRES VS. ABC SECURITY SERVICE, INC.**
**RG04158744**

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the Alameda County Superior Court and not a party to this cause. I served this ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF PLAINTIFFS FOR CLASS CERTIFICATION by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Scott Edward Cole
Clyde H. Charlton
Matthew R. Bainer
SCOTT COLE & ASSOCIATES, APC
1970 Broadway, Suite 950
Oakland, CA 94612

Geoffrey Spellberg
Dana S. Zamczyk
MEYERS, NAVE, RIBACK, SILVER & WILSON
50 California Street, Suite 3050
San Francisco, CA 94111

Peter Rukin
Zachary R. Cincotta
RUKIN HYLAND & DORIA LLP
100 Pine Street, Suite 725
San Francisco, CA 94111

Dated: December 12, 2006

Executive Officer/Clerk of the Superior Court

By _____
*Elizabeth Opelski-Erickson, Deputy Clerk*