1  QUALLS & WORKMAN, L.L.P.
   Daniel H. Qualls (Bar # 109036)
2  Robin G. Workman (Bar # 145810)
   244 California Street, Suite 410
3  San Francisco, CA 94111
   Telephone: (415) 782-3660
4
   Attorney for Plaintiff Johnny McFarland,
5  and all others similarly situated.

6

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHNNY MCFARLAND, on behalf of himself    )  CASE NO.  CV 07-03953 PJH
    and all others similarly situated,        )
12                                            )  REQUEST FOR JUDICIAL NOTICE IN
                                              )  SUPPORT OF PLAINTIFF'S MOTION FOR
                   Plaintiff,                 )  PARTIAL SUMMARY JUDGMENT
13                                            )
          vs.                                 )
14                                            )  Date:  2/13/08
    GUARDSMARK, LLC, and Does 1 through 50,   )  Time:  9:00 a.m.
15  inclusive,                                )  Ctrm:  3, 17th Floor
                                              )  Judge: Hon. Phyllis J. Hamilton
16                 Defendants.                )

17

18        Plaintiff hereby requests the Court take judicial notice of the following documents:

19        1.      Division of Labor Standards Enforcement, Enforcement Policies and

20  Interpretations Manual, Chapter 45, attached hereto as Exhibit A.

21        2.      Labor Code Section 226.7, Legislative History & Intent, pages 266-278, attached

22  hereto as Exhibit B.

23

24  Date:  January 9, 2008                    QUALLS & WORKMAN, L.L.P.

25

26                                  By:   /S/ Robin G. Workman
                                          Robin G. Workman
27                                        Attorneys for Plaintiff Johnny McFarland,
                                          and all others similarly situated.

28

REQUEST FOR JUDICIAL NOTICE          -1-          3150\MOTIONS\MSJJUDNOT.DOC

1    <u>PROOF OF SERVICE</u>

2       I, the undersigned, hereby declare:

3       I am a member of the bar of this court. I am over the age of eighteen years and not a party

4    to the within action. My business address is Qualls & Workman, L.L.P., 244 California Street,

5    Suite 410, San Francisco, California.

6       October 25, 2007, I served a true and correct copy of the **REQUEST FOR JUDICIAL**

7    **NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**

8    **JUDGMENT** electronically. I caused said documents to be transmitted using ECF as specified by

9    General Order No. 45 to the following parties:

10   Martin D. Bern
     Munger Tolles & Olson LLP
11   560 Mission Street
     Twenty-seventh Floor
12   San Francisco, CA 94105-2907
     bernmd@mto.com
13
     Malcolm A. Heinicke
14   Munger Tolles & Olson LLP
     560 Mission Street
15   27th Floor
     San Francisco, CA 94105-2907
16   heinickema@mto.com

17       I declare under penalty of perjury under the laws of the State of California that the

18   foregoing is true and correct, and that this declaration was executed on January 9, 2008, at San

19   Francisco, California.

20
                                                    /S/ Robin G. Workman
21

22

23

24

25

26

27

28

# EXHIBIT A

# The 2002 Update Of

# The DLSE

# Enforcement Policies and Interpretations

# Manual

# (Revised)

## ACKNOWLEDGEMENTS

The Division of Labor Standards Enforcement (DLSE) Enforcement Policies and
Interpretations Manual summarizes the policies and interpretations which DLSE has
followed and continues to follow in discharging its duty to administer and enforce the
labor statutes and regulations of the State of California.

We would like to thank the following DLSE management, deputies, attorneys and clerical
staff members for editing, cite checking and otherwise contributing to the Manual:

Robert Jones, Acting State Labor Commissioner

| | | | |
|---|---|---|---|
| Guadalupe Almaraz | David Balter | Benjamin Chang | John Chiolero |
| Leslie Clements | Dan Cornet | Susan Dovi | Fred Duscha |
| John Fennacy | Rachel Folberg | Mary Ann Galapon | Edna Garcia-Earley |
| Linda Gelsinger | Char Grafil | Tom Grogan | Randi Guerrero |
| Dave Gurley | Johanna Hsu | Michael Jackman | Tom Kerrigan |
| Tim Kolesnikow | Teresa McDonald | Allen Perlof | William Reich |
| Anne Rosenzweig | Brenda Schrader | Nance Steffen | Robert Villalovos |
| Michael Villeneauve | | | |

**March, 2006**

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

**45          WORKING CONDITIONS UNDER THE IWC ORDERS**

**45.1          Reporting Time Pay.  Section 5 of each of the Orders provides:**

(A)   Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B)   If an employee is required to report for work a second time on any one workday and is furnished less than two (2) hours of work on the second reporting, said employee shall be paid for two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

(C)   The foregoing reporting time pay provisions are not applicable when:
   (1)   Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or
   (2)   Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or
   (3)   The interruption of work is caused by an Act of God or other cause not within the employer's control

(D)   This section shall not apply to an employee on paid standby who is called to perform assigned work at a time other than the employee's scheduled reporting time.

**45.1.1          Reporting Time Pay In Connection With Call Back.**  If the employee is on a paid standby and is called to work, the reporting time pay provisions do not apply.  In order to qualify as paid standby, the hourly wage for the standby time which has been agreed to or, absent a specific agreement, at the employee's regular rate of pay must be paid.

**45.1.1.1**  Reporting time pay constitutes wages.  *(Murphy v. Kenneth Cole* (2007) 2007 WL 1111223).  Thus, failure to pay all reporting time pay due at the time of employment termination may be the basis for waiting time penalties pursuant to Labor Code § 203.

**45.1.2          Employee Reports To Work And Told To Return Later.**  The DLSE has been asked what the reporting time pay requirements are when an employee is told to report at a specific time and is then told that there is no work available at that time but that he or she is to report again, say, two hours later.  The language of the regulation clearly requires that the applicable premium be paid if, at the first reporting of the day, the employee is not put to work or is provided less than one-half the scheduled or usual number of hours; this would be the result despite the fact that the employee might, eventually, work more than the scheduled hours in the day in a subsequent reporting.  At the second reporting of the day the same plain language of the regulation would require that in the event the employee is furnished with less than two hours of work, the employee is, nevertheless, entitled to recover two hours at the employee's regular rate of pay.

**45.1.2.1**  The reporting time premium requirement is designed to discourage employers from having employees report unless there is work available at the time of the reporting and is further designed to reimburse employees for expenses incurred in such situations.

**45.1.2.2**  If the employee was not simply told to report later, but the employee's activities were restricted by the employer pending the second reporting time, the time spent would be compensable as waiting time.  (See also Section 45.1.6.1, below)

**MAY, 2007**                                                                                                        **45 - 1**

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

45.1.3    **"Employee's Usual Or Scheduled Day's Work."** If an employee has no regularly scheduled shift, then the usual shift worked by the employee (but in no event less than two or more than four hours) must be paid. However, if an employee has a <u>regularly contracted</u> "scheduled" relief shift of less than two (2) hours the reporting time penalty is not applicable. However, in such a situation the employee must be paid for the regularly scheduled contracted amount.

45.1.3.1    *Example:* Assume a worker is scheduled to work four days of two hours each and one day of one hour. The *regularly contracted relief* shifts are not subject to the reporting time penalty. Note the emphasis on regularly contracted part-time relief (see AG Opinion in footnote). This exception would not apply unless the shift is regularly scheduled and is less than two (2) hours.

45.1.4    **Required "Training" Or "Staff" Meeting Attendance.** DLSE has been asked on a number of occasions how the Reporting Time provisions of the Orders affect a situation where the employer requires employees to attend a short training meeting, staff meeting or similar gathering under a variety of circumstances. Most common are:

     1. Required meeting is scheduled for a day when the worker is not usually scheduled to work. The employer tells all of the workers that attendance at the meeting is mandatory and a one- or two-hour shift is "scheduled" for this meeting. For those workers not "regularly scheduled" to work, the employee must be paid at least one-half of that employee's *usual or scheduled* day's work.

     2. Required meeting is scheduled on the day a worker is scheduled to work, but after the worker's scheduled shift ends.

         a. If there is an unpaid hiatus between the end of the shift and the meeting, the employee must be paid, pursuant to Section 5(B) (see above) at least two hours for reporting a second time in one day.

         b. If the meeting is scheduled to immediately follow the scheduled shift, there is no requirement for the payment of reporting time no matter how long the meeting continues.

---

     *There is an Attorney General Opinion (AG Opn. NS-5108, September 21, 1943, page 235-236) regarding the reporting time penalty as it appeared in 1943 ("each day an employee is required to report to work and does report for work but is not put to work or works 4 hours or less the employer shall pay the employee for not less than 4 hours at $.50 per hour"). In the opinion, the AG concluded: "where an employee is called to report and does report expecting to receive the usual day's work with the prescribed pay therefor she is denied the opportunity to earn a living wage if she is not compensated for at least a portion of the time she makes available to the proposed employer. This would not be true in connection with regularly contracted relief for part-time work...Should a woman be employed regularly to work a lunch hour to relieve the full-time clerk and reports to work expecting and knowing that she is to receive but one hour's employment per day and this is the regular part-time arrangement, we are of the opinion that is was not the intention of the mercantile order to apply to such an arrangement and that the employee may be paid the minimum wage at the hourly rate for the time actually employed." (Emphasis added)*

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

45.1.5    **Interruption Of Work.** You will note that reporting time pay is not required when "the interruption of work [requiring the second reporting time] is caused by an Act of God or other cause not within the employer's control." DLSE has recently concluded that rain or other inclement weather that makes it impossible or unsafe to work falls into the category of "an Act of God or other cause not within the employer's control." This means that if workers are sent home (either immediately upon reporting to work or during the workday) because of rain or other inclement weather, there is no obligation to pay reporting time pay.

45.1.5.1    However, employees must be paid for all time they are restricted to the employer's premises, or worksite, while "waiting out" a delay caused by rain or other inclement weather, if they are not free to leave the premises or worksite during that time, even if the employees are relieved of all other duty during the period of time they are waiting for weather conditions to improve. The reason for this is that under the IWC orders, employees must be paid for all "hours worked," and the term "hours worked" includes both "all time the employee is suffered or permitted to work, whether or not required to do so," and all "time during which an employee is subject to the control of an employer." Restricting employees to the employer's premises, or worksite, means that the employee is subject to the employer's control so as to constitute "hours worked." See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, and *Bono Enterprises v. Labor Commissioner* (1995) 32 Cal.App.4th 968. Under such circumstances, the employees must be paid their regular rate of compensation (which cannot be less than the minimum wage), or any overtime rate, if applicable. (O.L. 1998.12.28)

45.1.6    **Restrictions Placed On Employee In Situations Involving Weather Delays.** Even if the employee is given some limited freedom to leave the employer's premises or worksite while "waiting out" a delay caused by rain or inclement weather, there will still be an obligation to pay the employee for such time if the employee is so restricted geographically and/or temporally that the worker is deprived of effective use of his own time.

45.1.6.1    *Example:* If a worker is told that he can go across the street to a café during a rain delay, but that he must report back to work within five minutes of being notified that work is starting, the entire time that the worker is waiting in the café will constitute "controlled stand-by time", which is treated as "hours worked". (See generally, *Berry v. County of Sonoma* (9th Cir.1994) 30 F.3d 1174)

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

**45.2**    **Meal Periods.** Section 11 of each of the Orders (except Order 16) provides:

> (A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

> (B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

> (C) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

> (D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one (1) day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect.

**45.2.1**    **Regulation Clearly Places Burden On Employer To Insure Meal Period.** The language of Section 11(A) (patterned on Labor Code § 512) provides that "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than thirty (30) minutes..." The clear intent of the IWC is that the burden of insuring that employees take a meal period within the specified time is on the employer; it is the employer's duty not to "employ any person for a work period of more than..." It is the employer's burden to compel the worker to cease work during the meal period. The burden is similar to that imposed upon the employer that he or she "shall pay to each employee wages not less than six dollars and seventy-five cents ($6.75) per hour..." The employer must pay the employee the minimum wage and may not defend his or her failure to do so on the fact that the employee chose to accept less than the minimum wage. As with the minimum wage obligation, the employer is not entitled to excuse the fact that he or she employed an employee for a period of more than five hours without a meal period on the failure of the employee to take the meal period.

**45.2.2**    **Note:** Labor Code § 512, requiring an employer to provide a meal period, does not exclude any class of employee. Consequently, it would appear that exempt employees are also entitled to meal periods in accordance with that section. However, the premium pay provided in Labor Code § 226.7 for failure to provide the meal period only applies if the meal period is required by the applicable IWC Order. The IWC Orders specifically excluded exempt employees from the coverage of the IWC meal

45 - 4

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

period requirement. Thus, no premium pay may be imposed on a employer who fails to provide a meal period to an exempt employee.

**45.2.3.1    Limited Waiver Of Meal Period Requirement Allowed In Two Situations:**

1. If a work period of not more than six hours will complete the day's work, the meal period may be waived entirely by mutual consent of the employer and employee. [1]

   a. Note, there is no requirement that the waiver be in writing in this situation.

   b. There is no requirement in this situation that the employee be able to eat while on duty as is the case with an "on-duty" meal period described below.

   c. An employer may not employ an employee for a work period of more than 10 hours in a workday without providing a second meal period. This second meal period may be waived if the total hours of work are no more than 12 hours *and* the first meal period has not been waived.[2]

2. An on-duty meal period may be provided if the employee agrees in writing, *and* such on-duty meal is allowed "only when the nature of the work prevents an employee from being relieved of all duty."

   a. The test of whether the nature of the work prevents an employee from being "relieved of all duty" is an objective one. An employer and employee may not agree to an on-duty meal period unless, based on objective criteria, any employee would be prevented from being relieved of all duty based on the necessary job duties.

   b. The written agreement for an on-duty meal period *must* contain a provision that the employee may, in writing, revoke the agreement at any time.

   c. DLSE does not have the jurisdiction to exempt an employer from the meal period provisions in the Orders or those of Labor Code §§226.7, 512.

**45.2.3.2    Collective Bargaining Situations.** Labor Code § 514 was amended effective January 1, 2002, to repeal the statutory exemption from the meal period requirement in the case of workers covered by a collective bargaining agreement. The Legislature adopted a statement that this amendment was declarative of existing law and shall not be deemed to alter, modify or otherwise affect any provision of any IWC Order. IWC Orders 1-15 and 17 do not provide, and never have provided, a CBA opt-out for meal period requirements. While Order 16 does contain such an opt-out provision, in 2006 the Court of Appeal declared this opt-out provision to be unenforceable due to its having been adopted in violation of the express provisions of Labor Code § 516 which does not allow the IWC to adopt meal period requirements that are inconsistent with Labor Code § 512. *Bearden v. Borax,* 138 CA 4th 429 (2006).

---

[1]   Labor Code Section 512 which requires the meal periods, allows the IWC to adopt a working condition permitting a meal period to commence after six hours of work -- however, the IWC has not done so. Consequently, the employer and employee must agree to the waiver under the conditions set out in the Orders.

[2]   When an employee works more than six (6) hours, there is only one set of circumstances wherein a first meal period may be waived and that is if the employee accepts, in writing, an on-duty meal period under the conditions set out in the Orders concerning the nature of the work, precluding an employee from being relieved of all duty. This provision of the IWC Orders and Labor Code §512(a) precludes two on-duty meal periods in any one day.

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

45.2.4.1    **Order 1-2002 Amendment Allowing Parties To Collective Bargaining Agree-
ments To Agree To A Meal Period After Six Hours Of Work.** Effective July 1,
2002, IWC Order 1-2002 allows a limited exception to the rule that no employer shall
employ a worker for a period of more than five hours without a meal period to workers
employed under the terms of a collective bargaining agreement. The IWC added a second
sentence to Paragraph A that provides: "In case of employees covered by a valid collective
bargaining agreement, the parties to the collective bargaining agreement may agree to
a meal period that commences after no more than six (6) hours of work." Note that
this CBA exception only applies to Order 1.

45.2.4.2    There is, of course, language in the Orders which allows an employee to waive the meal
period by accepting an on-duty meal period if all of the required circumstances exist.
California law has always allowed a union, as the collective bargaining representative,
to act on behalf of its members where such waiver is allowed. (*Porter v. Quillin* (1981)
123 Cal.App.3d 869). However, as is the case where there is no CBA, it must be
established by objective criteria that the conditions for the on-duty meal period are met
before the waiver is allowed. The parties may not agree to the on-duty meal period
because it is desired or helpful.

45.2.5    **"On-Duty Meal Period".** Even if all of the circumstances exist to allow an on-duty
meal period, the employee must be provided with the opportunity to eat his or her meal
while performing the duties required.

45.2.6    **Meal Time Training Or Client Meetings.** If an employee is required by the employer to
attend a luncheon, dinner or other work related meal, or training accompanied by a meal, the
employer must pay for the cost of the meal and the employee must be paid at the employee's
regular rate of pay. As the time is work time, it must be counted as hours worked for overtime
purposes. In addition, covered employees continue to be entitled to a duty free 30 minute meal
period in accordance with the terms of the applicable Wage Order.

45.2.7    **Premium For Failure Of The Employer To Provide The Meal Period.** For each
workday that the employer fails to provide the required meal period, the employer shall
pay the employee one (1) hour of pay at the employee's regular rate of compensation.
This premium pay is a "wage" under Labor Code § 200.

45.2.8    **Premium For Missed Meal Period Is Only Imposed Once Each Day.** No matter
how many meal periods (rest period penalties are separate) are missed, only one meal
period premium is imposed each day. Thus, if an employer employed an employee for
twelve hours in one day without any meal period, the penalty would be only one hour
at the employee's regular rate of pay.

45.2.9    **Premium Is Imposed For Failure To Provide Meal Period In Accordance With
Applicable IWC Order.** The Orders require that no employer shall employ any

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

employee for a work period of more than five hours without a meal period, and the meal period shall be for no less than at least thirty minutes. Thus, if the employee took the first meal period in the sixth hour or if the meal period was for less than thirty minutes, the premium would apply.

45.2.9.1.     **Relationship Between Record-Keeping Requirement And Meal Period.** Inasmuch as the employer has an obligation under the record-keeping requirements to track meal periods unless "all work ceases", the employer should know whether or not its employees have taken the required off-duty meal period. Therefore, it generally would not be a defense for an employer to assert that it had no knowledge that its employees were working during a meal period.

45.2.10     **Wage Order 16-2001 Meal Period Requirements.** In addition to the requirements contained in the other Orders, Order 16-2001, Section 10(C), requires that the employer furnish "an adequate supply of potable water, soap, or other suitable agent and single use towels for hand washing."

45.2.10.1     Note: In Orders 4 and 5, the IWC has determined that hours of work of employees in the Health Care Industry are to be determined by the federal definition of hours worked. Thus, as discussed at Section 47.3.2, *et seq.* of this Manual, the employees in the Health Care Industry may be required to remain on the premises during their paid meal period.

**MAY, 2007**                                                                                                **45 – 7**

**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL**

45.3    **Rest Periods**. Section 12 of each of the Orders (except Order 16) provides:

> (A) Every employer shall authorize and permit all employees to take rest periods,
> which insofar as practicable shall be in the middle of each work period. The
> authorized rest period time shall be based on the total hours worked daily at the rate
> of ten (10) minutes net rest time per four (4) hours or major fraction thereof.
> However, a rest period need not be authorized for employees whose total daily
> work time is less than three and one-half (3 ½) hours. Authorized rest period time
> shall be counted as hours worked for which there shall be no deduction from
> wages.
> (B) In an employer fails to provide an employee a rest period in accordance with the
> applicable provisions of this order, the employer shall pay the employee one (1)
> hour of pay at the employee's regular rate of compensation for each workday that
> the rest period is not provided.

45.3.1    **"Major Fraction"**. DLSE follows the clear language of the law and considers any time
in excess of two (2) hours to be a major fraction mentioned in the regulation. (O.L.
1999.02.16).

45.3.2    **Rest Period Is Paid And Counted Toward Hours Worked**. The regulation requires
that the rest period time shall be counted as hours worked for which there shall be no
deduction from wages.

45.3.3    **The Rest Period Is A "Net" Ten Minutes**. The IWC has provided that the rest
period is net – in other words, the rest period begins when the employee reaches
an area away from the work station that is appropriate for rest. The employee is
entitled to one rest period per work period. This means than an employer may not
(except in the case of certain workers in extended care homes under Order 5) count
periods of less than 10 minutes as rest periods meeting the requirements of Section 12
of the IWC Orders. (O.L. 2002.02.22; 1986.01.03)

45.3.4    **Rest Period Is Not Limited To Toilet Breaks**. The intent of the Industrial Welfare
Commission regarding rest periods is clear: the rest period is not to be confused with
or limited to breaks taken by employees to use toilet facilities. The conclusion is
required by a reading of the provisions of IWC Orders, Section 12, Rest Periods, in
conjunction with the provisions of Section 13(B), Change Rooms and Resting
Facilities which requires that "Suitable resting facilities shall be provided in an area
separate from the toilet rooms and shall be available to employees during work hours."

45.3.4.1    Allowing employees to use toilet facilities during working hours does not meet the
employer's obligations to provide rest periods as required by the IWC Orders. This is
not to say, of course, that employers do not have the right to reasonably limit the
amount of time an employee may be absent from his or her work station; and, it does
not indicate that an employee who chooses to use the toilet facilities while on an
authorized break may extend the break time by doing so. DLSE policy simply prohibits
an employer from requiring that employees count any separate use of toilet facilities as
a rest period.

**45 – 8**                                                                **MARCH, 2006**

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

45.3.5     **Order 16, Exceptions.**  Order 16 covering the on-site occupations contains some exceptions which allow the employer to "stagger" the rest periods to avoid an interruption in the flow of work and maintain continuous operations. The DLSE has opined that an employer subject to Order 16 still may not schedule a rest period at the very beginning or very end of the workday.  The very idea of a "rest period" is to provide the worker with needed rest time during the workday. (O.L. 2001.09.17)

45.3.6     **Opt-Out Clause In CBA's.**  Under Order 16 only, the IWC Orders provide that parties to collective bargaining may chose to opt-out of the rest period provisions if the CBA provides "equivalent protection" for the workers.

45.3.6.1     Equivalent protection has been held to mean that the CBA must contain the same substantive requirements both as to the right to rest periods and the right to premium pay for rest period violations. (O.L. 2001.09.17)

45.3.6.2     In addition, if the CBA specifically provides final and binding arbitration for resolving disputes regarding the rest period provisions of a CBA, the collective bargaining agreement will prevail. The IWC announced in its Statement As To The Basis for Order 16-2001, that this language was intended to mean that the premium does not apply in the event that the CBA provides for final and binding arbitration of disputes involving the enforcement of the rest period provisions.

45.3.7     **Premium For Failure To Provide Rest Periods** is the same as that imposed for failure to provide meal periods.  Note that only one hour for failure to provide a rest period may be imposed in each day regardless of the number of rest periods missed.

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

**45.4**    **Meals and Lodging Costs.**

45.4.1    The credit associated with meals and lodging contained at Section 10 of each of the Orders have been increased:

| Credits | January 1, 2001 | January 1, 2002 |
|---|---|---|
| Lodging: | | |
| Room occupied alone | $29.40 per wk. | $31.75 per wk. |
| Room shared | $24.25 per wk. | $26.20 per wk. |
| Apartment: two-thirds (⅔) of the ordinary rental value, and in no event more than: | $352.95 per mo. | $381.20 per mo. |
| Where a couple are both employed by the employer, two-thirds (⅔) of the ordinary rental value, and in no event more than: | $522.10 per mo. | $563.90 per mo. |
| Meals: | January 1, 2001 | January 1, 2002 |
| Breakfast | $2.25 | $2.45 |
| Lunch | $3.10 | $3.35 |
| Dinner | $4.15 | $4.50 |

45.4.2    **Only Actual Meal and Lodging Costs May Be Used As Credit Against The Employer's Minimum Wage Obligation.** The actual costs of meals and lodging (in no event to exceed the amounts set out above) may be offset against the minimum wage obligation of the employer. If the actual cost of the meal or the lodging is less than the rate shown in the Orders, only the actual amount may be credited.

45.4.3    **Meals** must be "an adequate, well-balanced serving of a variety of wholesome, nutritious foods...consistent with the employee's work shift."

45.4.4    **Lodging** means "living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed."

45.4.5    **Written Agreement Required For Credit Against Minimum Wage:** Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee which explicitly references that such credits are being applied toward the minimum wage obligation of the employer. In addition, "Deductions shall not be made for meals not received nor lodging not used."

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

45.4.6     **Employer May Not Force Purchase On The Employee.** As the California courts have determined, deductions by employers which amount to coerced purchases from the employer are forbidden by the provisions of Labor Code § 450. (See *California State Restaurant Assn. v. Whitlow* (1976) 58 Cal.App.3d 340)  Consequently, while the offer may be made by the employer, it may not be couched in terms of a requirement that the employee purchase the meal or the lodging.

45.4.6.1   **Prior History.** IWC Orders prior to 1976 had contained language which was silent on the question of the employer's right to credit meals toward the employer's minimum wage requirement. It had been the established practice in the restaurant industry up until 1976 to credit the minimum wage obligation if meals were "furnished or reasonably made available" to the employee. The *Whitlow* court noted that "In light of the prohibition against compelled purchases in section 450, the implied power of the commission to authorize in kind payments must be limited to situations in which such manner of payment is authorized by *specific and prior voluntary employee consent.* This limitation is consistent with the strong public policy favoring full payment of minimum wages, which the Legislature has effectuated by making payment of less than the minimum wage unlawful." (*Id.,* at 58 Cal.App.3d p. 348)

45.4.7     **Labor Code § 1182.8.** Labor Code § 1182.8 permits employers of apartment managers to charge up to two-thirds of the fair market rental value of an apartment if:

   1. there is a voluntary written agreement, and

   2. no portion of the rental charge is used to meet the minimum wage obligation.

45.4.7.1   This means that the manager must be paid at least the minimum wage for all of the hours worked* and none of the apartment value may be credited toward that minimum wage obligation.

45.4.7.2   **Calculating Overtime.** In situations involving either charging two-thirds of the fair market value or use of the credits allowed in Section 10 of the Orders, if it becomes necessary to establish what the regular rate of pay is for purposes of overtime computation, the difference between the amount paid for rent or the amount taken as credit and the actual fair market value of the apartment must be figured into the calculation. (See discussion at Section 49.1.2.2 of this Manual)

---

*Note that the "hours worked" definition for these types of employees is different under Order 5. (See *Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 25 Cal.Rptr.2d 65)

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

**45.5**    **Uniform And Tool Requirements.**

45.5.1    The IWC Orders, Section 7, Section 9(A), provides, *inter alia*:

> When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color.

45.5.2    **Color And/Or Design.** The Division has historically taken the position, based upon notes of the Commission, that nurses can wear their white uniforms wherever they work, and the employer, consequently, need not pay for them. Other workers in occupations for which the particular white uniform is generally useable would fall into the same category. (See, generally, O.L. 1994.02.16-1)

45.5.3    If, instead of being professional nurses, the individuals were house-keepers or clerical employees, the rationale contained in the Statement of Basis would not be applicable since a uniform would not be "generally usable in the occupation". Consequently, any uniform (regardless of color) which is required to be worn by an individual in an occupation which would not generally wear that particular uniform, must be paid for by the employer. (See, generally, O.L. 1991.02.13)

45.5.4    If, for instance, given a choice of pastel or white uniforms, a pastel uniform were freely chosen by a nurse or other health care professional in an occupation which generally wears a white uniform, it is the opinion of the Division that it need not be paid for by the employer because the employer would not have been required to pay for the standard white uniform. The employee could not take advantage of the option and thereby create an obligation for the employer. Such would not be the case, of course, if the choice of wearing a standard white uniform were not available.

45.5.5    In the Statement of Basis for the Orders beginning in 1980, the IWC accepted DLSE enforcement policy:

> The definition and [DLSE] enforcement policy is sufficiently flexible to allow the employer to specify basic wardrobe items which are usual and generally usable in the occupation, such as white shirts, dark pants and black shoes and belts, all of unspecified design, without requiring the employer to furnish such items. If a required black or white uniform or accessory does not meet the test of being generally usable in the occupation the employee may not be required to pay for it.[*]

45.5.6    **Clothing And Accessories Of A Distinctive Design.** DLSE has taken the position that clothes of a particular design (*e.g.,* tropical shirts) would be so distinctive as to require that the employer pay the cost of such clothes. (O.L. 1990.09.18) In the case of *DIR v. UI Video* (1997) 55 Cal.App.4th 1084, the dress code imposed by the employer which was found to be a uniform consisted of a blue shirt and tan or khaki pants.

45.5.7    **Tools.** When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by

---

[*]This language appeared in the Statement As to The Basis for the 1980 and subsequent Orders and inasmuch as no substantive changes were made to the language dealing with uniforms, the basis for the language remains valid.

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

45.5.8  **Remedy.** Failure of an employee to receive two times the minimum wage while still obligated to purchase the tool would result in the employer being liable for the cost of the tool or equipment under Labor Code § 2802.

45.5.8.1  **Definition Of "Hand Tools And Equipment".** DLSE has opined that the term "hand tools and equipment" is to be given its literal meaning. Such hand held tools and hand held equipment do not include power driven tools or equipment. The IWC intended that the term be limited to hand held tools such as hammers or screw drivers. The word equipment is meant to encompass hand held measuring instruments or like apparatus. The IWC Statement As To The Basis of the 2000 Orders states: "This exception is quite narrow and is limited to hand (as opposed to power) tools and personal equipment, such as tool belts or tool boxes, that are needed by the employee to secure those hand tools."

45.5.9  **Deduction From Wages For Non-Return Of Uniforms Or Tools.** The IWC, except in Order 16-2001, continues the language which ostensibly allows employers to deduct from an employee's final wages for the cost of uniforms or tools provided by the employer and not returned. The Orders require that the deduction be authorized by a prior written authorization by the employee.

45.5.10  *Caveat:* It is important that Deputies note that the DLSE must enforce the IWC Orders as written; however, employers should be warned that the deduction language is not in compliance with Labor Code Section 224, 300 and 400-410. Also, of course, the IWC Orders specifically prohibit deductions for normal wear and tear.

45.5.11  Even if there is a deduction made, the deduction may only represent the reasonable cost of the equipment or tool provided by the employer and not returned. The burden is on the employer to establish the reasonable cost.

# EXHIBIT B

JAN RAYMOND
# LEGISLATIVE | HISTORY & INTENT

# LABOR CODE

## SECTION 226.7

### A SELECTED HISTORY

## VOLUME 1 OF 2

P.O. Box 74005, Davis CA 95617 | Phone: (888) 676-1947 | Fax: (530) 750-0190 | www.naj.net

# ENROLLED BILL REPORT

| DEPARTMENT INDUSTRIAL RELATIONS | AUTHOR: Steinberg | BILL NUMBER AB 2509 |
|---|---|---|

**SUBJECT:** Employment: remedies for employment law violations

**SUMMARY:**

This bill amends and revises a number of statutes that regulate wages and hours, including applicable administrative and enforcement procedures.

NOTE: Due to the number and disparate nature of the labor law issues addressed by this bill, for the sake of clarity, a separate analysis has been prepared for each major issue affected by this legislation. Sections on "Appointments," "Other States' Statutes/Programs," and "Recommended Position" will be reported at the end of this document.

## 1. PROVISIONS RELATED TO THE RATE OF INTEREST APPLIED TO UNPAID WAGES (Section 1: Amending Labor Code § 98.1 and Section 5: Adding Labor Code § 218.6)

**ANALYSIS:**

Existing law requires the Labor Commissioner to award interest on all unpaid wages in any order, decision or award that is issued following a hearing on an employee's wage claim. Interest ". . . shall accrue. . . at the adjusted annual rate established pursuant to Section 19269 of the Revenue and Taxation Code." The referenced section of the Revenue and Taxation Code has been repealed.[1]

---

[1]Revenue and Taxation Code §§ 19264 to 19270 were repealed effective January 1, 1994 (Statutes of 1993, Chapter 31 (SB 3)).

Prepared by: Pat Johnson (415) 703-4810

| VOTE | ASSEMBLY | 42 - 31 | SENATE | 22 - 14 |
|---|---|---|---|---|

| RECOMMENDATION | SIGN X | VETO | DEFER TO |
|---|---|---|---|

| DIVISION CHIEF *Arthur Lujan* ② | DATE SEP 1 1 2000 | GOVERNOR'S OFFICE USE |
|---|---|---|
| DEPARTMENT CHIEF *Stephen J Smith* | DATE 9/13/00 | |

**Enrolled Bill Report**
**Bill No.** AB 2509
Page 2

This bill deletes the current method of calculating interest and instead substitutes the method prescribed by Civil Code § 3289 which prescribes that interest be calculated at the rate of 10% per year from the date of the breach of the agreement to the date of payment.[2] Interest calculations under the existing annual adjust rate method are fairly complex and are unfamiliar to the courts, since interest in civil litigation is generally governed by Civil Code §§ 3287 and 3289. Adopting the legal rate of 10% per annum as specified in Civil Code § 3289 simplifies interest calculations without significantly changing the amount of interest awarded to claimants.

**FISCAL IMPACT:**

This bill makes a technical amendment of Labor Code § 98.1. There will be no fiscal impact on Division of Labor Standards Enforcement (DLSE) programs as a result of this change.

**ECONOMIC IMPACT:**

None foreseen.

**PRO:**

The amendment of the Labor Code to permit calculation of accrued interest at 10% per annum under Labor Code § 98.1 (c) will eliminate any confusion under the existing statute due to the repeal of Revenue and Taxation Code § 19269.

**CON:**

None known.

**LEGAL IMPACT:**

None

**LEGISLATIVE HISTORY:**

None

---

[2] The interest rate of 10% per annum applies to awards resulting from hearings of the Labor Commissioner (Labor Code § 98.1) and to awards made by a court for nonpayment of wages (Labor Code § 218.6).

Enrolled Bill Report
Bill No. AB 2509
Page 3


## 2. PROVISIONS RELATED TO POSTING AN UNDERTAKING IN APPEALING AWARDS BY THE LABOR COMMISSIONER
(Section 2: Amending Labor Code § 98.2)

### ANALYSIS:

Existing law provides that an order, decision, or award of the Labor Commissioner on an unpaid wage claim may be appealed to the municipal or superior court where a trial on the wage claim is heard *de novo* (as a new trial) by the court [Labor Code § 98.2(a)].

This bill amends Labor Code § 98.2 to require an employer seeking to appeal the Labor Commissioner's wage claim decision to post with the reviewing court an undertaking, consisting of a duly issued appeal bond or cash deposit in the amount owed pursuant to the Labor Commissioner's order, decision, or award.

DLSE has found that the overwhelming majority of employer appeals from Labor Commissioner's awards are unsuccessful and are often filed as a means of forcing the employee to compromise part of his or her claim in order to avoid having to make repeated appearances for lengthy court proceedings. More distressingly, there is no guarantee that an employer, having taken advantage of the right to appeal will pay the judgment entered in favor of the employee following a trial. By that time, the employer may have closed its business or become insolvent, leaving the employees' wages unpaid. Presently, approximately one-third of the judgments that DLSE obtained in proceedings conducted pursuant to Labor Code § 98.2 are unsatisfied, despite DLSE's collection efforts.

### FISCAL IMPACT:

The amendment of this section makes technical changes to statutory language and will have no fiscal impact on DLSE staff or enforcement programs.

### ECONOMIC IMPACT:

Employers who file an appeal of the Labor Commissioner's decision in favor of an employee will incur the expense of posting a bond in order to proceed. However, the requirement ensures that the employee will receive wages, if found due, at the conclusion of the appeal.

### PRO:

Proponents of this bill maintain that employers risk nothing by appealing the Labor Commissioner's decisions because there are no requirements currently in place (e.g., bond or deposit) to ensure that an appeal is made in good faith, rather than as a tactic to delay or avoid payment. Requiring an employer to post a bond will discourage frivolous appeals and it will ensure that there will be a source of funds to pay the employees' wages whenever an employer does appeal. Additionally, the reduction of frivolous appeals will benefit the courts by reducing the congestion and cost of adjudicating such cases.

Enrolled Bill Report
Bill No.  AB 2509
Page 4


**CON:**

Employers who have been ordered by the Labor Commissioner to pay wages to employees will undoubtedly claim that it is unfair to require them to advance, in the form of a bond or cash deposit, the amount due before they are allowed their day in court.  Opponents argue that the requirement is based upon an presumption that the employer will not prevail at an appeal.

**APPOINTMENTS:**

None

**LEGAL IMPACT:**

Requiring appellants to post an undertaking with the court may reduce the number of appeals, particularly frivolous ones, coming before the courts for resolution.

**LEGISLATIVE HISTORY:**

AB 1652, vetoed by Governor Davis on October 10, 1999, contained a proposal different but similar to this section.


3.     **PROVISIONS RELATED TO PAYMENT OF WAGES BY CHECK DRAWN ON INSUFFICIENT FUNDS**
       **(Section 3:  Amending Labor Code § 203.1)**

**ANALYSIS:**

Existing law penalizes an employer in the building and construction industry who pays an employee wages or benefits with a check, draft, or voucher drawn upon a nonexistent account or on an account with insufficient funds [Labor Code § 203.1].  The wages or benefits due continue as penalty from the due date up to thirty days, <u>unless the employer establishes that the nonpayment occurred unintentionally</u>.  There is no comparable penalty for employers in any other industry.

Additionally, under current law, employers who do not pay wages due to discharged employees, as required by Labor Code §§201, 201.5, 202, and 205.5, incur waiting time penalties from the due date up to thirty days.  Penalties in this instance apply only to employees who have resigned or are discharged.  There is no waiting time penalty applicable to the wages of an employee who continues to be employed.

This bill extends the penalties on employers in the building and construction industry to employers in all industries.  The wages or benefits due, in such a case, will continue as penalty from the due date up to thirty days.  An employee aggrieved under this section may either file a complaint with the Labor Commissioner under Labor Code § 98 (a) or file a civil suit for recovery of the penalty.  <u>However, the waiting time penalty authorized by this bill is not applicable in when an employee recovers service charges authorized by Civil Code § 1719.</u>

Enrolled Bill Report
Bill No. AB 2509
Page 5

## FISCAL IMPACT:

DLSE has always accepted wage claims filed by employees who were paid with bad checks, regardless of the claimant's industry of employment. Any additional costs associated with the passage of this legislation are absorbable by DLSE.

## ECONOMIC IMPACT:

None

## PRO:

Supporters maintain that all employees, not just those in the building and construction industry, need to be protected from employers who pay wages with checks drawn against accounts with insufficient funds. Supporters of this bill argue that employees are being inconvenienced and deprived of the wages and benefits which they have rightfully earned when employers issue bad checks. The workers who are most commonly victimized by this unscrupulous behavior are those earning low wages and they can ill afford the hardship of receiving a bad check. Supporters also point out that the penalties don't apply if the nonpayment occurred unintentionally.

Supporters point out that, currently, there is little or no consequence for the employer who commits such an act. Supporters view this bill as a means of making the employee whole and of penalizing the employer that intentionally issues such checks.

## CON:

Opponents of this bill argue that no special law is needed to help employees and to penalize employers that intentionally issue bad checks for wages and benefits earned. An employee who has been paid with a bad check has not been paid, and is, therefore, entitled to file a claim with the Labor Commissioner for the wages due. In some cases, a third party merchant, now the holder of an insufficient funds check issued by the employer, has already paid the employee's wages. Critics of the bill point out that the bill does not address this all too typical occurrence.

## LEGAL IMPACT:

None

## LEGISLATIVE HISTORY:

AB 1652, vetoed by Governor Davis on October 10, 1999, contained a proposal similar to this section. However, the legislation has been modified to take into account Civil Code §1719 that caused the conflict with last year's bill.

Enrolled Bill Report
Bill No. AB 2509
Page 6

4.    **PROVISIONS RELATED TO COURT ACTIONS FOR UNPAID WAGES**
      **(Sections 4:  Amending Labor Code § 218.5)**

**ANALYSIS:**

Existing law authorizes an employee to bring a private civil action to obtain unpaid minimum
wages or overtime, interest, attorney's fees and court costs [Labor Code § 1194].

This bill codifies existing law that attorney's fees are not recoverable pursuant to Labor Code
§ 218.5 if they may be recovered in an action for unpaid wages pursuant to Labor Code § 1194.[3]

This addition to the Labor Code will not affect the programs of the DLSE.

5.    **PROVISIONS RELATED TO ITEMIZED WAGE STATEMENTS AND PAYROLL RECORDS**
      **(Sections 6:  Amending Labor Code § 226 and Section 10:  Amending Labor Code § 1174)**

**ANALYSIS:**

Existing law requires every employer to provide with each wage payment a written, itemized
statement containing specified information.  In addition, Section 7 of the existing Industrial
Welfare Commission (IWC) orders requires every employer to provide a detachable itemized wage
statement containing specified information.

Existing law requires every employer to maintain specified records, including the names and
addresses of all employees, and the ages of all minors, and payroll records containing other
specified information.

This bill requires employers to:

1)  Provide employees with an itemized wage statement containing:

    a)  The number of piece rate units earned and the applicable piece rate whenever an employee
        is being paid on a piecework basis; and,

    b)  All applicable hourly rates of pay and the corresponding number of hours an employee
        worked at each rate during the pay period.

2)  Maintain payroll records containing the number of piece-rate units earned by and the
    applicable rate paid to an employee.

This bill will also permit an employee who is harmed by an employer's failure to provide the
required itemized statement to recover all actual damages or a penalty of $50 dollars (*whichever is*

---

[3] This section also codifies the holding of the Court of Appeal in *Early v. Superior Court (2000) 79 Cal.App.4th 1420.*

Enrolled Bill Report
Bill No. AB 2509
Page 7

greater) for the initial pay period and $100 per employee for each violation occurring in a
subsequent pay period in which an employer knowingly and intentionally failed to provide an
itemized statement as required by law. The total amount of recoverable penalty will be limited to
$4,000, plus court costs and attorney's fees. The employee will be authorized to seek recovery of
damages or penalties by filing Labor Code § 98 complaint with the Labor Commissioner or by
filing a civil suit.

DLSE has encountered serious problems in enforcing Labor Code § 226. Due to the limitation
contained in the section (total hours worked by employees whose compensation is based on an
hourly wage), the employer need only state the total hours worked for hourly employees and not
for other employees who are paid according to other compensation methods (e.g., piece rate,
commission, or salary). Virtually all piece work employees and most salaried and commissioned
employees are not exempt from payment of overtime. The lack of records showing the hours
worked by a
non-exempt employee significantly hinders DLSE's enforcement of the law.

In addition, § 226 requires a statement of hours worked and total wages earned, but fails to require
a breakdown showing the hourly rate in effect for all hours worked. This makes it difficult for
employees and DLSE investigators to determine whether payment has been made at the proper
overtime rate for any overtime hours worked.

A related enforcement problem arises from the § 226 (a) requirement that deductions made from
cash payments of wages be kept on file by the employer for at least three years. This provision,
immediately following the list of items required to be included on the itemized wage statement,
can be interpreted as excusing employers from any requirement to maintain records of deductions
made from wages when those wages are paid by check. The requirement to maintain records for
three years should apply whether the wage payment is made by check or cash.

FISCAL IMPACT:

The amendment of Labor Code § 226 may result in an increased number of complaints filed with DLSE,
which carries the potential for an increased workload. Many employers who operate in the underground
economy do not issue itemized statements at the time wages are paid. The number of businesses
participating in the underground economy and the number of workers they employ are unknown. Since
these businesses are operating outside the law, it is difficult to predict precisely how many claims DLSE
may receive. We reasonably expect noncompliance to be high, especially during the initial period of
implementation, due to lack of knowledge on the part of affected employers. This may result in
increased penalty collections deposited into the General Fund.

ECONOMIC IMPACT:

Some employers may incur minor costs of providing certain pay records to their employees. This
increase should be offset by placing a cap on the amount of penalties that can be assessed for
noncompliance. Moreover, this bill will not require employers to keep any records that are not already

Enrolled Bill Report
Bill No.  AB 2509
Page 8

required by law.  However, it will supply employees with information that is essential for them to know whether they have been paid properly.

PRO:

Proponents of this bill say that requiring piecework unit information on the itemized wage statement gives employees the benefit of knowing how much they have actually produced.  Employees will also have information on overtime rates of pay and the number of hours worked at that rate.  Employers will also benefit by having payroll records to substantiate the basis for wages paid in the event of a wage dispute.

Proponents maintain that placing a cap on the amount of penalties an employer may be required to pay is fair.  They will also point out that employers who intentionally violate the law will be penalized by their liability to the employee for damages, in addition to any civil penalties for which they may be responsible.  Supporters believe that this will serve as a deterrent to violations.

CON:

Opponents of this bill argue that there may be costs to the employer for supplying the additional information on the wage statement.

Opponents of the bill point out that allowing civil suits under this amendment encourages employees to become litigious.

LEGAL IMPACT:

None

LEGISLATIVE HISTORY:

This amended section is very similar to one contained in AB 1652, which Governor Davis vetoed on October 10, 1999.

This session, AB 2856 would also have amended Labor Code § 226 to clarify that itemized statements are required for wage payments tendered in any form—not just those involving cash payments. AB 2856 was passed by the Assembly Committee on Labor and Employment on April 3, 2000 and referred to the Assembly Committee on Appropriations.

6.    PROVISIONS RELATED TO MEAL AND REST PERIODS
      (Section 7:  Adding Labor Code § 226.7)

ANALYSIS:

Enrolled Bill Report
Bill No. AB 2509
Page 9

Existing law entitles an employee who performs work for more than five hours to a mandatory meal period of at least thirty minutes, unless waived under specified conditions by the mutual consent of the employer and employee. Additionally, an employee who works for a period of more than 10 hours must be given a second meal period of the same length of time, unless waived [Labor Code § 512]. Section 11 of every order of the IWC contains regulations governing meal periods. Neither Labor Code § 512 nor the IWC orders contain penalties for violation of these provisions. Labor Code § 558 provides for the imposition of penalties against an employer who violates a section of the chapter containing § 512, however, the penalties specified apply to the underpayment of wages and not to meal or rest period violations.

This bill prohibits an employer from requiring an employee to work during a meal or rest period prescribed by the IWC. Any employer who violates this provision is required to compensate an employee with one additional hour's pay at the regular rate for each day that a meal or rest period was denied.

DLSE has found that the fact the employers must pay employees their regular wages for working during a meal period is insufficient to discourage noncompliance (since regular wages must be paid for any time worked) and does little to protect the mandatory character of the off-duty meal period. Currently, the means of enforcing meal period requirements consists of filing an action for injunctive relief to compel prospective compliance with the law. Of course, an injunction does nothing to remedy past noncompliance.

FISCAL IMPACT:

This provision is not expected to have a fiscal impact for DLSE's enforcement programs.

ECONOMIC IMPACT:

None

PRO:

The IWC has acknowledged that duty-free meal periods are important to the health and safety of employees. Adding a penalty component to the Labor Code will support the underlying purpose of meal periods by encouraging employers to comply with the meal period provisions. Without the proposed provisions there is no effective enforcement of current law.

CON:

Opponents point out that rest periods are paid time while meal periods are not. They question the fairness of an employer being penalized and required to pay wages to the employee for rest periods-- time that had already been paid by the employer.

Enrolled Bill Report
Bill No. AB 2509
Page 10

## LEGAL IMPACT:

None

## LEGISLATIVE HISTORY:

Labor Code § 512, enacted by AB 60 (Statutes of 1999, Chapter 134), codified meal requirements that previously had been required by IWC orders only.

7.    **PROVISIONS RELATED TO GRATUITIES**
       **(Sections 8 and 9:  Amending Labor Code §§ 350 and 351)**

## ANALYSIS:

Existing law:

1) Provides a number of definitions related to employment, including employer, employee, agent, and gratuity [Labor Code § 350]. Gratuity is defined as, ". . . any tip, gratuity, money, or part hereof, which has been paid or given to or left for an employee by a patron of a business over and above the actual amount due such business for services rendered or for goods. . . or articles sold or served to such patron."

2) Prohibits an employer from taking any gratuity that a patron of a business pays, gives or leaves for an employee [Labor Code § 351].

3) Prohibits an employer from reducing the amount of wages due an employee on account of receiving gratuities [Labor Code § 351].

4) Exempts employment in which the patron is not charged for services rendered if the employee receives the state or federal minimum wage, whichever is higher, and the employee's salary is guaranteed and paid in full [Labor Code § 351].

5) Designates the violation of these provisions as a misdemeanor crime, punishable by a fine not greater than $1,000 and/or by imprisonment not to exceed 60 days.

This bill:

1) Specifies that any amount paid directly to a dancer employed by an employer covered by IWC orders numbered 5 or 10 is a gratuity.

2) Deletes the exemption for employment in which the patron is not charged for services where the employee is guaranteed and paid a salary equivalent to the higher minimum wage law, be it state or federal (see discussion of this provision below).

Enrolled Bill Report
Bill No. AB 2509
Page 11

3) Provides that, if an employer permits the payment of gratuities by credit card, employees must be paid the full amount stated on the credit card slip by the patron, without deductions, no later than the next regular payday following the date of the patron's authorization.

This bill clarifies that, despite the language of § 351, in reality, there is no exemption that permits an employer to take possession of an employee's gratuities.[4] The legislative history of this section indicates that it was added to allow employers who hire employees for valet parking services and who do not charge patrons for those services, to receive the tips given by patrons to those employees.

In 1988, the California Supreme Court in *Henning v IWC* 46 Cal.3d 1262, held that tipped employees must be paid not less than the minimum wage and that employers cannot credit an employee's tips against the obligation to pay minimum wage. As a matter of law, gratuities are the legal property of the employee. However, it is relatively easy for an employer to claim that it is not charging patrons for services provided by tipped employees, and DLSE has found these claims difficult to disprove.

DLSE has also experienced problems enforcing § 351 in the exotic dance industry. Some employers in that industry are attempting to circumvent § 351 by characterizing tips that patrons give to dancers as "service fees" which the dancers are then required to pay over to the employer and from which the employer then pays the dancers a lesser amount characterized as "wages." The courts have uniformly ruled that these dancers are employees and that, therefore, they should be entitled to the same protection afforded by the Labor Code as employees in any other industry.

FISCAL IMPACT:

The amendments will have no cost impact on DLSE staff or enforcement programs. DLSE reasonably expects higher employer violations, especially during the initial period of implementation, to possibly result in increased revenues deposited to the General Fund. DLSE does not have reliable information with which to accurately estimate the number of violations or amount of penalties that may be collected if the bill is enacted.

ECONOMIC IMPACT:

None

PRO:

Proponents maintain that clarifying the definition of gratuities in Labor Code § 350 and removing inconsistent language from § 351 will indisputably guarantee employees the payment of their earned gratuities. Employee advocacy groups and unions, particular those representing service industries, support the amendments.

CON:

Opponents of this bill's amendments are likely to be those who refuse to comply with the law or those who interpret the amendments as an expansion of legal prohibitions upon employers with respect to gratuities.

---

[4] Labor Code § 351, in part, states that, "[T]his section shall not apply to any employment in which no charge is made to a patron for services rendered by an employee on behalf of his employer. . . ."

Enrolled Bill Report
Bill No.  AB 2509
Page 12

## LEGAL IMPACT:

This bill codifies existing case law that has held that tipped employees must be paid at least minimum wage and that employers cannot credit an employee's tips toward its minimum wage obligations.

## LEGISLATIVE HISTORY:

AB 1652, vetoed by Governor Davis on October 10, 1999, contained similar provision to this bill's amendment of Labor Code § 351.  There is no known prior legislation dealing specifically with the tips of dancers.

The following segments are applicable to AB 2509 as a whole.

## APPOINTMENTS:

None

## OTHER STATES' PROGRAMS/STATUTES

No other states appear to have a comparable statutory framework in place for administrative remedies and court procedures pertaining to labor law.

## LEGISLATIVE HISTORY

Many provisions of this bill were lumped with more far-reaching and controversial provisions of AB 1652 vetoed last year.  The introduced version of this bill also contained several more controversial provisions (e.g., successor liability for unpaid wages owed employees by a predecessor employer) which were deleted by amendments at the request of the Director of the Department of Industrial Relations and were never again taken up during this year's session.  Other original provisions of this bill were amended into AB 2857, which was placed on inactive status after discussion between the author and DIR director on August 31, 2000.

April 13, 2000 – Assembly Committee on Labor and Employment (6 – 3)
May 11, 2000 – Assembly Committee on Appropriations (14 – 7)
May 25, 3000 – Assembly Floor (41 – 32)
July 5, 2000 – Senate Committee on Industrial Relations (4 – 1)
August 9, 2000 – Senate Committee on Judiciary (5 – 3)
August 21, 2000 – Senate Committee on Appropriations (7 – 5)
August 29, 2000 – Senate Floor (22 – 14)
August 30, 2000 – Assembly Floor (42 – 31)

Enrolled Bill Report
Bill No.  AB 2509
Page 13

## RECOMMENDATION

Sign, as this bill contains several provisions that will help to assure that employees receive wages that they have earned.  Notable provisions provide for a penalty against employers that pay wages by checks drawn against bank accounts containing insufficient funds; and require an employer appealing an award of the Labor Commissioner to secure wages due by posting an undertaking with the court hearing the appeal.

Art Lujan
Labor Commissioner
Office (415) 703-4813
Cell (415) 717-7180
Home (760) 591-0034

Daniel Curtin
Chief Deputy Director
San Francisco Office (415) 703-5061
Sacramento Office (916) 324-4163
Cell (916) 257-3081
Home (916) 489-6836

Steve Smith
Director
San Francisco Office (415) 703-5050
Sacramento Office (916) 324-4163
Cell (916) 205-4163
Home (530) 758-7715